**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE, *et al.* | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER**

1. Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by senior supervisors at Defendants the Office of the Director of National Intelligence ("ODNI") and Central Intelligence Agency ("CIA") to personnel management functions involving diversity, equity, inclusion and accessibility ("DEIA") matters.

2. On January 20, 2025 the President issued Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, describing existing such programs as "illegal and immoral," followed by a White House statement the next day condemning DEIA in even stronger terms.

3. E.O. 14151 did *not* call for the termination of officers temporarily assigned to DEIA programs, and cautioned that it shall be implemented consistent with applicable law. Yet on January 22, 2025 Defendants ODNI and CIA placed Plaintiffs upon administrative leave, only because of their temporary assignments, directed by senior supervisors, to personnel functions involving DEIA. On February 14 Plaintiffs received telephone calls ordering them to report to the

visitors' centers of ODNI or CIA Headquarters with their access badges first thing on February 18, 2025.

4. Plaintiffs are going to be fired (or placed on involuntary leave without pay, "LWOP") in violation of the Administrative Procedure Act ("APA"), in an unlawful agency action that is arbitrary and capricious abuse of discretion; contrary to their rights under the First and Fifth Amendments to the Constitution; without observance of Agency regulations requiring notice and granting the rights to be heard and to appeal; and unsupported by any record whatsoever.

5. Plaintiffs seek a temporary injunction restraining Defendants from terminating them or placing them on LWOP, and ask for the same relief regarding other similarly-situated officers. Plaintiffs are likely to succeed on the merits of their APA and constitutional claims. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging in illegal and immoral activity. The balance of hardships is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all. And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

## BACKGROUND

6. This Motion incorporates the factual allegations of Plaintiffs' Complaint. This background is intended to provide the Court with a brief summary of operative events.

7. Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by Defendants ODNI and CIA to personnel management functions involving DEIA matters.

8. On January 20, 2025 Donald Trump was inaugurated the forty-seventh president of the United States. That same day, the President issued Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, describing existing such

programs as "illegal and immoral." The E.O. provided no citation to any statute supporting the assertion that these programs are "illegal" or "immoral."

9. On January 21, 2025 the White House issued a statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. The statements describes DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination." Again, no legal citations were provided for these sweeping statements.

10. The E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions." *Id*. at § 2(b)(i). Similarly, the January 21 White House statement called upon the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id*. at § 2.

11. Notably, E.O. 14151 and the subsequent White House statement did *not* call for the termination of officers assigned to DEIA programs, whether in temporary or permanent capacities. In fact, the E.O. cautioned that nothing in it impaired any legal authority granted to an executive agency, and directed that the order shall be implemented consistent with applicable law. *See id.* at § 8 (a)(i) and (b).

12. On or about January 22, 2025 Defendants CIA or ODNI placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA. On or about February 14, 2025 Plaintiffs received telephone calls from

human resources officers ordering them to report to ODNI or CIA facilities in northern Virginia, bringing with them their access badges, as early as 8:00am on Tuesday, February 18. It is apparent that all of these officers will be summarily fired, or placed on indefinite leave without pay.

## LEGAL STANDARD

13. The standard in this jurisdiction for granting a temporary restraining order is a four-fold test: (1) Whether plaintiffs are likely to succeed on the merits of their statutory claim, (2) whether plaintiffs are likely to suffer irreparable harm in the absence of an injunction, (3) whether the balance of hardships weighs in their favor, and (4) whether an injunction serves the public interest. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325-26 (4th Cir. 2021) (upholding a temporary restraining order on the implementation of E.O. 13888, *Enhancing State and Local Involvement in Refugee Resettlement* (Sep. 26, 2019) on the basis of, *inter alia*, the Administrative Procedure Act).

14. Plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, but Plaintiffs need not show a certainty of success. *See Aziz v. Trump*, 234 F.Supp.3d 724, 733 (E.D.Va. 2017) (upholding a temporary restraining order on the implementation of E.O. 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States* (Jan. 27, 2017) on the basis of, *inter alia*, the Administrative Procedure Act and U.S. CONST. AMENDS. I and V, *citing League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

## ARGUMENT

15. In *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), the Court of Appeals upheld a preliminary injunction against the discharge of two Air Force servicemembers on the basis of their being Human Immunodeficiency Virus ("HIV")-positive, pursuant to the Administrative Procedure Act (APA) and their Fifth Amendment due process rights.

16. In *Roe*, the Court of Appeals observed that the APA commands courts to hold unlawful and set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that courts retain an important role in ensuring that agencies have engaged in reasoned decision-making, as the APA embodies the basic presumption of judicial review to one suffering legal wrong because of agency action. *See id*. at 220 (internal citations and quotations omitted). While courts "accord substantial deference to an agency's final action and presume it valid, the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action." *Id*. (internal citations removed).

17. The *Roe* court reasoned that to comply with the APA, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. Agency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider …" and in "reviewing an agency action, we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (internal citations and quotations omitted).

18. The *Roe* court agreed with the District Court that discharging the airmen for being HIV-positive would amount to an irreparable injury, as the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," the airmen faced "a particularly heinous brand of discharge … that bears no relationship to their 'ability to perform their jobs," and the airmen could not address these harms through post-discharge military procedures. *Id*. at 229.

19. Plaintiffs in the instant case are similarly situated to the plaintiff-respondents whose temporary restraining order was obtained and upheld in *Roe*. Defendants ODNI and CIA engaged in no reasoned decision-making whatsoever. Like uniformed servicemembers, intelligence

5

officers may not appeal to the Merit Systems Protection Board ("MSPB"), so judicial review is Plaintiffs' only avenue of appeal. Defendants ODNI and CIA appear to have failed to examine relevant data between January 20, 2025 when the E.O. was issued and January 22 when Plaintiffs were placed on leave. Defendants have articulated no satisfactory explanation, or rational or reasoned basis at all for Plaintiffs' terminations. As explained *infra*, Defendants appear to be relying on regulatory and statutory authority regarding terminations in an extreme way that Congress did not intend and the Supreme Court, per *Webster v. Doe*, 486 U.S. 596 (1988), has not supported. Similar to the *Roe* airmen, the circumstances surrounding Plaintiffs' impending public firings, together with the resultant effect on them, so far depart from a normal termination that they amount to irreparable injury, as they have been labeled by the President as engaging in illegal and immoral activity, an injury Plaintiffs cannot not address through post-termination appeals (even if such appeals are available). Plaintiffs' injuries would be the same if placed on indefinite LWOP.

**I.     Plaintiffs are likely to succeed on the merits.**

    **A.     APA**

20.     The APA provides at 5 U.S.C. § 706 that a U.S. district court may hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. *See* § 706(2).

21.     Defendants' scheme to terminate Plaintiffs on or about February 18 is a perfect example of arbitrary and capricious agency action amounting to an abuse of discretion. Plaintiffs' suspension two days after the issuance of the Executive Order, only on the basis of their temporary

6

assignments to DEIA roles, and their anticipated February 18 firings, even though E.O. 14151 does not call for their termination, is the definition of arbitrary, capricious and abusive agency action.

22. Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a *domestic* political issue, an issue which is irrelevant while they serve in agencies dedicated to collecting and analyzing *foreign* intelligence. Plaintiffs planned termination is also contrary to their right under the Fifth Amendment to due process, including adequate notice and the opportunity to be heard, before being denied their property interest in their employment.

23. Defendants ODNI and CIA plan to terminate Plaintiffs without following *any* legal procedure, as called for by agency regulations, and without any evidentiary record at all, could be presented by Plaintiffs in their defense at a CIA PEB, for example. Plaintiffs will receive no hearing at all, not even before the MSPB. They will apparently lack the regulatory right of appeal to CIA's third-ranking official as well as its director as provided for in that agency's regulations. *See Termination of Employment* at ¶¶ (g)(3)-(4) (available at https://irp.fas.org/cia/term.pdf).

24. The APA permits the Court to review final agency action, as well as action for which there is no other adequate remedy. *See* 5 U.S.C. §§ 702, 704. Defendants appear to have already taken final agency action. The IC is prepared to present Plaintiffs with *faits accompli* on February 18th: thus, their insistence that Plaintiffs appear at their employers' external visitors centers, instead of their offices, and with their IC access badges, so that their professional identification may be seized. Defendants have taken their final action, Plaintiffs merely await to be informed of that action; certainly, Defendants do not plan to hold required administrative hearings at their visitors centers on February 18.

25. Classified Agency regulations which allow the Director of CIA (and presumably the Director of National Intelligence) to terminate an employe when the Director "deems such determination necessary or advisable in the interests of the United States," *Termination of Employment* at ¶ 8(d), based upon the National Security Act, 50 U.S.C. § 403(c), are constitutional only insofar as such a termination complies with the rationale set forth *Webster v. Doe*.

26. In *Webster* Chief Justice Rehnquist reasoned CIA directors could wield such regulatory and statutory power because of their unique responsibility for protecting intelligence sources and methods from unauthorized disclosure. *See id*. at 600-01 (citing *Snepp v. United States,* 444 U.S. 507, 510 (1980) and *CIA v. Sims,* 471 U.S. 159, 168-69 (1985)).

27. Here, Petitioners are suspended and face imminent termination (or involuntary LWOP) not because of any national security issues. Rather, these civil servants face personnel action only because of a domestic political and legal dispute between other parties regarding the efficacy and legality of DEIA initiatives within the federal government, in which they, their careers and their families are collateral damage. The rationale set forth by the Supreme Court in *Webster* to uphold the legality of CIA directors' broad authority under Section 403 does not apply here.

28. The Agency regulations' claim that this discretion is not limited by any other law, *see Termination of Employment* at ¶ 8(f), stretches this authority beyond the breaking point; no mere agency regulation can exist without reference to any other statute, such as the Administrative Procedure Act, or constitutional provisions such as the First and Fifth Amendments. The Director of National Intelligence and the Director of Central Intelligence obviously may not terminate an intelligence officer on the basis of their religion, race or sex, in derogation of constitutional prohibitions on religious tests for office, constitutional guarantees of equal protection and civil rights statutes. Neither, here, may the directors terminate an intelligence officer on the basis of an

assumption about their support for a domestic political policy such as DEIA. Defendants' conduct appears to be based on an assumed ideological commitment to DEIA, which would be First Amendment-protected, when in fact Plaintiffs' association with DEIA-related "belief" is simply that they were assigned by senior supervisors to DEIA-related jobs.

### i. *First Amendment*

29. The First Amendment provides in pertinent part that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for a redress of grievances," such as the issues raised by DEIA. Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a domestic political issue while serving in agencies dedicated to foreign intelligence.

### ii. *Fifth Amendment*

30. The Fifth Amendment provides in pertinent part that no person shall be deprived of property without due process of law. Defendants plan to terminate Plaintiffs with insufficient notice, without any of the agency administrative procedures required by law and the agencies' own regulations, and without any evidentiary record—no hearing at all, not even before the MSPB— nor rights of appeal to senior agency officials. Plaintiffs' impeding termination is contrary to their constitutional right to due process before being denied their property interest in their employment.

**II. Plaintiffs will suffer immediate, irreparable injury should they be terminated on February 18, 2025.**

31. Because of press attention understandably being paid to current events, Plaintiffs' terminations would amount to very public firings, crippling their ability to obtain private sector work within their professions, at defense and intelligence contractors for example.

32. It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning,

immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

33. This bell cannot be unrung. Indeed, if any private employer issued such a remarkable statement about a group of terminated employees, it would be liable for defamation. If as expected Plaintiffs are terminated on February 18 (again, with insufficient notice, and without any due process and without any record), Plaintiffs will enter the job market with this libelous statement from the presidential "bully pulpit" ringing in potential employers' ears. Again, Plaintiffs' injuries in this regard are just as bad if they are placed on involuntary LWOP.

**III.     The balance of equities and the public interest favor Plaintiffs.**

34. Petitioners are not career DEIA officials, they are career intelligence officers. Rather than terminate Petitioners, even under the terms of E.O. 14151 and its companion policy statement, Defendants CIA and ODNI could simply reassign them to duties not involving DEIA, duties they performed well for years before their most recent assignment.

35. Indeed, several Plaintiffs' career services within ODNI and CIA immediately identified other open and mission-critical positions into which these officers could immediately be slotted. Each Plaintiff appraised of their career service's intention to offer those jobs expressed their willingness to accept them.

36. Instead, the IC is opting for the draconian, illegal and unnecessary alternative of arbitrarily terminating good officers recruited, vetted and trained at great taxpayer expense, capriciously wasting cumulatively hundreds of years of national security experience.

37. Leaving aside the question of the merit of DEIA programs in other government agencies (or lack thereof), CIA for example has specific national security reasons to value diversity. The Agency needs some operations officers with, *inter alia*, the ability to blend in racially with foreign populations, the capability to meet female sources in cultures in which unmarried adults of the opposite sex rarely meet in private, dual citizenship documentation, foreign language skills, overseas living experiences, and more.

38. These officers performed a necessary national security mission which is wholly apolitical, unique to the Intelligence Community, and unlike any other federal government DEIA role. Plaintiffs performed an essential function in the intelligence cycle—from source development to recruitment, from to collection to analysis. It is a key task of intelligence officers to assimilate, communicate and understand. This critical function includes diversity in appearance, culture, language and sex, for example.

39. Plaintiffs did a valuable public service, at the request or insistence of the IC, when they undertook temporary assignments to DEIA roles. They deserve praise and reassignments, not obloquy and summary firings, for their efforts.

## CONCLUSION

Plaintiffs deserve a temporary injunction restraining Defendants from terminating them. Plaintiffs are likely to succeed on the merits of their APA and constitutional claims. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging—according to a White House statement—in illegal and immoral activity. The balance of hardships is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all. And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest. Plaintiffs did a valuable public service, at the request or insistence of the IC,

when they undertook temporary assignments to DEIA roles. They deserve praise and reassignments, not obloquy and summary firings, for their efforts.

Dated: February 17, 2025

Respectfully submitted,

<u>*/s/ Kevin T. Carroll*</u>
Kevin T. Carroll, VSB No. 95292
**Fluet**
1751 Pinnacle Dr., Ste. 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorney for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2025, a copy of the foregoing was mailed first class mail, postage prepaid, to:

U.S. Office of the Director of National Intelligence
Office of General Counsel
1500 Tysons McLean Dr.
McLean, VA 22102

Central Intelligence Agency
Office of General Counsel
Washington, DC 20505

Tulsi Gabbard
Director of National Intelligence
1500 Tysons McLean Dr.
McLean, VA 22102

John Ratcliffe
Director of Central Intelligence Agency
Litigation Division
Office of General Counsel
Central Intelligence Agency
Washington, DC 20505

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.