**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE 1, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:25cv300 (AJT/LRV) |
| | ) | |
| UNITED STATES OFFICE OF THE | ) | |
| DIRECTOR OF NATIONAL | ) | |
| INTELLIGENCE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A**
**<u>TEMPORARY RESTRAINING ORDER</u>**

## INTRODUCTION

No matter which way Plaintiffs attempt to frame their current circumstances, this is ultimately a dispute about federal employment.  And not just any federal employment -- employment with the Central Intelligence Agency and the Office of the Director of National Intelligence, in whose respective leaders Congress has vested substantial discretion to terminate the employment of personnel when, in their discretion, they deem such termination "necessary or advisable in the interests of the United States."  The Supreme Court has recognized that this extensive discretion, along with Congress's promulgation of the Civil Service Reform Act (notwithstanding the carve-outs in that statute for CIA and ODNI employees), precludes any relief for plaintiffs under the Administrative Procedure Act or other putative statutory rubrics.  And while Plaintiffs purport to assert that their First Amendment and due process rights have been violated, those claims are at best predicated on speech that is not protected and property rights they do not have.  The flaws in Plaintiffs' legal claims alone is sufficient to deny plaintiff's instant application, and certainly precludes any extraordinary relief in the form of a temporary restraining order.

But Plaintiffs also have not justified the extraordinary emergency relief they seek for another reason, that is, they have failed to demonstrate the clear existence of irreparable harm.  The Supreme Court and lower courts have repeatedly held – for decades – that because federal courts have the equitable authority to make an employee whole in the event that an adverse employment action was wrongfully taken against him or her, there can be no irreparable harm in employment circumstances such as these.  Any other conclusion would authorize any federal employee in Northern Virginia to head to this Court immediately upon learning of a potential adverse employment action to seek this Court's emergency intervention.

1

In short, Plaintiffs have failed to meet the high bar for the extraordinary relief they seek. For the reasons explained below, their motion should be denied.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

Plaintiffs have brought their claims, and the currently-pending application for a temporary restraining order, against two national security and intelligence-related federal agencies – the Central Intelligence Agency ("CIA") and the Office of the Director of National Intelligence ("ODNI").  The CIA was established by the National Security Act of 1947, *see* Act of July 26, 1947, 61 Stat. 496, ch. 343, § 102, and is led by the Director of the CIA ("D/CIA"), who has the responsibility to, *inter alia*, "collect intelligence through human sources and by other appropriate means," and "correlate and evaluate intelligence related to the national security," 50 U.S.C. §§ 3035(a); 3036(c)(1)-(2).  The position of the Director of National Intelligence ("DNI") was created in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011 (a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004).  The DNI "serve[s] as head of the intelligence community," "act[s] as the principal adviser to the President, to the National Security Council, and the Homeland Security Council for intelligence matters related to the national security," and "oversee[s] and direct[s] the implementation of the National Intelligence Program." 50 U.S.C. §§ 3023(a)-(b).  ODNI was further established by Congress to assist the DNI in carrying out her duties and responsibilities as directed by law or the President.  *Id.* § 3025(b).

As this Court is aware, this civil action particularly relates to ongoing employment-related decisions at CIA and ODNI.  And on this subject, Congress has been pellucidly clear: the aforementioned National Security Act – including its subsequent amendments – provides both the

D/CIA and the DNI with exceptional discretion to terminate the employment of personnel employed within the CIA and ODNI.  With respect to CIA, the statute provides as follows:

> Notwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, in the discretion of the Director, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director deems the termination of employment of such officer or employee *necessary or advisable in the interests of the United States*.

*Id.* § 3036(e)(1) (emphasis added).[1]  Congress vested the exact same discretion in the DNI.  *Id.* § 3024(m)(1) ("The [DNI] may exercise with respect to the personnel of the [ODNI] any authority of the [D/CIA] with respect to the personnel of the CIA under the Central Intelligence Agency Act of 1949 [50 U.S.C. §§ 3501, *et seq.*], and other applicable provisions of law, as of December 17, 2004, to the same extent, and subject to the same conditions and limitations, that the [D/CIA] may exercise such authority with respect to personnel of the [CIA] . . . .").

The CIA has implemented the discretion that Congress provided to the D/CIA in the National Security Act of 1947, in part, by issuing an internal regulation concerning "Termination of Employment," which provides that "[a]ll employment terminations other than mandatory or involuntary retirement under the Central Intelligence Retirement Act of 1964 for Certain Employees, as amended (50 U.S.C. § 2001 et seq.), shall be pursuant to the Director of the Central Intelligence Agency's (D/CIA's) statutory authority," and "sets forth circumstances under which [CIA] employment may be terminated and provides for the manner in which such employment terminations may be effected."  EX. A (*Agency Reg. 4-16*) at 1.[2]  The regulation first explains that

---

[1]The statute similarly provides that when the D/CIA exercises this extraordinary discretion, a terminated employee is not precluded from "seek[ing] or accept[ing] employment in any other department, agency, or element of the United States Government."  50 U.S.C. § 3036(e)(2).

[2]As explained in the declaration of Robert A. Newton accompanying this brief, the ODNI applies the same regulation with respect to terminations by the ODNI.  However, because the DNI

3

for termination of a CIA employee to be effected, the D/CIA "need only deem employment termination necessary or advisable in the interests of the United States': *i.e.*, "[i]t is not required that an employment termination under this statute be in the interests of the national security, but only that the [D/CIA], in his discretion, [has] deem[ed] such termination to be in the interests of the United States." *Id.* ¶ I.  The regulation then articulates a series of "circumstances" under which a CIA employee might have his or her employment terminated (*e.g.*, "failure to complete trial period," "failure to meet security standards," "failure to meet the work and efficiency requirements of the agency"), *id.* ¶ II(B), but this list concludes with a catch-all provision that encompasses the statutory discretion that the D/CIA may invoke. "In addition to the circumstances specified in paragraphs (1) through (10) above, an employee may have his or her employment be terminated whenever the D/CIA, in his discretion, deems such termination necessary or advisable in the interests of the United States." *Id.* ¶ II(B)(11)

CIA's regulation also identifies procedures that are to be followed when the D/CIA effects the termination of CIA employment under *certain circumstances*.  As such, the regulation identifies particularized bases for termination (*e.g.*, "for abandonment of position"), and describes the procedural steps that the agency is take in effecting that type of termination.  *Id.* ¶ II(C).  The regulation also provides impacted employees with a limited ability to appeal their termination internally with an identified agency official.  *Id.* ¶ II(E).  But these provisions do not apply to terminations effected pursuant to "paragraph D" of Section II of the regulation, which mirrors D/CIA's broad grant of statutory authority under 50 U.S.C. § 3036(e)(1), and provides as follows:

> Pursuant to statutory authority, any employee may be terminated from the [CIA] at any time *without regard to any procedural steps set forth in this regulation or elsewhere* when

---

has not taken any termination-related action against any plaintiff in this action, Defendants have limited their discussion here to CIA's application of this regulatory framework.

*the D/CIA, in his discretion*, deems it necessary or advisable in the interests of the United States. . . . The existence or the exercise of this discretionary authority by the D/CIA is:

(1) Not constricted, limited, affected or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law.

(2) In abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law.

*Id.* ¶ II(D) (emphasis added). Accordingly, when the *D/CIA* exercises his discretion to terminate an employee pursuant to 50 U.S.C. § 3036(e)(1) and § II(D) of Agency Regulation 4-16, the impacted employee is not entitled to any of the procedures set forth in the regulation, or any other interests or privileges to which the employee might otherwise be entitled under the regulation.

The regulation also discusses the potential dissemination of information regarding an employee's termination. *See id.* ¶II(H). To this end, the regulation articulates a general mandate that "the reasons for the termination or resignation of [CIA] employment shall not be disseminated outside the [CIA] to any private organization or Federal or other governmental body without the consent of the employee." *Id.* Instead, absent such consent and subject to certain exceptions, in "response to a request for information as to why an individual's employment was terminated," CIA personnel may *only* indicate – generically – "that the employment was terminated pursuant to statutory authority." *Id.*

## II.    FACTUAL BACKGROUND

### A.    PRESIDENTIAL EXECUTIVE ORDER & OPM MEMORANDUM

On January 20, 2025, President Trump issued an Executive Order, which mandated "the termination" of all "DEI and 'diversity equity, inclusion, and accessibility,' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Exec. Ord. No.* 14151, § 2(a), *available at* 2025 WL 244164 (Jan. 20, 2025). The

Executive Order also mandated that "[e]ach agency head . . . in consultation with the Attorney General, the Director of [the Office of Management and Budget ("OMB")], and the Director of [the Office of Personnel Management ("OPM")]" take certain actions within the ensuing sixty days. *Id.* § 2(b). Amongst these actions was the "terminat[ion], to the maximum extent allowed by law," of "all DEI [and] DEIA . . . offices and positions." *Id.*

As articulated in the Executive Order, the Acting Director of OPM issued a memorandum to all agency heads (including acting agency heads) on January 24, 2025. *See Memorandum From Charles Ezell to Agency Heads* (Jan. 24, 2025), *available at* << https://www.opm.gov/media/0gpnja24/opm-memo-guidance-regarding-rifs-of-deia-offices-1-24-2025.pdf>> (visited Feb. 20, 2025) (hereinafter "*Ezell Memorandum*"). That memorandum directed agencies to commence employment actions regarding those employees who were employed in now-shuttered agency DEI or DEIA offices. *Id.* In taking such actions, OPM directed agencies to "define the competitive area" – *i.e.*, the segment of the agency in which impacted employees would typically compete for any remaining positions, *see* 5 C.F.R. § 351.402 – "solely in terms of the DEIA office where the employees worked." *See Ezell Memorandum*. Put simply, OPM directed that impacted DEI employees were only authorized to "compete" for "open positions" in an agency component that, pursuant to the Executive Order, no longer existed.

### B.    CIA IMPLEMENTATION

The current D/CIA is John Ratcliffe, who was confirmed by the United States Senate on January 23, 2025. *Compl.* ¶14. On February 18, 2025, D/CIA Ratcliffe signed a memorandum in conformance with President Trump's aforementioned Executive Order and consistent with OPM's memorandum regarding the same. EX. B. That memorandum articulated that D/CIA Ratcliffe had concluded – in an exercise of his discretionary authority under the National Security Act of

1947 and Agency Regulation 4-16 – that the termination of employees who were then-employed in the agency's now shuttered "Diversity and Inclusion Office" ("DIO") was "necessary or advisable in the interests of the United States."  EX. B, ¶¶2; 4.  Consistent with the provisions of both the National Security Act of 1947 and Agency Regulation 4-16, these employees will retain their security clearances and are free to apply to federal agency employment vacancies, including those at the CIA.  D/CIA's determination that this action was "necessary or advisable in the interests of the United States" in this context follows directly from the President's and OPM's published guidance to all executive agencies regarding the elimination of DIO offices.

As counsel for plaintiffs explained in open court and as D/CIA Ratcliffe specifically provided in his memorandum, CIA personnel brought impacted employees back[3] to agency headquarters, beginning on February 18, 2025, to inform them of D/CIA Ratcliffe's decision and to advise them of the various options from which they could choose in ending their employment relationship with the CIA.  To this end, impacted employees had the following options:

- *Retirement* – If an impacted employee were eligible to retire (under generally applicable federal regulations), he or she would be entitled to elect a retirement date prior to September 30, 2025, and would remain on administrative leave (with pay) up until their retirement date.  If the impacted employee would not become eligible to retire until a date between October 1 and December 31, 2025, the agency may allow them to extend their administrative leave to their retirement date within this temporal window.[4]

- *Deferred Resignation Program ("DRP")* – Akin to the much-publicized DRP that was offered to the general federal workforce over the past month, CIA is offering

---

[3]As Plaintiffs allege, *Compl.* ¶4, consistent with the terms of President Trump's Executive Order, DIO employees at CIA had been placed on administrative leave (with pay) on January 22, 2025.

[4]Similarly, if an impacted employee would not be eligible for traditional retirement during calendar year 2025, but *would* be eligible for participation in the Voluntary Early Retirement Authority ("VERA") during calendar year 2025, *see* 5 U.S.C. §§ 8336(j); 8414, the CIA will allow the impacted employee to avail him or herself of VERA – in the same manner as traditional retirement described above.

a virtually identical program to impacted employees here.  Should an impacted employee elect this option, their voluntary resignation from the CIA's employ will be effective on September 30, 2025, and until then, they will remain on administrative leave (with pay).

- _Termination_ – An impacted employee may elect to be formally terminated by the CIA.  But an election of this option does not result in _immediate_ termination; rather, an impacted employee electing termination will remain on administrative leave (with pay) for _ninety (90) days_, and only after the expiration of this ninety (90) day period will the employee's termination become effective.

- _Voluntary Resignation_ – An impacted employee may elect to voluntarily resign from the CIA.  If they elect this option, the employee's resignation is effective immediately.

As such, the CIA has offered multiple choices to impacted employees.[5]  And importantly for Plaintiffs' TRO application, under none of these circumstances is the CIA _immediately_ terminating the employment of any impacted employee; instead, at the _earliest_, an impacted employee will only be involuntarily separated from employment with the agency ninety (90) days after making such an election.[6]

## B.    ODNI IMPLEMENTATION

Plaintiffs' complaint is conspicuously devoid of substantive allegations regarding ODNI's implementation of the above Executive Order and OPM Memorandum with respect to impacted

---

[5]At the prior hearing in this matter, plaintiffs' counsel openly mused about what would occur in the event that an impacted employee simply refused to make a choice from this menu of options. _Transcript_ (Dkt. No. 13), at 3-4.  In that case, the CIA would place the impacted employee into the "Termination" category articulated above, meaning that they would remain on administrative leave with pay for 90 days, at which point their termination from the CIA's employ would become effective.

[6]And for similar reasons, obligating an impacted employee to choose from amongst the above options would not cause the immediate termination of that impacted employee or remove them off administrative leave; as such, obligating an impacted employee to make such a choice would not run afoul of this Court's administrative stay order. _Ord._ (Feb. 18, 2025) (Dkt. No. 12), at 1.  Nevertheless, in an abundance of caution and the interest of good faith, the CIA has extended the time within which an impacted employee must choose from amongst the above options until at least February 24, 2025, after this Court's next scheduled hearing in this matter.

ODNI employees.  And despite the statements made by their counsel at the last hearing, *Transcript*, at 3, there are similarly no non-conclusory allegations in Plaintiffs' complaint that "the Intelligence Community" writ large – to include ODNI – have finalized and begun the process of separating impacted employees.

There is a good reason for this gap in Plaintiffs' allegations.  As demonstrated by the attached declaration, EX. C, there are differences between the two agencies that are material to plaintiffs' pending TRO application.  Most significantly, though, ODNI does plan to pursue the separation of certain employees previously working in DEIA positions, ODNI has not at this time issued any final decision regarding the separation of such employees.  ODNI is thus unable to address, at present, the terms or timing of whatever action it may take regarding the Plaintiff ODNI employees.

## III.  PROCEDURAL HISTORY

### A.    PLAINTIFF'S COMPLAINT & TRO APPLICATION

On February 17, 2024, Plaintiffs – eleven (11) individuals who purport to be impacted employees of the CIA and ODNI's DEI-related components, who seek to proceed pseudonymously – filed their complaint in this action (Dkt. Nos. 1; 3-5).  That complaint is brought against the CIA and ODNI as entities, *Compl.*, ¶ 12, and D/CIA Ratcliffe and DNI Gabbard, in their official capacities, *id.* ¶¶ 9; 13-14.

The complaint asserts four independent causes of action.  *First*, Plaintiffs seek Article III judicial review of CIA and ODNI's putative "scheme to terminate plaintiffs" under the Administrative Procedure Act (Count I), alleging that it is "arbitrary and capricious agency action amounting to an abuse of discretion."  *Id.* ¶¶ 42-49; *see also* 5 U.S.C. §§ 702-06; *Nebraska Health Care Ass'n v. Dunning*, 575 F. Supp. 176, 180 (D. Neb. 1983) (explaining that "[a]n agency's

actions cannot violate" the APA and that the APA simply provides a standard by which a federal court is to review agency action). *Second*, plaintiffs assert a claim under the Administrative Leave Act of 2016 (Count II), *see* 5 U.S.C. § 6329a, alleging that the CIA and ODNI have placed them on administrative leave for too lengthy a time period. *Compl.*, ¶¶ 51-52. *Third*, plaintiffs assert a claim directly under the First Amendment (Count III), alleging that their putative termination from employment violated their right to freedom of speech because it was motivated by "their (assumed) beliefs about a domestic policy issue." *Id.* ¶ 54. And *finally*, plaintiffs assert a claim directly under the Fifth Amendment (Count IV), alleging that they have a "property interest" in continued federal employment, and that the CIA and ODNI "plan to terminate" them without constitutional due process. *Id.* ¶ 56.

On the same day, Plaintiffs filed a motion seeking to have this Court issue a temporary restraining order against defendants (Dkt. No. 7). That motion specifically sought a singular type of relief: entry of "a temporary restraining order against Defendants *to prevent them from terminating the employment of Plaintiffs.*" *Id.* at 1. Plaintiffs also filed a memorandum in support of their motion for a temporary restraining order (Dkt. No. 8).

B.  **HEARING**

This Court held a preliminary hearing on plaintiffs' motion for a temporary restraining order in the early afternoon of February 18, 2025.[7] After argument from counsel, this Court elected not to act on Plaintiffs' motion, but instead, to stay that motion administratively under the All Writs Act, call for further briefing from the parties on the salient issues, and hold another hearing on Plaintiffs' motion on February 24, 2025. *Transcript*, at 18. And subsequent to the hearing, the

---

[7]The Office of the United States Attorney for this district, and the CIA and ODNI's Offices of General Counsel, did not learn of this civil action, or the motion for a temporary restraining order, until mid-morning on February 18, 2025.

Court memorialized its order from the bench in a written order, which also provided that during the pendency of this administrative stay period, CIA and ODNI were to "refrain from terminating Plaintiff John Does 1-6 and Jane Does 1-5 or placing these Plaintiffs on leave without pay, such that, these Plaintiffs shall continue to be on administrate leave with their full pay and benefits." *Ord.* (Feb. 18, 2025) (Dkt. No. 12), at 2.

## **STANDARD OF REVIEW**

Plaintiff seeks a temporary restraining order—"an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (Trenga, J.). To be eligible for a temporary restraining order, Plaintiff must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22. The requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (alterations and quotation marks omitted) (emphasis in original).[8]

---

[8] Some of Defendants' cited cases arise in the context of a motion for preliminary injunction as opposed to a temporary restraining order. These apply equally to the motion before the court, since "[t]he standard for granting either a TRO or preliminary injunction is the same." *Toure v. Hott*, 458 F. Supp. 3d 387, 396 (E.D. Va. 2020).

Further, The Court should exercise its discretion to convert Plaintiffs' motion to one for a preliminary injunction because Defendants have "had a fair opportunity to oppose it." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006) ("[A] district court could properly consider a motion for a TRO as a request for a preliminary injunction, . . . focusing not on a specific time period but on whether the opposing party had a fair opportunity to oppose it.").

# ARGUMENT

This Court should deny Plaintiffs' motion for a temporary restraining order because they have not met their burden of making a "clear showing" on *any* of the four required elements for obtaining a preliminary injunction.

## I.    PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Office of the Director of National Intelligence Has Not Finalized, Let Alone Acted Upon, Any Plan to Terminate Employees Working in DEI Offices.

Plaintiffs' Complaint and motion for a temporary restraining order purport to address the actions of two agencies, the CIA and ODNI. But contrary to Plaintiffs' pleadings, ODNI has not at this time finalized any plan to separate employees working in DEI offices from the agency. *See* EX. C ¶ .  As of yet, it has not, contrary to Plaintiffs' assertions, *see, e.g.,* Compl. ¶ 4, asked any employee working in a DEI position to report to the agency to effect any such potential separation. *Id.*  Accordingly, Plaintiffs' complaint and evidence submitted to date does not establish any potential harm with respect to ODNI that is irreparable and imminent.

In any event, the DNI has the same authority to terminate ODNI employees if she deems it in the United States' interest as the D/CIA has with respect to CIA employees, and the same regulation governs these terminations.  *See* 50 U.S.C. 3036(e)(1) (providing this authority to the Director of the CIA)' 50 U.S.C. § 3024(m)(1) (providing the DNI with any authority as to ODNI that the Director of the CIA possessed with respect to CIA personnel); EX. A §  II.D; EX. C ¶ 9. Accordingly, the arguments presented below would apply with equal force to ODNI employees should the DNI decide to take the same course as the one the D/CIA has taken here.

### B.    Plaintiffs Are Not Likely to Prevail on the Merits of their Claims against CIA Where the CIA's Actions were Broadly Authorized by Law, Had No Nexus to Any Protected Speech, and Where they Were Not Entitled to Any Due Process.

### 1. APA Claim (Count I)

*First,* Plaintiffs' APA claim with respect to their leave and CIA's decision to separate them from the agency is precluded by the Civil Service Reform Act ("CSRA"). The CSRA provides "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). Importantly, the CSRA operates "to the exclusion of all other statutory remedies for claims arising out of the federal employment relationship." *Hall v. Clinton*, 234 F.3d 202, 203-06 (4th Cir. 2000) (affirming district court's dismissal of preempted claim for lack of subject-matter jurisdiction). Among other claims, it "precludes APA actions challenging personnel decisions . . . as well as those challenging adverse actions, including terminations." *Doe P v. Goss*, No. 2007 WL 106523, at * 6 (D.D.C. Jan. 12, 2007). This preclusion extends to any claim that "in taking a particular adverse personnel actions, an agency violated its own regulations." *Id.* (citing *Graham v. Ashcroft*, 358 F.3d 931, 935-36 (D.C. Cir. 2004)).[9]

To be sure, employees of an enumerated set of intelligence agencies, including CIA and ODNI, are expressly excluded from the MSPB adverse personnel action appeal rights that the CSRA provides other employees. *See* §§ 2302(a)(2)(C)(ii)(I). But the Supreme Court has made clear that CSRA preclusion nevertheless applies, even where a remedy is not available to the employee under the CSRA:

> The CSRA established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and

---

[9] Defendants' jurisdictional arguments are raised with respect to Plaintiffs' statutory claims only. In accordance with *Webster v. Doe*, 486 U.S. 592, 601-05 (1988), Defendants do not argue that this Court lacks jurisdiction over their claims for injunctive relief for alleged constitutional violations.

> judicial review for personnel action of the sort at issue here prevents respondent
> from seeking review . . . [under a different statute].

*Fausto*, 484 U.S. at 455 (reasoning that allowing direct judicial review of employment claims to employees without CSRA rights would provide a more substantial right to review without the administrative exhaustion requirements imposed by the CSRA than those covered by the CSRA would have); *see also, e.g.*, *Doe*, 2007 WL 106523 at *5. Allowing direct review of employment actions outside of the streamlined procedures of the CSRA would frustrate the congressional intent to "avoid[] an unnecessary layer of judicial review in lower federal courts." *Id.* at 449. Rather, Congress's exclusion of employees from the protections of the CSRA do not leave those employees "free to pursue whatever judicial remedies [they] would have had before enactment of the CSRA. *Id.* at 447. Their exclusion instead demonstrated a "clear congressional intent to deny the excluded employees the protections . . . including judicial review . . . for personnel action covered by" the CSRA. *Id.*; *Zimbelman v. Savage*, 228 F.3d at 371 (explaining that the courts should not "substitute our judgment for that of Congress in federal employment disputes").

In short, there is extensive authority for the proposition that even though employees of intelligence agencies are "exempted by Congress from the Civil Service Reform Act [, that] does not release them from its exclusive remedial framework." *Zimbelman*, 228 F.3d at 370; *see also Doe*, 2007 WL 106523, at *6 (holding that CSRA precluded CIA employee's statutory claims regarding his termination); *Peter B. v. United States*, 570 F. Supp. 2d 78, 83 (D.D.C. 2008) ("It seems clear (albeit counterintuitive), then, that as CIA employees are expressly excluded from the review procedures under [the CSRA], they may not seek outside of the CSRA scheme any judicial review of termination decisions."); *Lane v. Wynne*, 2006 WL 4711891 (D. Md. June 23, 2006) ("This may be a harsh result, but it is not for this Court to create a remedy where Congress has determined that one should not exist . . . ."), *aff'd*, 218 F. App'x 262 (4th Cir. 2007); *Blaney v.*

*Gonzalez*, 2020 WL 5569749, at *4-7 (D. Md. Sept. 17, 2020) (holding the CSRA precluded Plaintiff's statutory claims regarding NSA's alleged retaliatory revocation of his employment offer), *aff'd*, 2024 WL 1505485 (4th Cir. 2024).  Plaintiffs' APA claims are thus precluded, and Plaintiffs have failed to carry their burden that this Court has jurisdiction over these claims, let alone that they have a clear likelihood of success on the merits.

    *Second*, even if Plaintiffs' APA claim were not precluded, the Court would still lack jurisdiction over it.  The APA does not permit courts to review the merits of agency decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Section 701(a)(2) exempts from review agency actions for which "'a court would have no meaningful standard against which to judge the agency's exercise of discretion' and 'no judicially manageable standards . . . for judging how and when an agency should exercise its discretion.'" *Angelex Ltd. v. U.S.*, 723 F.3d 500, 506 (4th Cir. 2013) (quoting *Heckler v. Cheney*, 470 U.S. 821, 830 (1985)); *see also Holbrook v. TVA*, 48 F.4th 282 (4th Cir. 2022) (considering, in determining whether a decision falls within the APA exception for acts left to agency discretion, whether the action has been traditionally committed to agency discretion, and whether, if so, Congress has overcome the presumption against jurisdictional review by providing guidelines for the agency to follow in exercising these powers). The CIA Director's decision here falls well within this exception.

    Longstanding, binding Supreme Court precedent makes clear that the CIA Director's decision here falls well within his discretion.  Federal law provides that "[n]otwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, *in the discretion of the Director,* terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interests of the United States."  50 U.S.C. § 3036(e)(1) (emphasis

added).  In *Webster v. Doe*, the Supreme Court considered a functionally identical predecessor statute[10] to 50 U.S.C. § 3036(e)(1), and squarely determined that an APA claim challenging the plaintiff's termination under this statute was not justiciable.  486 U.S. 592, 600 (1988).  The Supreme Court explained that the statute allows the termination of an Agency employee "whenever the Director shall *deem* such termination necessary or advisable," and not "simply when the dismissal *is* necessary or advisable to those interests."  *Id.* (internal quotation marks omitted, alterations in original).  This "standard fairly exudes deference to the Director," and "foreclose[s] the application of any meaningful judicial standard of review."  *Id.*  The Court explained that "short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests," it could not determine a "basis on which a reviewing court could properly assess an Agency termination decision."  *Id.*  In short, the Court held, the National Security Act "exhibits . . . extraordinary deference to the Director in his decision to terminate individual employees," and "indicate[s] that Congress meant to commit individual employee discharges to the Director's discretion."  *Id.* at 601.  Neither the statute, nor the CIA's regulations, provide any guidelines that would circumscribe or otherwise limit the CIA Director's use of this power.  *See* 50 U.S.C. § 3036(e)(1); EX. A.  Accordingly, review of such decisions is precluded by the APA, 5 U.S.C. § 701(a)(2).  *Webster*, 486 U.S. at 601.

Although this provision has been updated and moved to a different section of the federal code, it retains all of the language on which the *Webster* decision turns.  And although Plaintiffs

---

[10] That predecessor statute provided: "[T]he Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States . . . ." 50 U.S.C. § 403 (1947).

argue that, in their view, the national security interests that justify this broad Congressional grant of discretionary power are not present in this case, Compl. ¶¶ 32-34, inquiry into such assertions requires *precisely* the process of questioning the D/CIA directly about the merits of his decision that *Webster* forecloses.  *Webster*, 486 U.S. at 600.  Accordingly, this Court also lacks jurisdiction over Plaintiffs' APA claim because it falls within the exception to the waiver of sovereign immunity set forth in 5 U.S.C. § 701(a)(2).

*Third*, even if this Court had jurisdiction over Plaintiffs' APA claims, which it does not, Plaintiffs have not made a "clear showing" that the agency is not following its own regulations with respect to termination.  Although CIA's employment termination regulation does specify specific administrative procedures to be used in certain circumstances, it also expressly provides for termination without *any* procedures where, as in this case, a termination would occur pursuant to the D/CIA's statutory termination authority."  *See* EX. A ¶ II.D; EX. B; *see also* 50 U.S.C. § 3036(e)(1).  Specifically, the regulation states that "[p]ursuant to statutory authority, any employee may be terminated from the Agency at any time without regard to any procedural steps set forth in this regulation or elsewhere when the [D/CIA] in his discretion deems it necessary or advisable in the interests of the United States. . . . The [D/CIA] need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required."  EX. A § II.D.  In this case, D/CIA made expressly clear in the February 18 memorandum that he was invoking his plenary termination authority pursuant to statute, utilizing the language of the statute, which CIA has also incorporated into its internal regulation authorizing termination by D/CIA authority without any process.  By statute and regulation, therefore, there are expressly no procedures available to Plaintiffs with respect to this decision given the authority under which the termination decision was made.  Accordingly, Plaintiffs have failed to make any

showing that CIA is denying Plaintiffs procedures that should be available to them.

2.  *Administrative Leave Act Claim (Count II)*

Plaintiffs claim that this Court has jurisdiction over a standalone claim under the Administrative Leave Act of 2016 ("ALA"), which was promulgated in 2016, *see* 5 U.S.C. § 6329a, but Plaintiffs have failed to show any likelihood of success on the merits of this claim for multiple reasons. First, the act contains no express waiver of sovereign immunity that would be necessary to bring such a claim against the federal government. *See, e.g.*, *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity . . . The terms of consent to be sued may not be inferred but must be unequivocally expressed."). Second, even if the ALA did provide a cause of action against the federal government, it would be precluded by the CSRA for the same reasons as Plaintiffs' APA claim. *See supra* at 13-15.

In any event, Plaintiffs' claim under this act is meritless. The ALA, enacted in 2016, provides that that "[d]uring any calendar year, an agency may place an employee in administrative leave for a period of not more than a total of 10 work days." 5 U.S.C. § 6329a(b)(1). The implementing regulations for this statute clarify the meaning of this provision. Specifically, "the term 'place' refers to a management-initiated action to put an employee in administrative leave status, with or without the employee's consent, for the purpose of conducting an investigation (as defined in § 630.1502)," which describes investigations involving such matters as an employee's alleged misconduct or compliance with or adherence to security requirements. 5 C.F.R. § 630.1404(a) Critically for Plaintiffs' claim, "the 10-workday annual limit *does not apply to administrative leave for other purposes.*" *Id.* Plaintiffs have not alleged that the agencies have placed them on administrative leave for any kind of investigation; accordingly, they have failed to

18

plead a plausible violation of this Act, let alone made the necessary "clear showing" of a likelihood to succeed on the merits of this claim.

### 3. *First Amendment Claim (Count III)*

Plaintiffs next claim that they are being terminated in violation of the First Amendment because of unidentified speech about DEI, but the Ezell Memorandum and D/CIA Memorandum make clear that any separation from the agency would be because of their *positions*, separate and apart from any speech that any individual Plaintiff may have made.  *See* Ezell Mem. (directing agencies to take action with respect to "employees of DEIA offices"); EX. B at 1 (making decision with reference to "employees who most recently served in the Agency's former Diversity and Inclusion Office").  There is simply no non-conclusory allegation in Plaintiff's complaint, let alone in the current TRO record—to render plausible the conclusion that the decision to separate Plaintiffs from CIA employment was premised upon any exercise of Plaintiffs' speech rights.

But, Plaintiffs have failed to make a clear showing of their likelihood to prevail on the merits of a First Amendment claim.  In order to allege a plausible claim that a government employer took an adverse action against an employee for that employee's speech, courts use a three-part test: 1. "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest"; 2. if the former, "whether the employee's interest in First Amendment expression outweighs the employer's interest in the efficient operation of the workplace"; 3. "[w]hether the protected speech was a substantial factor in the employer's decision to take adverse employment action."  *Carey v. Throwe*, 957 F.3d 468, 475 (4th Cir. 2020) (internal quotations omitted).  As to the first prong, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications."

*Silverman v. Town of Blackstone*, 843 F. Supp. 2d 628, 633-34 (E.D. Va. 2012), *aff'd* 475 F. App'x 851 (4th Cir. 2012). In other words, "because employees' statements as employees . . . must be controlled by the government as employer, those statements simply are not protected speech." *Id.*; *see also Garcetti*, 547 U.S. at 419 ("[G]overnment offices could not function if every employment decision became a constitutional matter." (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)).

As noted above, Plaintiffs' complaint contains no non-conclusory factual allegations that the D/CIA decided to proceed with their separation from the agency based on any exercise of First Amendment protected speech. However, at best, they have alleged that the "speech" on which they premise their First Amendment claim consisted of carrying out their official duties in the DEI office. *See* Compl. ¶ 54. In short, even if Plaintiffs had plausibly alleged that they had been separated from CIA because they worked on DEI issues as part of their assignment to the DIO, such work was what these employees were "employed to do," *Garcetti*, 547 U.S. at 422, *i.e.*, for going "to work and perform[ing] the tasks [they were] paid to perform." *Garcetti*, 547 U.S. at 422. Despite Plaintiffs' disagreement with this decision, however, they simply have not raised a First Amendment problem, let alone established a likelihood of success on such a claim.

### 4. Fifth Amendment Claim (Count IV)

Plaintiffs also bring a constitutional claim alleging that they are being terminated without procedural due process. They have failed, however, even to make a threshold showing of a colorable constitutional claim. To advance a due process claim, a plaintiff must first "establish that he had a property or liberty interest at stake." *Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002) (cleaned up).

Plaintiffs have alleged that they have a property interest in their positions, but this is incorrect. Government employees can only demonstrate the requisite property interest for a due

process claim "where governing law provides that they may be discharged only for case." *Lamb v. Holder*, 82 F. Supp. 3d 416, 425 (D.D.C. 2014).  While federal employees who are covered by the CSRA's provisions do have a property interest in their continued employment, "[t]hose employees not covered by the termination provisions of the CSRA, . . . have no such property right." *Id.*; *see also, e.g., Doe v. Gates*, 981 F.2d 1316, 1321 (D.C. Cir. 1993) (holding CIA employee had no property right in his employment).  As discussed above, by law, CIA employees are both expressly excluded from the CSRA's protections and, at the same time, subject to termination without cause at any time at the CIA Director's discretion.  Indeed, the CIA's regulations only further reinforce this point, emphasizing that "nothing in [the CIA's termination] regulation or in any other regulation, document, or law, shall be construed as creating for any employee any property or other interests or privileges in his or her employment." EX. A ¶ II.F. In the absence of a property right in their continued employment, Plaintiffs have failed even to state a claim of a due process violation, let alone make the required "clear showing" of their likelihood to succeed on the merits necessary for the extraordinary relief they seek.

## II.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF *IRREPARABLE* HARM.

### A.    PLAINTIFFS MUST *INDEPENDENTLY* DEMONSTRATE IRREPARABLE HARM TO OBTAIN EXTRAORDINARY RELIEF

To prevail, Plaintiffs must also make a "clear showing" that, absent an injunction, they will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (reversing preliminary injunction); *see Winter*, 555 U.S. at 20, 22. "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Power Mobility Coal.*

21

*v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)).

As the Fourth Circuit has previously held, this inquiry is often dispositive of a litigant's request for emergency injunctive relief, that is, a claim for such relief can *only* proceed to the next step "if the party establishes irreparable harm." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). In other words, "if a party makes no showing of irreparable harm, the court may deny the motion for injunctive relief without considering the other factors." *In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 122 (D.D.C. 2007); *see also Winter,* 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Put simply, no matter how strong plaintiffs' claim is on the merits – and as provided above, it is *not* strong – the lack of irreparable harm requires the denial of any request for extraordinary preliminary relief.

### B. PLAINTIFFS CANNOT DEMONSTRATE THAT THE INSTANT ACTION IS ANYTHING MORE THAN A TYPICAL EMPLOYMENT DISPUTE

Plaintiffs have two particular problems in bearing their significant burden to demonstrate the existence of irreparable harm here. Either problem independently requires rejection of their application for a temporary restraining order.

**1.** It is well settled that, as a general matter, "termination of employment does not constitute irreparable injury because of the 'possibility that adequate compensatory or other corrective relief will be available at a later date.'" *Roe v. Shanahan,* 359 F. Supp. 3d 382, 419 (E.D. Va. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). As the Supreme Court observed in *Sampson*, absent a "genuinely extraordinary situation," the imminent loss of government

employment "will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.* at 92 n.68.  This is because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date," as is almost always the case in cases challenging employment actions, "weighs heavily against a claim of irreparable harm."  *Id.* at 90.

Following *Sampson*, courts have *repeatedly* held that emergency injunctive relief is not available to government employees seeking to challenge an employment action.  "[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 80 (D.D.C. 2006); *Price v. Howard Cnty. Pub. Sch. Sys.*, 2022 WL 21769772, at *3 (D. Md. June 17, 2022) (collecting cases within the Fourth Circuit); *see also, e.g.*, *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022) ("A permanent loss of employment, standing alone, does not equate to irreparable harm." (internal quotation omitted)); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021) (reversing and vacating grant of preliminary injunctive relief because "[i]t is well settled . . . that adverse employment consequences are not the type of harm that usually warrants injunctive relief").  Put simply, well-settled authority precludes federal employees from immediately coming to this Court seeking emergency injunctive relief whenever they are the subject of an adverse employment action.

Plaintiffs appear to understand that this is the upshot of Supreme Court and Fourth Circuit authority, and that an application of that authority requires rejection of their instant TRO motion. *TRO Mem.*, at 5 ¶ 18.  But plaintiffs contend that they are part of a very limited exception to this rule.  In particular, plaintiffs maintain that their putative termination from CIA's employ because of their current placement in the agency's now-shuttered DIO office would create the same kind

of stigma that would befall a military member who would have to disclose that he or she was discharged from service for being HIV-positive.  *Id.* at 5 ¶19 (quoting *Roe v. Dep't of Defense*, 947 F.3d at 229-30).  Plaintiffs' forced analogy is flawed for several reasons.

*First*, as noted above, plaintiffs would *not* be required to disclose that they were terminated for being employed in CIA's now-shuttered DIO office; indeed, the agency *itself* would be prohibited from saying anything about the end of their employment *other* than that it was "pursuant to statutory authority."  EX. A ¶  II(H).  Moreover, *any* termination of CIA employment by the D/CIA "shall not affect the right of the officer or employee to seek or accept employment" in the Government if declared eligible for such employment by OPM.  *See* 50 U.S.C. § 3036(e)(2).  *Second*, plaintiffs cannot seriously maintain that revelation that they were employed in the CIA's DIO office is akin to the type of stigma that attaches to an individual who is obligated to reveal that they are HIV-positive – a unique and long-stigmatized medical diagnosis.  And *third*, acceptance of plaintiffs' attempt to shoehorn themselves into the *Roe* exception would ultimately swallow the rule – any federal employee dismissed for any reason (including poor performance, unlike the plaintiffs here) could make the same argument that revelation of their termination for such wrongdoing was stigmatic and thus would cause irreparable harm.  *See Sampson*, 415 U.S. at 64-65, 92 n.68 (rejecting request for immediate injunctive relief in case alleging wrongful termination from federal employment based on "complete unwillingness to follow office procedure and to accept direction from [] supervisors"); *see also id.* at 92 n.68 (expressing concern that courts reserve exceptions to the general rule of no irreparable harm for "genuinely extraordinary situation[s]");  *Rydie v. Biden*, 572 F. Supp. 3d 153, 161 (D. Md. 2021) (refusing to equate, for irreparable harm purposes, termination for failure to obtain the COVID-19 vaccine with "the sort of severe and improper stigma as those who disclose with HIV-positive status" in *Roe*),

*vacated on other grounds*, 2022 WL 1153249 (4th Cir. Apr. 19, 2022).

**2.**     In addition, the facts do not support the conclusion that the *specific relief* that plaintiffs request in their instant motion is necessary to avoid irreparable harm as to either CIA or ODNI. As noted above, plaintiffs seek very specific relief in their motion – "a temporary restraining order against Defendants to prevent them *from terminating the employment of Plaintiffs*." *TRO Mtn.* (Dkt. No. 6), at 1 (emphasis added).  But the plaintiffs' *actual involuntary termination* is not imminent.  At the very earliest – for those plaintiffs who choose termination from the myriad of options that the CIA has provided to impacted employees – Plaintiffs who are CIA employees will be terminated in approximately *ninety days*.  And during that lengthy period, plaintiffs will remain on administrative leave with full pay.  That is not imminent irreparable harm requiring extraordinary emergency relief from this Court.  And Plaintiffs' failure to show imminent irreparable harm is even more pronounced as to ODNI, which has not even finalized or implemented any action to separate those plaintiffs that are ODNI employees.

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST BOTH FAVOR THE GOVERNMENT.

The final requirements for obtaining a temporary restraining order require a plaintiff to demonstrate that the balance of equities tips in his or her favor, and that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20, 22; *Dewhurst v. Century Aluminum Co*., 649 F. 3d 287, 290 (4th Cir. 2011).  The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Neither the balance of the equities nor the public interest favors Plaintiff's request for preliminary relief.

Plaintiffs' requested relief here would harm the public interest.  Such an injunctive relief would constrain the D/CIA's congressionally vested discretion to make personnel determinations when he deems such determinations in the interest of the United States, an authority that, the

Supreme Court has acknowledged, is due "extraordinary deference." *Webster* 542 U.S. at 601. What's more, denying temporary injunctive relief will not leave Plaintiffs without a remedy. If the Court determines that Plaintiffs have a viable claim with respect to their employment, it can award a host of injunctive relief to make Plaintiffs whole.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: February 20, 2025

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

_____/s/_____
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
REBECCA S. LEVENSON
Assistant United States Attorneys
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3891/3760
Fax:    (703) 299-3983
Email: dennis.barghaan@usdoj.gov
Rebecca.s.levenson@usdoj.gov
*Attorneys for Defendants*