**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official capacity as Director of National Security; and | ) |
| | ) |
| JOHN RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Plaintiffs deserve an injunction restraining Defendants from terminating their employment as career United States intelligence officers, without due process and in violation of their First and Fifth Amendments, for reasons of domestic politics. Plaintiffs are likely to succeed on the merits of their constitutional claims, in particular. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging—according to a White House statement—in illegal and immoral activity. The balance of equities is in Plaintiffs' favor as termination causes them economic hardship. And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

Defendants' arguments to the contrary are unavailing. Defendants' authority to terminate non-partisan, career civil servants without due process is constitutionally limited to doing so only in the interests of national security, not in the service of a partisan ideological agenda. Defendants are terminating Plaintiffs from jobs in which they hold a Fifth Amendment property interest, because of their professional speech supporting civil rights laws, made while serving in DEIA-related roles, *and* for their assumed private support of civil rights laws, in violation of the First Amendment. Plaintiffs will suffer irreparable injury from their termination because of the genuinely extraordinary presidential statement that they engaged in illegal and immoral activities. And Defendants' scheme to terminate DEIA-related intelligence officers endangers human sources they are entrusted to protect.

## ARGUMENT

The parties concur about several key points in this matter.

Plaintiffs agree, as career intelligence officers, that the Director of the Central Intelligence Agency ("D/CIA") and Director of National Intelligence ("DNI") may, at their discretion, terminate any intelligence officer's employment whenever either Director deems the termination of employment of such officer "necessary or advisable in the interests of the United States." 50 U.S.C. §§ 3036(e)(1) and 3024(m)(1); *see also* CIA Reg. 4-16 at 1.2.

Defendants admit, as they must, that Plaintiffs have received no procedural due process, that Plaintiffs' lack recourse to the Merit Systems Protection Board ("MSPB"), and that Plaintiffs' constitutional claims under the First and Fifth Amendments fall within this Court's jurisdiction. Defendants are also correct that under the ultimatum issued to Plaintiffs on February 18, 2025—a day after Plaintiffs filed for injunctive relief—offers them ninety more days of administrative leave before termination.

2

Plaintiffs recognize that they have no cognizable claim for damages under the Administrative Leave Act ("ALA"), 5 U.S.C. § 6329a. And Plaintiffs acknowledge that temporary restraining orders and preliminary injunctions ought only to be granted, in this Court's words, "sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).

The parties disagree about the following six important matters.

Plaintiffs contend that Defendants' Gabbard and Ratcliffe's statutory termination authorities under Sections 3024 and 3036 are limited, by the terms of *Webster v. Doe*, 486 U.S. 592 (1988), to the termination of intelligence officers in the interests *of national security*, and that Regulation 4-16 stretches the Directors' termination authority beyond the constitutional breaking point.

Plaintiffs assert that they are being punished by Defendants both because of the professional speech they made in support of civil rights statutes while serving in DEIA-related roles, *and* for their assumed private beliefs in support of civil rights laws, which is why Defendants seek their termination, in violation of their right to free speech under the First Amendment.

Plaintiffs further assert that they do maintain Fifth Amendment property interests in their continued federal employment, even though they are not covered by the 5 U.S.C. § 2301 *et seq*. ("CSRA"), as they have engaged in no misconduct and pose no security risk.

Plaintiffs also assert that while the termination of government employment does not ordinarily constitute irreparable injury, Plaintiffs' case is a genuinely extraordinary situation because of the unprecedented and defamatory presidential public statement that they engaged in illegal and immoral activities.

Granting that Plaintiffs' received no due process yet lack recourse to the MSPB, this Court ought to exercise its jurisdiction over both Plaintiffs' constitutional claims and their statutory claims under the ALA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

Finally, Plaintiffs believe that the balance of equities in this case tilts in their favor. Defendants' scheme to terminate all suspected DEIA-related intelligence officers actually endangers the human sources Defendants Gabbard and Ratcliffe are supposed to protect, the sacred responsibility for which they were granted the statutory authority to terminate employees for national security reasons in the first place.

**I.     Defendants' authority to terminate intelligence officers without due process is constitutionally limited to doing so only in the interests of national security.**

The paperwork Defendants CIA and Ratcliffe issued to Plaintiffs on February 18, 2025 relies only upon the Director's statutory authority to dismiss them pursuant to the National Security Act ("NSA"), 50 U.S.C. § 3036(e), if he determines that to be "necessary and advisable in the interests of the United States."

In *Webster v. Doe*, 486 U.S. 592 (1988) (Rehnquist, C.J.), the Supreme Court upheld the CIA director's termination of a gay officer pursuant to the director's authorities under the NSA. *Id*. at 595, 600. In so doing, Chief Justice Rehnquist reasonably invoked the director's special responsibility "for protecting the identities of intelligence sources from unauthorized disclosure." *Id*. at 600.

The Chief Justice added, however, that the language and structure of the NSA "indicate that Congress meant to commit *individual employee discharges* to the Director's discretion, and that … accordingly precludes judicial review of these decisions under the APA." *Id*. at 601 (emphasis supplied). The Chief Justice continued to state that "a constitutional claim based on an individual discharge may be reviewed by the District Court" *Id*. at 603-04. In dissent, Justice

4

Scalia made clear that he objected to the Court allowing CIA officers' constitutional claims against the Agency or Director because of the risk that classified information might be mishandled during discovery. *See id*. at 621.

Chief Justice Rehnquist made the holding of *Webster* explicit in a subsequent case, *Tenet v. Doe*, 544 U.S. 1 (2005). He reiterated that *Webster* held that the Director's statutory authority under the NSA "not be read to exclude judicial review of the constitutional claims made by a former CIA employee for alleged discrimination. In reaching that conclusion, we noted the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id*. at 10 (internal citations and quotation marks omitted).

It is clear therefore from *Webster* that (1) the Director's statutory authority pertains to the termination of individual CIA officers, (2) that statutory authority is constitutional insofar as it pertains to national security concerns, (3) CIA officers may pursue First and Fifth Amendment claims against their employer, and (4) the dissenting argument against allowing CIA officers to pursue constitutional claims revolves around counterintelligence concerns.

On remand, the meaning of *Webster* becomes even clearer. According to CIA, the reason Doe was terminated was not simply because he was gay, but because of "*his clandestine and deliberately concealed* [homosexual] *activity." Doe v. Gates,* 981 F.2d 1316 (D.C. Cir. 1993)*, at 120-21 (emphasis in original) (Sentelle, C.J.). The Court of Appeals found that "Doe's termination resulted not from a blanket policy but from the CIA's individualized determination that his own case represented a threat to the national security mission of the Agency … in light of the fact that he hid information about his involvement in homosexual activity … Doe's oft-expressed concern for the 'privacy' of his partners has led the Agency to conclude that he might well be susceptible

5

to threats of exposure directed against his past, present, or future homosexual partners." *Id*. at 1324.

The Court of Appeals therefore upheld the District Court's conclusion that "the discharge is rationally related to the legitimate government security interest in collecting foreign intelligence and protecting the nation's secrets." *Id*. In their concurrences, Circuit Judges Edwards and Randolph emphasized this point: "Doe points to no evidence that contradicts the Government's position that the CIA discharged him after an individualized assessment of the circumstances of his case, rather than pursuant to a blanket ban. The record plainly does not support a contention that Doe was dismissed because of the mere fact of his homosexuality;" and "I join only the portion of the opinion holding that Doe's termination resulted "from an individualized determination that his case represented a threat to the national security mission of the agency." *Id*. at 1325.

Again, the decisions in *Webster v. Doe* and *Doe v. Gates* upheld the Director's authority to dismiss that officer on the basis of an individualized assessment that he posed a particular counterintelligence concern as a closeted gay man worried about the privacy of his partners circa 1988—Doe was vulnerable back then to sexual blackmail by hostile foreign intelligence services. But the Director's termination authority under the NSA is not and cannot be plenary. Undoubtedly, if a CIA Director terminated all female officers, or all African-American officers, or all Jewish officers or all indeed gay officers, this Court would hear those officers' meritorious constitutional challenges to their terminations.

In the instant case, Defendants CIA and Director Ratcliffe have not made an individualized assessment about any of Plaintiffs; they are among a group of fifty-one (51) officers being terminated simply on the basis of their temporary DEIA-related assignments, a matter of domestic political controversy. Nor have any national security concerns about Plaintiffs been noted by CIA.

6

Indeed, Defendants CIA and Ratcliffe admit that Plaintiffs may keep their security clearances, indicating that they pose no counterintelligence or suitability problem at all.

Plaintiffs have a First Amendment right to believe in the civil rights laws of the United States, which DEIA (however it is defined) broadly seeks to uphold. Plaintiffs also have a Fifth Amendment right to due process before losing their property interest in their employment. And even taking Justice Scalia's concern in his dissent in *Webster* into account, there is no counterintelligence risk of disclosing classified information if Plaintiffs claims go forward in a case that revolves around a domestic political dispute regarding DEIA.

Defendant CIA's regulation stating that the D/CIA's authority is not limited to terminations in the interests of the national security, but only in the interests of the United States, *see* CIA Reg. 4-16 at 1.2, goes too far beyond the statutory and constitutional authority upon which it is based. Defendant CIA's internal regulation boldly claims that the D/CIA's termination authority is not "constricted, limited, affected or otherwise controlled by … any other regulation, document, or law" and abrogates "the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established" by any other law. This claim of such sweeping authority is more than a mere agency regulation can bear. Defendants may not lawfully terminate Plaintiffs, who are civil servants and not political appointees, without any due process and for reasons of partisan politics.

Defendants freely admit that Plaintiffs have received and will receive no due process. Defendant CIA's regulation seeks too ambitiously to expand the lawful authority of the D/CIA beyond what is permitted under Section 3036 and was upheld by *Webster*. Plaintiffs maintain rights to free speech under the First Amendment, to due process under the Fifth Amendment and

Administrative Procedure Act, and to a property interest in their employment, also under the Fifth Amendment, that Defendants CIA and Ratcliffe cannot simply wave away.

**II.     Defendants are terminating Plaintiffs because of professional speech supporting civil rights laws made while serving in DEIA-related roles, and for their assumed private support of civil rights laws, in violation of the First Amendment.**

Plaintiffs are being punished by Defendants both because of the professional speech they made in support of valid civil rights statutes while serving in DEIA-related roles, *and* for their assumed private beliefs in support of civil rights laws. If Defendants sought only to squelch Plaintiffs' professional speech about civil rights, Defendants' disestablishment of Plaintiffs' DEIA-related positions would suffice to that unpleasant task.

But Defendants take matters a step further and, even though the Executive Order does not call for this, they terminate Plaintiffs only on the basis of their assumed personal beliefs in support of civil rights. This is likely why Defendants are not simply transferring Plaintiffs to any of the myriad of non-DEIA related jobs in the Intelligence Community for which they are well-qualified. Defendants Gabbard and Ratcliffe evidently do not want managers within the IC in any leadership capacity who believe fundamentally in the enforcement of civil rights laws.

Plaintiffs' statements as nonpartisan, civil service intelligence officers supportive of the civil rights laws were in accordance with Executive Branch policy (until January 20, 2025) and the congressionally-mandated and funded IC programs in which they participated. For having made such statements in the past, Defendants seek to purge them from the IC based upon Defendants Gabbard and Ratcliffe's suspicions that Plaintiffs do indeed support the civil rights laws. (*See Memorandum From Charles Ezell to Agency Heads* (Jan. 24, 2025),[1] issued by the

---

[1] Available at https://www.opm.gov/media/0gpnja24/opm-memo-guidance-regarding-rifs-of-deia-offices-1-24-2025.pdf.

Office of Personnel Management, which states that Plaintiffs are only authorized to compete for open positions in CIA components that no longer exist. ("Ezell Memorandum")).

Defendants point to the *Webster* court's observation that "short of permitting cross-examination of the [CIA] Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests," a court could not determine a "basis on which a reviewing court could properly assess an Agency termination decision." Not so here.

Defendants freely admit that the basis upon which Director Ratcliffe seeks to terminate Plaintiffs is the Executive Order and the Ezell Memorandum. While Plaintiffs would enthusiastically welcome the opportunity to depose Directors Ratcliffe and Gabbard about their communications with the President and White House staff regarding the decision to terminate Plaintiffs, it is unnecessary for the purposes of deciding this motion: Defendants admit that the sole basis for their decision is the E.O. and Ezell Memorandum.

Plaintiffs presumed private beliefs in opposition to unlawful racial, religious or sexual discrimination, and in support of statutory requirements making their workplaces accessible to disabled people, are constitutionally protected free speech, and they have therefore stated a cognizable First Amendment claim.

### III. Plaintiffs hold Fifth Amendment property interests in continued federal employment.

Defendants are correct that cases from outside this jurisdiction, *see Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2014) (Chutkan, J.); *see also Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993), hold that employees who are not covered by the CSRA lack property interests in their continued employment. Yet *Lamb* and *Doe* may be distinguished from the case at bar regarding Plaintiffs' property interests.

9

*Lamb* concerned an agent of the Federal Bureau of Investigation terminated for cause—gross misconduct involving a lack of candor in a sworn statement—asserting a Fifth Amendment claim of a property interest in the possibility of an extension of his health insurance. Judge Chutkan reasoned that as the option to elect COBRA[2] is not available to FBI personnel terminated for gross misconduct, Lamb lacked a property interest in his health insurance. *See id.* at 425.

*Doe* concerns the aforementioned CIA officer terminated pursuant to the Director's authority under the NSA pursuant to an individualized assessment that he posed a particular security concern regarding his vulnerability to sexual extortion by foreign intelligence services. The Court of Appeals for the D.C. Circuit found that Doe lacked a cognizable Firth Amendment property interest in his employment after being terminated pursuant to Section 3036. *See id.* at 1321.

Here, Plaintiffs are not accused of any misconduct, much less gross misconduct. And as discussed *supra*, Plaintiffs' termination under Defendant Director Ratcliffe's authorities under the NSA is a bridge too far. While Lamb lost his property interest in his insurance through gross misconduct, and Doe lost a cognizable property interest in his CIA employment when he became a counterintelligence problem, Plaintiffs who have engaged in no misconduct and pose no security risks (again, they maintain their clearances) do not lose their Fifth Amendment right to due process nor their property interest in their employment.

IV. **Plaintiffs will suffer irreparable injury because of the genuinely extraordinary presidential statement that they engaged in illegal and immoral activities.**

Defendants are correct that termination of government employment does not ordinarily constitute irreparable injury because of the possibility that adequate equitable relief will later be

---

[2] Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161–1168 and 42 U.S.C. §§ 300bb-1–300bb-8.

available. *See Roe v. Shanahan*, 359 F. Supp. 3d 382, 419 (E.D. Va. 2020). Plaintiffs' case is however just the kind of "genuinely extraordinary situation," *see Sampson v. Murray*, 415 U.S. 61, 92 (1974), that is the exception to this general rule.

The President's January 21 statement described DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."[3]

The issue is not whether Defendants will make a future statement in violation of the Privacy Act about the circumstances of Plaintiffs' looming terminations. The fact is that the White House already made such a defamatory statement. The horse has left the barn, the bell cannot be unrung, and the toothpaste cannot be squeezed back into the tube, via subsequent attempts at injunctive relief.

Plaintiffs are indeed serious when they maintain that the revelation that they were employed DEIA-related activities, described by the President as set forth *supra*, is akin to the type of stigma that attaches to an individual obligated to reveal that they are HIV-positive, as discussed in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020). Few employers in 2025 would hesitate to hire an individual they know to be HIV-positive. In contrast, almost all employers would hesitate, for reasons of negligent hiring alone, to hire an individual described by the President as engaged in illegal and immoral activities.

---

[3] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (Jan. 21, 2025) at § 1 (available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/).

Defendants contend that Plaintiffs do not face irreparable harm because their terminations may take place in ninety days. Defendants Gabbard and Ratcliffe are, or ought to be, well-aware as leaders of intelligence agencies of the unique difficulty intelligence officers have in seeking onward employment.

Unlike any other professional, their resumes are by necessity classified. Before retiring or resigning, intelligence officers go through a lengthy process of negotiation with the Prepublication Classification Review Board (PCRB) at CIA, for example, about what they may and may not tell prospective employers about their public service. Plaintiffs may be held criminally liable if they do not follow PCRB's guidance in this regard. Plaintiffs must also be unusually careful not to accidentally accept employment with a business beneficially owned by representatives of a hostile foreign power, and to avoid accidentally disclosing classified information or committing export control violations when sharing their professional knowledge and training with new employers. Intelligence officers need far more than ninety days to conduct a job search without violating Defendant CIA's own regulations.

Defendants present the Court with an incomplete view of the Supreme Court's guidance on how to analyze irreparable harm for terminated federal employees seeking injunctions. While Plaintiffs will certainly suffer irreparable financial and reputational harm as result of termination— and while that by itself should justify granting injunctive relief—the Supreme Court's decision in *Sampson* makes clear that the irreparable harm analysis has two aspects: first, evidence of any potential harm to the individual plaintiffs, and second, equally as important, the scope and gravity of the "procedural irregularities" that lead to the termination. *Sampson*, 415 U.S. at 91-2 (analyzing whether the "procedural irregularities" behind the termination decision justify irreparable harm).

In explaining how the courts should determine what constitutes "genuinely extraordinary situation[s]" for irreparable harm purposes, the Court explained in *Sampson* that the analysis is not limited just to "the resultant effect on the employe," but also requires reviewing "the circumstances surrounding an employee's discharge," including how "unusual [the] actions relating to the discharge itself" are and whether they constitute irreparable harm. *Sampson* at 92 n.68.

While Defendants challenge the scope and impact of the resultant effect on Plaintiffs, they present no evidence to rebut the fact the mass termination in this case involved grave "procedural irregularities" and that the actions leading to the discharge are unprecedented and unusual. As the Court itself noted in *Sampson*, that decision does not "foreclose[] relief in the genuinely extraordinary situation" where the circumstances surrounding the termination itself are extraordinary. Defendants rely on examples of cases where an individual employee's termination and the resultant impact on that employee did not justify irreparable harm, yet they have not provided any examples where the courts were presented with the type of "procedural irregularities" that are present in this case (an unprecedented mass-layoff through executive fiat, circumventing congressional mandates) and still found no irreparable harm.

In fact, in reviewing the impact of the procedural irregularities imposed by the recent series of similar executive orders, other courts have found such irregularities to justify irreparable harm. *See Air Evac EMS, Inc.* v. *McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (finding that "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)); *PFLAG, Inc. v. Trump*, 2025 WL 510050 at \*22 (D. MD. Feb 14, 2025) (finding that irreparable harm is met as a constitutional injury matter when the executive order authorizing the action likely violated congressional authorization); *Dellinger v. Bessent*, 2025 WL 471022 at \*11 (D.D.C. Feb 12, 2025) (finding that the employee's

13

"loss of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief" and that injury "stems directly from 'extraordinary' circumstances" as Sampson requires); and *Harris v. Bessent*, 2025 WL 521027 at *8 (D.D.C. Feb. 18, 2025) (finding that permanent damage to "congressionally mandated independence" is the type of extraordinary case identified in Sampson which invites injunction).

V. **This Court may exercise jurisdiction over Plaintiffs' statutory claims under the Administrative Leave Act and Administrative Procedure Act.**

Plaintiffs recognize that they have no cognizable claim for damages under the ALA. Plaintiffs plead a violation of the ALA simply to show the lawless manner in which Defendants are proceeding in this matter, in derogation of a clear federal statute. Defendants appear to believe that the ALA simply does not apply to CIA or ODNI, in the same way that they ignore Plaintiffs' valid First Amendment concerns and Fifth Amendment and statutory due process concerns. Fundamentally, Defendants seek to hold themselves above the law and judicial review of their actions.

As Defendants do not claim to have extended Plaintiffs any due process at all regarding their termination, relying instead solely on the Director's authority under the NSA, Plaintiffs' claim of APA violations is arguably now both acknowledged as true, and moot. Yet Defendants claim that Plaintiffs lack recourse to either the MSPB or the courts regarding their statutory claims because of the CRSA, which Defendants acknowledge is a "counterintuitive" and "harsh" result. *Peter B. v. United States*, 570 F. Supp. 2d 78, 83 (D.D.C. 2008); *Lane v. Wynne*, 2006 WL 4711891 (D. Md. Jun. 23, 2006), *aff'd*, 218 F. App'x 262 (4th Cir. 2007).

The result Defendants propose is not only counterintuitive and harsh, but also wrong. Intelligence officers complaining of serious due process violations, Plaintiffs who in this case are all members of at least one protected class, may not blithely be denied by their Government

14

recourse to both administrative *and* judicial relief. The MSPB lacks jurisdiction over Plaintiffs' due process claims, but this Court does not.

**VI.     Defendants' scheme to terminate DEIA-related intelligence officers endangers human sources they are supposed to protect.**

Finally, Defendants claim that the public interest calls for denying Plaintiffs' request for injunctive relief. The opposite is true.

Perversely, Defendants' scheme to terminate all suspected DEIA-related intelligence officers actually endangers the human sources Defendants Gabbard and Ratcliffe are supposed to protect, the sacred responsibility for which they were granted the statutory authority to terminate employees for national security reasons. It is sometimes necessary for someone other than a young white man to securely handle an asset in a given location, without sticking out like a sore thumb to a foreign counterintelligence service as an American and a suspected intelligence officer. Defendant CIA's human sources are less safe, not safer, if that agency lacks a diverse workforce of intelligence officers.

## CONCLUSION

Plaintiffs deserve an injunction restraining Defendants from terminating them. Plaintiffs are likely to succeed on the merits of their constitutional claims, in particular. Plaintiffs will suffer irreparable harm in the absence of an injunction by being publicly fired for allegedly engaging—according to a White House statement—in illegal and immoral activity. The balance of equities is in Plaintiffs' favor as termination causes them economic hardship, and Defendants none at all. And Plaintiffs' continued public service as highly-trained intelligence officers serves the public interest.

Dated: February 21, 2025

Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
**Fluet**
1751 Pinnacle Dr., Ste. 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.