IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOHN DOES 1-6; and <br><br> JANE DOES 1-13, <br><br>        Plaintiffs, <br><br>        v. <br><br> U.S. OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; <br><br> CENTRAL INTELLIGENCE AGENCY; <br><br> TULSI GABBARD, in her official capacity as Director of National Security; and <br><br> JOHN RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency, <br><br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 25-300 (AJT/LRV) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**FIRST AMENDED COMPLAINT**

**NATURE OF THE CASE**

1.     Plaintiffs are nineteen nonpartisan civil servants serving in vital national security roles as highly-trained and expensively-vetted U.S. intelligence officers. Most currently serve in temporary assignments related to diversity, equity, inclusion and accessibility ("DEIA") within the Intelligence Community ("IC") at the Office of the Director of National Intelligence ("ODNI") and the Central Intelligence Agency ("CIA"), implementing federal civil rights laws within the Executive Branch as mandated by Congress.

2. Some officers are only suspected of doing so, only on the basis of having recruited for CIA at universities, for example, without intentionally violating civil rights laws.

3. Collectively, they represent approximately two-hundred and eighty-seven (287) years of combined service as intelligence officers for our Nation.

4. None of these officers' activities was or is illegal. At no time have the agencies employing Plaintiffs contended that they individually engaged in any misconduct, nor are they accused of poor performance.

5. On January 20, 2025 Executive Order ("E.O.") 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, described such programs as "illegal and immoral." On January 21, 2025 a White House statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* described DEIA programs as, *inter alia*, "dangerous," stigmatizing and demeaning hardworking Americans, resulting in "disastrous consequences."

6. E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law," all DEIA positions. The executive order did *not* call for the termination of officers temporarily assigned to DEIA programs, and cautioned that the order shall be implemented consistent with applicable law.

7. On January 22, 2025 Defendants ODNI and CIA, respectively, placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments believed by Defendants Gabbard and then Acting Director Tom Sylester and subsequently by confirmed Director Ratcliffe to relate to personnel functions involving DEIA. The CIA officers received this notice only verbally.

8. On February 14, 2025 most Plaintiffs received telephone calls from human resources officers advising them to report to the CIA visitors' center with their IC access badges,

but without counsel, as early as 8:00am on Tuesday, February 18. In Plaintiffs' many years of experience within the IC, this kind of summons is generally associated with a negative employment action, including termination.

9. On or about February 18, 2025 CIA asked, in person or via email, most Plaintiffs to choose from the following three options. One, immediate resignation effective February 18, 2025; two, deferred resignation, including administrative leave until September 30, 2025; or three, termination including administrative leave effective May 20, 2025.

10. Most Plaintiffs were told that if they declined to select an option by close of business on February 19, 2025, they faced termination "in accordance with the EO [Executive Order 14151], and pursuant [*sic*] the D/CIA's termination authority, as outlined in U.S.C. § 3036(e)."

11. Defendants ODNI and CIA and their directors, Defendants the Hon. Tulsi Gabbard and the Hon. John Ratcliffe, violated the Administrative Leave Act by placing Plaintiffs on administrative leave for more than ten workdays, despite the absence of any individual accusation of misconduct or workplace danger.

12. Defendants further violated the Administrative Procedure Act. While intelligence officers lack recourse to the Merit System Protection Board ("MSPB"), their own agencies classified internal regulations provide procedures for terminating officers. Officers' basic rights include notice, the development of a record, to consult with counsel, and the opportunities to be heard and to appeal. Plaintiffs received none of these rights.

13. CIA directors, for example, maintain statutory authority to terminate an Agency officer when the Director determines that this is necessary or advisable in the interests of the United States. However, as the Supreme Court explained, this provision of the National Security Act is

constitutional only because of the Agency's directors' unique responsibility to protect intelligence sources and methods from unauthorized disclosure due to counterintelligence threats.

14. Here, Plaintiffs—career intelligence officers—face termination *en masse* only because of their temporary assignment, and a domestic political dispute between the Republican and Democratic parties regarding the merits of DEIA programs within the Executive Branch, programs that are funded, mandated, overseen by and mandatorily reported to Congress.

15. Plaintiffs' imminent termination is therefore arbitrary, capricious, an abuse of discretion, not in accordance with IC regulations, and unsupported by any evidentiary record whatsoever. It is also contrary to Plaintiffs' constitutional rights under the First and Fifth Amendments. Plaintiffs are being fired because of their personal *assumed* beliefs about a domestic political issue—the enforcement of federal civil rights laws—and losing their property interest in their employment without due process of law.

## JURISDICTION

16. The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter arises under the First and Fifth Amendments to the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.; and the Administrative Leave Act, 5 U.S.C. § 6329a.

17. The Court exercises personal jurisdiction over Defendants ODNI and CIA as they are federal agencies, and the Defendants Gabbard and Ratcliffe are named in their capacities as heads of their respective agencies.

## VENUE

18. Venue in this District is proper because the constitutional and statutory violations took place in the Eastern District of Virginia, where Defendants' ODNI and CIA's headquarters are located, and where Plaintiffs are employed.

## THE PARTIES

19. Plaintiffs are nonpartisan civil servants—career U.S. intelligence officers temporarily assigned by ODNI and CIA to personnel functions, some of which involve DEIA matters.

20. Defendants ODNI and CIA are U.S. Government agencies.

21. The Hon. Tulsi Gabbard is the Director of National Intelligence, being confirmed in that role on February 12, 2025. It is unknown if Defendant Gabbard possesses personal knowledge of the matters set forth in the Complaint.

22. The Hon. John Ratcliffe is the Director of the Central Intelligence Agency, being confirmed in that role on January 23, 2025. It is unknown if Defendant Ratcliffe possesses personal knowledge of the matters set forth in the Complaint.

## FACTUAL ALLEGATIONS

23. Plaintiffs are nonpartisan civil servants serving in vital national security roles as U.S. intelligence officers. Plaintiffs are not somehow "DEIA officers." Plaintiffs are career intelligence officers of different career services who Defendants believe, in some cases inaccurately, now serve in temporary positions directly related to DEIA. Under their agencies' regulations and practices, Plaintiffs serve in numerous different roles within their agencies as part of their career progressions. They may be assigned to new roles within their agencies in response to the specific needs of their agencies.

24.     Plaintiffs are temporarily assigned (or believed by Defendants to be so assigned) by their agencies to carry out duties of implementing federal civil rights laws, fulfilling a perceived need of promoting DEIA in their workplace.  These duties included advancing the hiring, promotion and advancement of members of protected classes under the civil rights laws applicable to the federal government as an employer under, inter alia, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.  Congress appropriated funds to be spent by the Executive Branch on the specific tasks within the IC carried out by employees.

25.     Congressional oversight includes mandated annual demographic disparity reports, and related briefings to the House and Senate intelligence oversight committees.  These statistics are reported through CIA to ODNI and then to Congress.  Not only does Congress mandate and oversee IC diversity programs, but the Government Accounting Office also audits such programs.[1]

26.     None of these employees' activities was or is illegal, violated law or regulation, or are contrary to the well-established and regulatorily-supported interest of the federal government in prohibiting discrimination, retaliation, reprisal, harassment, bullying or the creation of hostile work environments for members of protected classes under the laws mentioned.  At no time did the agencies employing Plaintiffs contend that they individually engaged in any misconduct, nor are they accused of poor performance.

---

[1] *See U.S. Government Accountability Office, Intelligence Community: Additional Actions Needed to Strengthen Workforce Diversity Planning and Oversight* (Dec. 2020) (available at https://www.gao.gov/assets/gao-21-83.pdf).  *N.b.*, December 2020 was during the first Trump Administration.

27. On October 28, 2023 Defendant CIA posted on the Agency's Facebook page that "At #CIA, we believe that DEIA enables mission." That same post linked to CIA's 2024-2027 DEIA Strategy.

28. The National Security Act as amended on December 23, 2024 states that the statutory responsibilities of Defendant the Director of National Intelligence include ensuring "that the personnel of the intelligence community are sufficiently diverse for purposes of the collection and analysis of intelligence through the recruitment and training of women, minorities, and individuals with diverse ethnic, cultural, and linguistic backgrounds." 50 U.S.C. § 3024(3)(A)(4).

29. On January 15, 2025 Defendant John Ratcliffe stated under oath to the Senate Select Committee on Intelligence at his confirmation hearing to be Director of the Central Intelligence Agency that under his leadership, that Agency "will produce insightful, objective, all-source analysis, never allowing political or personal biases to cloud our judgement …".

30. On January 20, 2025 Donald Trump was inaugurated the forty-seventh president of the United States. That same day, the President issued Executive Order ("E.O.") 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, describing existing such programs as "illegal and immoral." *Id.* at § 1.

31. On January 21, 2025 the White House issued a statement, Ending Illegal Discrimination and Restoring Merit-Based Opportunity. The statements describes DEIA programs as "dangerous, demeaning, and immoral," "illegal," violative of civil-rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values … in favor of an unlawful, corrosive, and pernicious identity-based spoils system," stigmatizing and demeaning of hardworking Americans, and resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination." *Id.* at § 1.

32. Accordingly, E.O. 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions." *Id.* at § 2(b)(i). Similarly, the January 21 White House statement called upon the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id.* at § 2.

33. Notably, E.O. 14151 and the subsequent White House statement did not call for the termination of officers temporarily assigned to DEIA programs. In fact, the E.O. cautioned that nothing in it impaired any legal authority granted to an executive agency, and that the order shall be implemented consistent with applicable law. See *id.* at § 8 (a)(i) and (b).

34. On January 22, 2025 Defendants CIA or ODNI placed Plaintiffs upon administrative leave, apparently only because of their temporary assignments to personnel functions involving DEIA, or inaccurate perceptions of the same.

35. On February 14, 2025 most Plaintiffs received telephone calls from human resources officers advising them to report to the CIA visitors' center within the Eastern District of Virginia with their access badges, but without counsel, as early as 8:00am on February 18.

36. On or about February 18, 2025 CIA asked, either in person or via email, or by phone, those Plaintiffs to choose from certain options, including: one, immediate resignation effective February 18, 2025; two, deferred resignation, including administrative leave until September 30, 2025; or three, termination including administrative leave effective May 20, 2025. Defendant CIA told these Plaintiffs that if they declined to select an option by close of business on February 19, 2025, they faced termination in accordance with E.O. 14151, and pursuant to the director's authority under Section 3036(e).

8

### I.   Administrative Leave Act

37.   On January 16, 2025 Congress enacted and the Office of Personnel Management provided guidance on amendments to the Administrative Leave Act ("ALA"). Per 5 U.S.C. § 6329a(b)(1), an agency may now place an employee on administrative leave for no more than ten workdays. Investigative leave and notice leave are permitted, subject to statutory and regulatory requirements, only if an agency determines that an employee must be removed from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the continued presence of the employee in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in loss of or damage to Government property, or jeopardize legitimate Government interests.

38.   None of the specified conditions of the ALA are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments. Yet Plaintiffs have been on such leave since January 22, in an adverse employment action in violation of law.

### II.   Administrative Procedure Act

39.   On the afternoon of February 14, 2025 Defendants advised most Plaintiffs—on a Friday headed into a federal holiday weekend—to report to the CIA visitors center starting first thing on the morning of the next workday, and to bring their IC access badges with them. This gave Plaintiffs virtually no time to consult meaningfully with counsel about likely impending personnel actions. On February 14, Jane Doe 1 asked Defendant CIA if she could bring security-cleared counsel to the February 18 meeting. The Agency denied her permission to do so.

40.   Most CIA and ODNI officers work inside Special Compartmented Information Facilities ("SCIFs"), and work on government computer and telephone systems specially designed

to handle classified information. Plaintiffs cannot, without the IC's permission, even bring a paper copy of their own personnel file out of their workspaces.

41. Unlike other federal civil servants, intelligence officers lack recourse to the Merit System Protection Board (MSPB): their agencies' regulations provide their only avenue of administrative appeal. Pursuant to administrative regulations, which are classified, the IC has unique policies and procedures for terminating officers for misconduct, poor performance or unsuitability, such as CIA's Personnel Evaluation Board ("PEB") system.

42. A redacted and unclassified version of CIA regulations available on the internet provides for example that CIA's executive director may "decide the first-level appeals of employees recommended for termination of such employees upon recommendation of an advisory board." Termination of Employment at ¶ 8(b)(5) (available at https://irp.fas.org/cia/term.pdf). Ten grounds for termination are set forth in the regulation, none of which apply to Plaintiffs. An eleventh, catch-all reason, provides for when the Director "deems such determination necessary or advisable in the interests of the United States," ¶ 8(d), language taken from the National Security Act, 50 U.S.C. § 403(c), the constitutionality of which is explained by Chief Justice Rehnquist in *Webster v. Doe*, 486 U.S. 596 (1988), discussed *infra*.

43. In Plaintiffs' case, they are to be terminated by Defendants with only a holiday weekend's worth of notice, no meaningful ability to consult with counsel, no record developed, no opportunity to be heard, and no right of appeal.

44. Courts traditionally give the IC broad deference in its decisions to suspend or even terminate officers, for a good reason that is inapplicable to Plaintiffs. The judiciary gives a wide berth to Defendants CIA and ODNI on personnel decisions because such matters are sometimes

10

inextricably entwined with sensitive counterintelligence information bearing upon officers' loyalty to the United States, or suitability to handle classified information.

45. In *Webster*, Chief Justice Rehnquist set forth the reason for CIA directors to hold such broad discretionary power under the National Security Act, Section § 403(c), to terminate Agency employees "whenever he shall deem such termination necessary or advisable in the interests of the United States...".

46. Writing for the Court, the Chief Justice reasoned that DCIs and their successors are responsible "for protecting intelligence sources and methods from unauthorized disclosure," "the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees," "employment with the CIA entails a high degree of trust that is perhaps unmatched in Government service," and as such "Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Id*. at 600-01 (citing *Snepp v. United States*, 444 U.S. 507, 510 (1980) and *CIA v. Sims*, 471 U.S. 159, 168-69 (1985)).

47. Here, Petitioners are suspended and face imminent termination not because of any national security issues. Rather, these civil servants face personnel action only because of a domestic political dispute between the Republican and Democratic parties regarding the efficacy and legality of DEIA initiatives within the federal government, in which they, their careers and their families are collateral damage. The rationale set forth by the Supreme Court in Webster to uphold the legality of CIA directors' broad authority under Section 403 does not apply here.

48. The Agency regulations further provide for "procedures for termination of employment," ¶ 8(e), none of which are being followed here. The regulation also provides for "termination without procedures" at the director's discretion under his Section 403 authority, and

11

claims (dubiously) that this discretionary authority is not limited by any other law. *See* Termination of Employment at ¶ 8(f). Even still, the Agency's regulation provides at ¶¶ (g)(3)-(4) a right of appeal to CIA's third-ranking official as well as the director. It appears Plaintiffs are not to receive that right of appeal.

### III. The First Amendment and Fifth Amendments

49. While called as a vocation to a special kind of public service, an intelligence officer possesses a cognizable property interest in his or her job, as does any federal employee. Concomitantly they possess a First Amendment right not to lose that interest only because of their perceived beliefs about the hot-button domestic political issue of DEIA being assumed only on the basis of their temporary assignments, and a Fifth Amendment right not to lose that interest without the benefit of due process of law—including adequate notice, a record, and the opportunities to be heard and to appeal.

50. Petitioners are not career DEIA officials, they are career *intelligence officers*. Rather than terminate Petitioners, even under the terms of E.O. 14151 and its companion policy statement, Defendants CIA and ODNI could simply reassign them to duties not involving DEIA, duties they performed well for years before their most recent assignment.

51. Indeed, several Plaintiffs' career services within ODNI and CIA immediately identified other open and mission-critical positions into which these officers could immediately be slotted. Each Plaintiff appraised of their career service's intention to offer those jobs expressed their willingness to accept them.

52. Instead, the IC is opting for the draconian, illegal and unnecessary alternative of arbitrarily terminating (or placing on LWOP) good officers recruited, vetted and trained at great

taxpayer expense, capriciously wasting cumulatively over one-hundred of years of national security experience.

53. Plaintiffs' termination is especially arbitrary as Congress authorizes and appropriates money to IC elements specifically for DEIA activities. Once Congress makes that appropriation, there is no meaningful discretion by Executive Branch to not spend the money on DEIA activities, unless Congress approves a formal reprogramming request. On information and belief, the classified annexes of the federal budget identify funds to be spent on DEIA programs within the IC.

54. Plaintiffs were not only doing what their Executive branch managers assigned them to do within the IC, Plaintiffs were doing what Congress *mandated* the IC to do. If Plaintiffs for some reason refused on principle to accept a DEIA-related assignment, another IC officer would have been assigned to the role, or else Congress would have complained to the IC about its failure to expend the appropriated funds earmarked for these programs. *C.f.*, the Impoundment Act of 1974, 2 U.S.C. § 681 *et seq*.

55. Leaving aside the question of the merit of DEIA programs in other government agencies, Defendant CIA for example holds specific national security reasons to value diversity. The Agency needs some operations officers with, *inter alia*, the ability to blend in racially with foreign populations, the capability to meet female sources in cultures in which unmarried adults of the opposite sex rarely meet in private, dual citizenship documentation, foreign language skills, overseas living experiences, and more. Recruiting, developing and retaining a diverse Intelligence Community workforce is therefore a national security imperative.

## CLAIMS FOR RELIEF

### Count One:
### Violation of the Administrative Procedure Act,
### 5 U.S.C. § 706, by all Defendants

56. Plaintiff incorporates the allegations in paragraphs 1-43 as if fully set forth herein.

57. The Administrative Procedure Act ("APA") provides at 5 U.S.C. § 706 that a U.S. district court may hold unlawful agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  *See* § 706(2).

58. Defendants' scheme to terminate Plaintiffs is a perfect example of arbitrary and capricious agency actions that amount to an abuse of discretion.  Plaintiffs' suspension two days after the issuance of the Executive Order, only on the basis of their temporary assignments to DEIA roles, and their anticipated firings, even though E.O. 14151 does not call for their termination, is the definition of arbitrary, capricious and abusive agency action.

59. Plaintiffs' looming termination is contrary to their constitutional right under the First Amendment to free speech about their (assumed) beliefs about a *domestic* political issue, an issue which is irrelevant while they serve in agencies dedicated to collecting and analyzing *foreign* intelligence.  Plaintiffs planned termination is also contrary to their right under the Fifth Amendment to due process, including adequate notice and a record and the opportunities to be heard and to appeal, before being denied their property interest in their employment.

60. The IC plans to terminate Plaintiffs without following *any* legal procedure, as called for by agency regulations, and without any evidentiary record at all, as could be presented by

Plaintiffs in their defense at a CIA PEB, for example. Plaintiffs will receive no hearing at all, not even before the MSPB, nor will they receive rights of appeal.

61. The APA permits the Court to review final agency action, as well as action for which there is no other adequate remedy. *See* 5 U.S.C. §§ 702, 704. Defendants appear to have already taken final agency action. The IC presented Plaintiffs with *faits accompli* on February 18: thus, their insistence that Plaintiffs appear at their employers' external visitors centers, instead of their offices, and with their IC access badges, but without counsel. Defendants took their final action.

62. Because of press attention understandably being paid to current events, Plaintiffs' terminations amount to very public firings, crippling their ability to obtain private sector work within their professions, at defense and intelligence contractors for example.

63. It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning, immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

64. There is no other remedy than a judicial remedy for the harm Plaintiffs will suffer by termination.

**Count Two:**
**Violation of the Administrative Leave Act, 5 U.S.C. § 6329a,**
**by all Defendants**

65. Plaintiffs incorporate the allegations in paragraphs 1-53 as if fully set forth herein.

66. The Administrative Leave Act provides that an agency may only place an employee on administrative leave for ten workdays unless it determines that an employee must be removed

from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the employee's continued presence in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in damage to Government property, or jeopardize legitimate Government interests.

67. None of the ALA's conditions are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments. Plaintiffs have been on such leave since January 22, an adverse employment action in violation of law.

### Count Three:
### Violation of U.S. CONST. AMEND. I,
### by all Defendants

68. Plaintiffs incorporate the allegations in paragraphs 1-55 as if fully set forth herein.

69. The First Amendment provides in pertinent part that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for a redress of grievance, such as the issues raised by DEIA. Plaintiffs' terminations are contrary to their constitutional right under the First Amendment to free speech about their assumed beliefs about a domestic political issue—the advancement and enforcement of the civil rights laws of the United States among American citizens—while serving in agencies dedicated to foreign intelligence. Plaintiffs carried out programs lawfully funded and mandated by Congress specifically to promote DEIA objectives within the IC.

### Count Four:
### Violation of U.S. Const. Amend. V,
### by all Defendants

70. Plaintiffs incorporate the allegations in paragraphs 1-57 as if fully set forth herein.

71. The Fifth Amendment provides in pertinent part that no person shall be deprived of property without due process of law. Defendants plan to terminate Plaintiffs with insufficient notice, without any of the agency administrative procedures required by law, and without any evidentiary record—no hearing at all, not even before the MSPB—or right of appeal. Plaintiffs' impeding termination is contrary to their constitutional right to due process before being denied their property interest in their employment.

## JURY DEMAND

72. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all triable issues.

## PRAYER FOR RELIEF

73. Wherefore, Plaintiffs respectfully request that the Court enter an award and judgment in their favor, against Defendants as follows:

(a) Injunctive relief under the First and Fifth Amendments, and/or the APA;

(b) Expenses and costs, including attorneys' fees, pursuant to 5 U.S.C. § 504; and

(c) Such other relief as the Court deems appropriate.

Dated: February 24, 2025

Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
**Fluet**
1751 Pinnacle Dr., Ste. 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

                                                                      */s/ Kevin T. Carroll*
                                                                      Kevin T. Carroll, Esq.