# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| JOHN DOES 1-6; and | ) |
| | ) |
| JANE DOES 1-13, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY; | ) |
| | ) |
| TULSI GABBARD, in her official capacity as Director of National Security; and | ) |
| | ) |
| JOHN RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency, | ) |
| | ) |
| Defendants. | ) |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

As the Court is aware, Plaintiffs are nineteen nonpartisan career officers of the Central Intelligence Agency ("CIA") and the Office of the Director of National Intelligence ("ODNI") who were, or are suspected by the Intelligence Community ("IC") of having been, assigned to temporary duties related to, or perceived to be related to, congressionally-mandated and specifically funded diversity, equity, inclusion and accessibility ("DEIA") initiatives.

## INTRODUCTION

Plaintiffs were placed on administrative leave on January 22, 2025. Many were notified on February 14 to report to a CIA facility with their IC access badges starting on February 18, whereupon several received notice of the following: Defendant Ratcliffe seeks to terminate Plaintiffs from CIA pursuant to Agency Regulation 14-6, *Termination of Employment* ("AR 14-6"), as in his discretion he deems this action "necessary or advisable in the interests of the United States" in accordance with his authority under 50 U.S.C. § 3036(e), *Termination of employment of CIA employees*. Defendant Ratcliffe did not, however, refer with specificity to which section of AR 14-6 he sought to rely upon in his memorandum *See* Def.'s Memo. Ex. B *Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office* (Feb. 18, 2024), ("Director's Memorandum"), ECF No. 14-2.

Rather, Defendant Ratcliffe referred in his memorandum specifically to Section 3036(e); Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20, 2025); "follow-on memoranda from the Acting Director of OPM," which Defendants identified in their pleadings as including a memorandum from Acting Director of the Office of Personnel Management Charles Ezell, *Guidance Regarding RIFs of DEIA Office* (Jan. 24, 2025); and AR 14-6 in general.

Plaintiff ODNI officers also remain on administrative leave, and await similar correspondence from Defendant Gabbard.

## ARGUMENT

At oral argument on February 24, 2025 this Court presented the following questions for further briefing:

> (1) Whether as a matter of due process this Court may enforce Defendant CIA's regulations under the Due Process Clause of the Fifth Amendment;

2

(2) Whether under Defendant CIA's regulations, on the record now before the Court, Plaintiffs have a right to seek alternative assignments within the Agency, before being terminated based upon a finding that they are excess officers; and

(3) Whether Plaintiffs have a right of appeal under Defendant CIA's regulations.

Plaintiffs assert that this Court may enforce Plaintiffs' due process rights under Defendant CIA's regulations, as they possess cognizable liberty interests, as well as property interests in their employer following its own employment regulations. Also, that Plaintiffs possess rights to seek alternative Agency assignments if they are found to be excess employees—indeed forward assignments have been offered to Plaintiffs by their career services. And finally, Plaintiffs possess rights to appeal any decision to terminate them.

### I.   This Court may enforce CIA's application of its regulations to Agency officers, pursuant to their liberty and property interests under the Due Process Clause.

The parties agree that Defendants did not comply with CIA procedures, as set forth in Agency Regulation (AR) 14-6, *Termination of Employment*, regarding Plaintiffs' proposed terminations.

Defendants grant that Plaintiffs may plead a Fifth Amendment Due Process cause of action within the jurisdiction of this Court if CIA regulations are sufficiently firm, certain and definitive to give rise to Agency officers' property interest in their enforcement, but argue that AR 14-6 is insufficiently firm, certain and definitive only because of the inclusion of Section II(D) within the regulation, *Termination Without Procedures*. Section II(D) states that pursuant to Section 3036, the CIA Director may terminate any officer "without regard to any procedural steps" when "in his discretion" he "deems it necessary or advisable in the interests of the United States."

At oral argument, Defendants stated that they are reliant upon Section II(D) of the regulation, and not Subsection B(11), which provides in language similar to Section II(D) for the CIA Director to terminate Agency officers at his discretion, but impliedly and under the principle

3

of statutory construction of *in pari materia*—and in contrast to Section II(D)—<u>with</u> procedures, as statutes that relate to the same subject should be interpreted together.

Plaintiffs submit that Defendant CIA's detailed, eleven-page regulation regarding terminations is indeed sufficiently firm, certain and definitive to give rise to Agency officers' property interest in these regulations' enforcement. *Contra* Defendants' argument, even if they rely upon Section II(D), that section's grant of procedure-less discretionary authority to Defendant Ratcliffe does not somehow make AR 14-6 infirm, uncertain or vague.

### A. This court may enforce CIA regulations to protect officers' due process rights under *Webster v. Doe.*

As Plaintiffs have argued, both the language and subsequent history of *Webster v. Doe*, 486 U.S. 592 (1988), which upheld the constitutionality of an application of Section 3036(e), show that Defendant Ratcliffe's judicially unreviewable Section II(D) authorities are limited to individualized determinations regarding national security risks, not terminations of groups of nineteen or more officers such as Plaintiffs.[1]

As set forth in *Webster*, the National Security Act of 1947 created "CIA and gave its Director the responsibility for protecting intelligence sources and methods from unauthorized disclosure.' Section [3036(e)] is an integral part of that statute, because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Id*. at 601 (citing S.Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H.R.Rep. No. 961, 601 80th Cong., 1st Sess., 3–4 (1947)).

Defendants admitted at oral argument that Section 3036 is "primarily" used "only instances in which national security harms are at stake." (*See* Feb. 24, 2025, Oral Argument on Mot. for

---

[1] *See* J. Barnes, *CIA Plans Largest Mass Firing in Nearly 50 Years*, NEW YORK TIMES (Feb. 20, 2025) (stating that Defendants plan the largest group termination of CIA officers since 1977).

4

TRO ("OA Tr.") at 13, ECF No. 19). While the answer may be classified, counsel suspects that Section 3036 has *only* ever been used in instances in which national security harms are at stake. Certainly, there are no reported cases in which the use of Section 3036 in pursuit of anything other than national interests has been upheld by any court. And nothing in this record allows the Court to find that these employees are to be terminated for national security reasons. Rather, Plaintiffs are being terminated only for domestic political reasons completely inapplicable and inappropriate to career civil servants in a foreign intelligence agency. Specifically, Plaintiffs are being fired for their implementation of congressionally-funded and -mandated DEIA programs, and the enforcement of valid civil rights statutes, at the direction of the President of the United States at that time.

AR 14-6's claim on the Agency's behalf that "a national security basis for the exercise of this authority is not required" is of course useful for Defendants CIA and Ratcliffe, but it is not grounded in the words of *Webster* and its progeny. The Supreme Court closely tied the legality of Section 3036(e) authority to the CIA Director's unique duty to protect human intelligence sources.

Upon remand and in subsequent appeals, the District of Columbia Circuit made plain that Director Webster's decision to exercise his Section 3036(e) authority in that case depended upon his individualized assessment of particular circumstances related to that plaintiff/respondent's personal vulnerability to sexual blackmail, and not generalizations about gay men. Here, Defendants CIA and Ratcliffe conducted no individualized assessments whatsoever of the nineteen Plaintiffs (or other thirty-two similarly-situated officers at CIA and ODNI), and Plaintiffs retain their security clearances, showing that they pose no counterintelligence threat or vulnerability at all.

Taken to its logical end, Defendants' extreme position would extend Section II(D) authority to allow Director Ratcliffe to fire not only all DEIA activity-related CIA officers simply for following the civil rights laws, but fire all Agency officers who are members of any protected class—and without either due process of law or the possibility of judicial review. Constitutionally speaking, this simply cannot be the case.

Plaintiffs are career officers who have held managerial roles. Some Plaintiffs have more than twenty years of Agency service. A sizable number of Plaintiffs have served as long as nineteen years within CIA, just short of the twenty years of hard service at which point an Agency retirement can deservedly vest (or be otherwise ineligible for the Voluntary Early Retirement Act option that Defendants CIA and Ratcliffe offered in lieu of termination). These retirements, if a Plaintiff is blessed with good health and longevity, can be worth, individually, millions of dollars. As career officers, each Plaintiffs is well aware that CIA regulations provide detailed procedures for terminating officers, and also grant the Director authority to terminate officers without procedures in the national interest.

It does not follow that the mere inclusion of Section II(D) in AR 14-6 somehow vitiates Plaintiffs' entire property interest under the Due Process Clause. Were Defendant Ratcliffe to make an individualized determination that any Plaintiff presented a security risk—which as continued security clearance holders, they do not—that would end any cognizable property interest in their employment. Absent such individualized determinations by Defendant Ratcliffe that each of them is somehow now a counterintelligence problem, Plaintiffs retain property interests in their employer following its own regulations regarding their employment—including in some cases many years of dangerous overseas work—in return for the promise of financially valuable pensions. Plaintiffs' legitimate and reasonable property interest in their employer playing by its

own codified rules may not now be taken from them, just short of the proverbial goal line in some cases, without granting them due process under the Fifth Amendment.

> **B.   This Court may enforce CIA regulations to provide due process under the *Accardi* Doctrine.**

As a matter of due process, this Court may enforce an agency's own termination regulations against them if their failure to follow them constitutes a procedural due process violation. Defendants argue that when a regulation rests the exercise of discretionary authority in an agency, those harmed by the agency's enforcement—or lack thereof—are without the right to judicial review. Courts routinely reject such an unbounded view of agencies' discretionary power to depart from their own regulations. Courts may invalidate an ultimate administrative determination when an agency fails "to afford an individual procedural safeguards required under its own regulations." *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999).

This principle is rooted in the Supreme Court's decision *in United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), where the Court found that the Board of Immigration Appeals' failure to follow its own procedures violated due process. *See id*. at 268. The *Accardi* doctrine is a "constitutional rule-of-law provision" reflecting "a founding principle of this Republic." *Wilkinson v. Legal Serv. Corp.*, 27 F. Supp.2d 32, 48 (D.D.C. 1998). That simple founding principle is that "procedural rules confer procedural rights, and even if these procedural rights are not 'property' protected by the Due Process Clause, the Clause still authorizes judicial review to remedy injury caused to an individual by an agency's violation of its procedural rules." *Id*.

Therefore, under the *Accardi* doctrine, Plaintiffs possess a constitutionally-protected procedural interest in CIA following the Agency's own employment regulations that is on par with a constitutional property interest.

The Fourth Circuit acknowledges that the *Accardi* doctrine is applied "in a variety of contexts," against different agencies that having adopted regulations that protect procedural due process, fail to follow them, while attempting to rely on their own broad discretion to do so. *See Morgan*, 193 F.3d at 266 (collecting cases and holding that an agency, having adopted a policy or regulation, is bound to apply it because prejudice as result of agency's failure to follow its regulations may create a due process violation).

*Accardi* does not just empower courts in cases where an agency fails to exercise its own discretion, contrary to existing valid regulations, it also applies "where dismissal from federal employment falls 'substantially short of the requirements of the applicable departmental regulations.'" *Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959)). The dangerous path Defendants Ratcliffe and CIA commits themselves to here—termination at a snap of the Director's fingers, allegedly without the possibility of judicial review—falls substantially short of constitutional requirements as matter of fact, law, and history.

Courts of Appeal have found that intelligence agencies, including Defendant CIA, could run afoul of the Fifth Amendment liberty interests of their officers if they terminate them without due process.

The District of Columbia Circuit found that the National Security Agency ("NSA") did not deny a terminated employee due process regarding his liberty interest when:

> He was afforded notice of NSA's concerns resulting from his conduct; he submitted voluntarily to a psychiatric exam; he received consideration by a board of appraisal that recommended revoking his security clearance while specifically noting that it did not weigh the fact of his homosexuality in its decision; he submitted lengthy written materials in support of his argument; and he had an interview with the NSA Director. Thus, Doe had a meaningful opportunity to contest any allegation that his homosexuality presented a security risk.

*Doe v. Cheney*, 885 F.2d 898, 911 (D.C. Cir. 1989) (Wald, Chief Judge) (internal punctuation marks omitted).

Here, Plaintiffs were afforded little notice, they were examined by no one, nor considered by a board, had no opportunity to be heard, and certainly had no meeting with the CIA Director. Plaintiffs also had no opportunity to appeal their termination.

Earlier, the D.C. Circuit found that CIA did not deny a terminated employee due process regarding his liberty interest when he

> was given a meaningful opportunity to contest any allegation that his homosexuality presented a security risk—indeed, a meaningful opportunity that Doe and his counsel vigorously pursued. Doe had notice that the CIA was seriously concerned about his homosexuality. The CIA furthermore permitted Doe to examine the polygraph officer's report, and to submit lengthy written arguments on his behalf. Finally, Doe makes no allegation that either the Office of Security or the Director of Central Intelligence were biased. In the context of a very sensitive agency such as the CIA, we cannot say that the Constitution requires more.

*Doe v. Casey*, 796 F.2d 1508, 1524 (D.C. Cir. 1986)(Edwards, Circuit Judge).

Here again, Plaintiffs were afforded little notice, they were examined by no one, and had no opportunity to be heard, and Plaintiffs reasonably suspect that Defendants are biased against them. All nineteen Plaintiffs are members of at least one protected class. Their mass terminations would have a disparate impact upon minority employment in the Intelligence Community, and suggest Defendants' malintent to evade federal equal employment opportunity laws through misuse of Section 3036.

Plaintiffs also note that prior to January 20, 2025 *all* CIA employees were in some manner required to do work in the DEIA space. Such work was included in all Agency job notices and performance evaluations prior to January 22, 2025 and therefore, the entire CIA workforce could

9

be susceptible to being placed on administrative leave on the basis set forth by Defendants CIA and Ratcliffe.[2]

Courts' previous interpretations of national security employees' rights before termination, and the agencies' own regulations, create a liberty interest that Defendants Ratcliffe and CIA cannot then trample on with impunity. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by [other] laws or policies") (internal citation omitted); *see also Lopez v. FAA*, 318 F.3d 242 (D.C. Cir. 2003) (Agencies "cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination.") (*citing Mazaleski v. Treusdell*, 562 F.2d 701, 719 (D.C. Cir. 1977)). Therefore, "when agencies establish 'special' 'pre-termination procedures," they are bound to follow them. *Lopez*, 318 F.3d at 247 (*citing Doe v. Dep't of Justice*, 753 F.2d 1092, 1098 (D.C. Cir. 1985)).

Plaintiffs recognize that intelligence officers possess no property rights to their security clearances, which again, are not at issue in the case at bar. But in the context of drafting the appeal procedures for persons denied access to special compartmented information ("SCI") throughout the IC, Defendant CIA's own internal legal advice was that any pre-termination procedural guarantees, once officially adopted as regulations, must be adhered to—and that CIA's failure to comply will be subject to judicial review. *See* CIA, *Proposed Appeals Procedures for SCI Access Denials* (noting that "an appeals procedure is both rational and fair," and advising that once the

---

[2] Furthermore, Defendant CIA's application of what work is (or is not) DEIA-related is not being equally applied to all Agency positions and officers. There are officers who worked substantially in the DEIA space, but whose job title did not identify those activities as such, and so they were not placed on administrative leave on January 22, 2025. Even by Defendants CIA and Ratcliffe's own terms, they are not fairly implementing their own policy.

10

regulation "is adopted, the government will be bound" by its terms) (citing to *Vitarelli v. Seaton*, 359 U.S. 535 (1959)).[3]

Defendants CIA elected to adopt pre-termination rights that its officers reasonably relied upon, because of clear case law necessitating the Agency's own practice of adhering to it as compulsory. The extraordinary denial of those well-established rights to Plaintiffs, makes their termination process (such as it is) fall substantially short of what is procedurally and therefore constitutionally required, and what these officers reasonably expected and relied upon in choosing to spend their careers at CIA.

Therefore, this Court may hold Defendant CIA's decision invalid for violating the *Accardi* doctrine, and in turn the Due Process Clause, as the Agency failed to follow its own procedures regarding Plaintiffs. *See Sanchez v. McAleenan*, 2024 WL 1256264 (D. MD. Mar. 25, 2024) (applying the *Accardi* doctrine and finding that the U.S. Citizenship and Immigration Service's failure to follow its own provisional waiver application process violated due process).

**II.     Defendant Ratcliffe designated procedures to be followed in Plaintiffs' terminations as allegedly excess officers, which include a right to be considered for reassignment, but Defendant CIA did not comply with this procedure.**

Defendant Ratcliffe's memorandum on the terminations states that his termination of Plaintiffs will be "consistent with" AR 4-16. While there are no allegations of misconduct or unsuitability made by anyone against Plaintiffs,[4] AR 14-6 provides for eleven grounds for termination from CIA, one of which is "other circumstances" – *with* procedures, when "the D/CIA

---

[3] CIA-RDP96M01138R000600030011-9 (Jan. 23, 1979), *available at* https://www.cia.gov/readingroom/document/cia-rdp96m01138r000600030011-9.

[4] *E.g.*, failures to complete trial period satisfactorily, meet work and efficiency requirements, meet security standards, medical standards or Agency standards of conduct; abandonment of position or legal incompetence. *See* AR 14-6 at § II(b).

11

in his discretion, deems such termination necessary or advisable in the interests of the United States." *Id*. at § II(b)(11); *c.f. id*. at § D (*Termination Without Procedures*).[5]

Alone among the many reasons and procedures for termination specified in AR 14-6, the Director's memorandum can only be read to constitute a finding of excess under § II(B)(9), *Termination of Excess Personnel*, which triggers the rights and privileges listed under § IV, *Procedure for Termination of Excess Personnel* for the Plaintiffs. Critically, the memorandum describes the termination in language that clearly invokes excess finding, referencing an office that no longer exists. *See* Def.'s Memo. Ex. B ¶1, ECF No. 14-2 (defining the employees subject to termination as those who served "in the Agency's *former* Diversity and Inclusion Office"). Despite the fact that the Director's memorandum constitutes a finding of excess, Plaintiffs are not being afforded the rights and privileges AR 4-16 provides excess termination employees, such as reassignment.

Section § II(C)(4) provides that in considering whether an officer is excess to the needs of a CIA career service, Agency officials "will take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth." *Id*. at ¶ (a). An officer determined to be excess will be advised of this in writing, and if the officer so wishes, "the Career Service will make an effort to arrange placement

---

[5] While Defendants insinuated that the terminations may be pursuant to Section II(D), as the Court correctly noted during the oral argument, that Section is "not in the director's memorandum," and nothing in the record before the Court suggests that Section II(D) was exercised. *See* OA Tr. at 16-18. Therefore, resort to Section II(D) as a source of "secret, undisclosed" authority for termination is foreclosed to Defendants Ratcliffe and CIA. *Id*.

Court's review of the agency's decision is "limited to the agency's original reasons," and the Court must ensure that the decision "is not upheld on the basis of impossible '*post hoc* rationalization.'" *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 22 (2020) (*citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).

in another component within that Career Service." *Id*. at ¶ (b).  If such efforts fail, and the officer wishes, "an Agency-wide placement effort" will follow.  *Id*. at ¶ (c).

Additional requirements under Section § II(C)(4), further to a different classified Agency Regulation to which counsel does not have access, pertain to officers with disabilities.  *Id*. at ¶ (a). Some Plaintiffs are indeed disabled, some in connection with their previous, honorable uniformed service in the U.S. armed forces.

Every single one of the Plaintiffs in this case has had at least one currently vacant, suitable and career service-appropriate position identified for them by their career service.  Most Plaintiffs received offers of several such positions from their career service; one Plaintiff received as many as seven.  Plaintiffs' continued service in CIA is, clearly, valuable to the national security.

Plaintiffs must be considered for reassignment before potentially being terminated by Defendant Ratcliffe under Section II(b)(9) and granted all the rights and protections listed under Section § II(c)(4).  Despite the facts that (a) Executive Order 14151 does *not* call for the termination of personnel in Plaintiffs' position, and (b) Defendant CIA knows that currently vacant, suitable and career service-appropriate positions are identified and waiting for Plaintiffs, Defendant Ratcliffe still seeks to terminate rather than reassign them, in a clear violation of rights to which excess employees are entitled.

As this Court stated at oral argument, Plaintiffs "are talented, experienced assets, if you will, that would be in the interest of the United States to try to reassign elsewhere if that need existed.  And the regulations seem to recognize that as an important aspect of their employment. I, frankly, don't quite understand why that's being resisted by the Agency."

Plaintiffs contend that Defendants Ratcliffe and CIA are resisting simply reassigning them, in accordance with both Agency Regulation 14-6 and the national interest in retaining expensively-

13

trained and highly-experienced intelligence officers, because of Plaintiffs' perceived private support for the advancement of the civil rights laws of the United States. This is why Defendants' failure to afford Plaintiffs due process impinges upon their Fifth Amendment property *and* liberty interests, as well as their First Amendment rights to free speech.

Even if the Court finds that the Director's memorandum was in effect an excess termination finding under § II(B)(9), and therefore find that Plaintiffs are entitled to Section II(C)(4) procedures, the Court must still independently analyze whether either § II(B)(9) or indeed any law or constitutional provision allows the head of any executive agency to identify a "class" of employees as excess solely based on the fact that they followed and were entrusted to discharge the lawful orders of the previous head of the agency and the previous President.

Executive branch employees are expected to follow the lawful direction of a President. Their termination for following the lawful direction of a previous President cannot legally be upheld as a "necessary or advisable" termination on that basis a subsequent President's CIA or ODNI Director. *See* Director's Memorandum at ¶ 4. Neither can the Defendant Ratcliffe's Memorandum permissibly define and target a class of employees to be eliminated as excess solely because an executive order now regards their views as "illegal and immoral," when Plaintiffs faithfully executed well-established civil rights laws as ordered by Congress and the former President they served under.

Given Plaintiffs' status as members of protected classes, it also suggests an unlawful effort by Defendants Ratcliffe and CIA to misuse the Director's unique national security-related authorities to evade federal equal opportunity laws in order to terminate, with disparate impact, underrepresented populations within the Agency and the Intelligence Community more broadly.

### III. Defendant Ratcliffe designated procedures to be followed in Plaintiffs' terminations as allegedly excess officers include a right of appeal, but Defendant CIA did not comply with this procedure.

Defendant Ratcliffe appears to be attempting to fire Plaintiffs under AR 14-6, *Termination of Employment*, §§ II(b)(11), *Termination in Other Circumstances* and IV, *Procedure for Termination of Excess Personnel*.

Agency Regulation 14-6 provides that in Plaintiffs' case, a termination decision may within ten days be appealed in writing to CIA's number-three official, its Chief Operating Officer ("COO"). Plaintiffs whose IC access badges were seized on February 18, 2025 also have a right to request Agency regulations and other materials for use in drafting their appeal. *See* § E(3), *Appeal of Termination Decision*.

If the COO denies a Plaintiff's appeal, he or she may within another ten days further appeal to Director Ratcliffe, again having access to a secure facility from which to write any written comments for the Director's consideration. *See id*. at § E(4).

As stated in Section I(B), plaintiffs are being denied regulatory rights of appeal to the COO and the Director, in further violation of their property interests under the Due Process Clause of the Fifth Amendment, rights that Defendant CIA itself acknowledges cannot be taken away without subjecting the Agency to judicial challenge. *See Lopez*, 318 F.3d at 55 ("where dismissal from employment is based on a defined procedure, even though generous beyond the requirements binding the agency, that procedure must be scrupulously observed…").

## CONCLUSION

This Court may indeed enforce Plaintiffs' due process rights under Defendant CIA's regulations, including rights to seek alternative Agency assignments, and to appeal any decision to terminate them.

Defendants seek to fire civil servants who simply followed congressional mandates and a previous President's orders regarding DEIA, terminating them with no due process, and for exercising free speech rights, only for domestic political reasons having nothing to do with national security, and without any judicial review.

Plaintiffs are likely to succeed on the merits of their Fifth Amendment due process claim, especially; they will suffer imminent irreparable harm if fired pursuant to defamatory statements by the President; many will suffer the hardship of being fired short of their pensions; and the efforts, knowledge and capabilities to create and maintain a diverse workforce in the Intelligence Community to serve the public's national security interest will be lost.  Plaintiffs therefore respectfully request a preliminary injunction to prevent their unlawful terminations for "illegal and immoral" activities falsely, publicly and repeatedly alleged against them by the President.

Dated: February 26, 2025                    Respectfully submitted,

/s/ Kevin T. Carroll
Kevin T. Carroll, VSB No. 95292
**Fluet**
1751 Pinnacle Dr., Ste. 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 26, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.
