**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JOHN DOES 1-6, *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 25-300 (AJT/LRV) |
| | ) |
| U.S. OFFICE OF THE DIRECTOR OF | ) |
| NATIONAL INTELLIGENCE, *et al*. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

As acknowledged by the Court on February 27, 2025, Plaintiffs—nineteen career, civil service intelligence officers of Defendants the Central Intelligence Agency ("CIA") and Office of the Director of National Intelligence ("ODNI"), facing termination from the Intelligence Community ("IC") for suspected participation in legally required and congressionally-mandated diversity, equity, inclusion and accessibility programs—may possess cognizable Fifth Amendment Due Process claims. Plaintiffs' constitutional claims are based on a lack of due process from (1) reputational injury suffered from defamatory presidential statements about their termination, and (2) a lack of post-termination consideration for reassignment to positions for which they are qualified.

The Court previously ruled that Plaintiffs' claim for reputational injury is not yet ripe. The Court also held that it did not yet need to grant an injunction to protect Plaintiffs' right to have any termination decisions reviewed, as it was unclear at the time if "any of these plaintiffs will attempt to invoke such a review." (Feb. 27, 2025 Hearing on Pl.'s Mot. for TRO ("TRO Tr.") at 27:22-28:7). Similarly, the Court acknowledged that Plaintiffs may indeed have a right to reassignment

but that at the time, "particularly in light of what may be ongoing discussions concerning reassignment," there was no need to grant an injunction pending further developments. *Id*. at 26:21-27:3; *see also* 25:16-25 (recognizing a "post-decision remedy" of reassignment in the event that a termination decision is made).

After the Court's order, Plaintiffs invoked their right under CIA regulations to the review of their terminations, including especially whether they may be reassigned within the IC rather than terminated. CIA takes the position that no such right of review exists.

Because Plaintiffs invoked their right to request review and reassignment, and because CIA rejected those requests, Plaintiffs renew their request for preliminary injunctive relief to (1) stay their looming terminations; (2) order Defendant John Ratcliffe, the CIA Director, in accordance with Agency regulations, to review and reconsider his termination decisions on an individualized basis; (3) order Defendants Ratcliffe and Gabbard, pursuant to *Webster v. Doe*, to state why each individual termination somehow serves the national interest; and (4) allow each Plaintiff to be considered for reassignment within the IC in accordance with their civil service grades and their skills.

The Court stated on February 27, 2025 that a "perfectly understandable" desire by Plaintiffs to have Defendant Ratcliffe review aspects of their termination, "including whether they were properly included on the list of employees to be terminated or whether they should continue in their other ongoing duties unaffected by the shuttering of the DEI office," should be considered in good faith by the Director. TRO Tr. at 28:1-11. Plaintiffs' request has not been so considered by Defendant Ratcliffe.

Brushing aside Plaintiffs' appeal of their terminations, Defendant Ratcliffe blithely ignores his subordinates' earnest and repeated requests, the Court's words, and the plain language of their

Agency's own regulations—to which the Court patiently directed the new Director's attention. Plaintiffs therefore renew their request for preliminary injunctive relief.

## PROCEDURAL AND FACTUAL HISTORY

### I.    Procedural history

Plaintiffs assume the Court and the parties' familiarity with the facts of this case. Procedurally, Plaintiffs moved for a temporary restraining order ("TRO") on February 17, 2025. The Court issued an administrative stay on February 18.   The Court heard further argument and extended its stay on February 24.  The Court denied Plaintiffs' motion for injunctive relief, and lifted its stay, on February 27.

Denying Plaintiffs' motion, the Court stated:

> [I]t would be perfectly understandable if some of these plaintiffs would … want the director to review aspects of their termination, including whether they were properly included on the list of employees to be terminated or whether they should continue in their other ongoing duties unaffected by the shuttering of the DEI office.  I certainly have no reason to think that the director would not consider such requests in good faith such that no further consideration or action on the Court's part *at this time* is warranted.

TRO Tr. at 28:1-11 (emphasis added).

To support their argument that they may terminate Plaintiffs without due process or judicial review, Defendants rely upon Executive Order 14151, *Ending Radical And Wasteful Government DEI Programs And Preferencing* (Jan. 20, 2025).  Subsequent to the Court's last hearing on Plaintiff's motion for a preliminary injunction, on March 10 and 17, 2025, the enforcement of E.O. 14151 was, for other reasons, enjoined by two other District Judges within the Fourth Circuit.  *See American Ass'n of Colleges for Teacher Educ. v. McMahon,* 2025 WL 833917 at *25 (D. Md. Mar. 17, 2025) (Rubin, J.); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 750690 at *4 (D. Md. Mar. 10, 2025) (Abelson, J.).

Also since the Court last heard argument, yet another District Judge within this Circuit stayed the terminations, pursuant to Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 11, 2025), of approximately 25,000 employees of eighteen federal departments and agencies, ordering some reinstated. *See Maryland v. U.S. Dep't of Agriculture*, 2025 WL 800216 at *27 (D. Md. Mar. 13, 2025) (Bredar, J.).

## II.    Subsequent factual developments

On March 7, 2025 the ODNI Plaintiffs received word from Defendant ODNI to anticipate termination notices received on March 10. Similar to termination notices received by the CIA Plaintiffs on February 18, these ODNI notices offered three options: deferred resignation, resignation or termination. *See* Ex. 1.

However unlike notices earlier received by the CIA Plaintiffs, and consonant with the Court's suggestion of February 27, notices received by the ODNI Plaintiffs included the following language: "I understand that if I do not elect the ODNI [deferred resignation program] or resignation, that I may submit a request to the DNI [Director of National Intelligence] for reconsideration of the termination decision." *See id*.

On March 18, 2025 ODNI Plaintiffs appealed to the DNI, Defendant Tulsi Gabbard, *see* Ex. 2. On March 20, Defendant ODNI acknowledged receipt of the same. As of March 27, the ODNI officer Plaintiffs received no response to their appeal.

On March 17, 2025 the CIA Plaintiffs received word from Defendant CIA that they too should anticipate termination notices, received on March 18. Similar to the February 18 termination notices, the notices received by the CIA Plaintiffs on March 18 offered three options: retirement, resignation or termination. *See* Ex. 3. Yet unlike the ODNI Plaintiffs, the CIA Plaintiffs

were *not* advised of any opportunity to petition Defendant Ratcliffe for reconsideration of his termination decision. *C.f.* Ex. 1.

On March 17, 21 and 24, 2025 the CIA Plaintiffs requested that Defendant Ratcliffe reconsider his termination decisions, on an individualized basis, and for them to be considered for reassignment within CIA, as the Court suggested on February 27. On March 25, Defendant CIA informed the undersigned counsel through email that there will be no appeal of Defendant Ratcliffe's decision within the Agency, as in their view, the governing regulation does not offer appeal under these circumstances. The CIA Plaintiffs' choice of termination option is due to Defendant CIA by March 31.

On March 20, 2025 several Plaintiffs met with the bipartisan staff of one of the Intelligence Community's congressional oversight committees of jurisdiction, a meeting approved in advance by both Defendants CIA and ODNI. Some of Plaintiffs' statements prepared for that meeting are quoted below; undersigned counsel did not edit any Plaintiff's statement. *See* Ex. 4.

## STANDARD OF REVIEW

The standard for granting a preliminary injunction is a four-fold test: (1) whether plaintiffs are likely to succeed on the merits of their claim, (2) whether plaintiffs are likely to suffer irreparable harm in the absence of an injunction, (3) whether the balance of hardships weighs in plaintiffs' favor, and (4) whether an injunction serves the public interest. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325-26 (4th Cir. 2021) (enjoining the implementation of E.O. 13888, *Enhancing State and Local Involvement in Refugee Resettlement* (Sep. 26, 2019)). The standard for a renewed motion is the same as for the original motion. *See e.g., Coreas v. Bounds*, 457 F. Supp. 3d 460, 462 (D. Md. 2020).

5

**ARGUMENT**

Plaintiffs are likely to succeed on the merits of their Fifth Amendment Due Process claim; Plaintiffs will suffer irreparable economic and reputational harm in the absence of an injunction, whereas Defendants will face no hardship from following CIA regulations to allow Plaintiffs to appeal their termination, and to seek employment elsewhere in the IC; and an injunction serves the American public's interest.

## I.      Plaintiffs are likely to succeed in their Fifth Amendment Due Process claim.

Defendants rely upon three authorities to terminate Plaintiffs without due process rights to appeal and to seek reassignment:

- 50 U.S.C. § 3036(e), *Director of the Central Intelligence Agency.* Section 3036(e) provides that notwithstanding any other law, the CIA Director may, in his discretion, terminate any CIA officer whenever he deems the officer's termination "necessary or advisable" in the interests of the United States.[1]

- E.O. 14151 § 2(b)(1), which orders the termination, "to the maximum extent allowed by law," all DEIA [diversity, equity, inclusion and accessibility] offices and positions.

- An Office of Personnel Management (OPM) memorandum, *Guidance Regarding RIFs of DEIA Offices* (Jan. 24, 2025) (Ex. 5), closing executive branch DEIA offices and limiting employees subject to those closures to applying to jobs in the closed DEIA offices.[2] E.O. 14151 calls for the termination of offices and positions, not personnel, but the

executive order and OPM memo together deliberately seek to present Plaintiffs with a Catch-22: they can only apply for work in shuttered offices. Defendant Ratcliffe offers no explanation for why Plaintiffs' curt terminations are in the national interest of the United States. Rather, Defendant

---

[1] The correlative statute for the DNI is 50 U.S.C. § 3024(m), *Responsibilities and authorities of the Director of National Intelligence*.

[2] *See* Memorandum of Charles Ezell, Acting Director, U.S. Office of Personnel Management, *available at* opm-memo-guidance-regarding-rifs-of-deia-offices-1-24-2025.pdf. Acting Director Ezell refused a U.S. District Court order to testify on March 13, 2025 in another case challenging the legality of recent mass firings of federal workers. *See* E. Sullivan, *Trump Official Will No Longer Testify in Challenge to Mass Firings*, NEW YORK TIMES (Mar. 12, 2025).

Ratcliffe points to the E.O. and OPM memo and states—*ipse dixit*, arbitrarily and capriciously—that he "determined that it was 'necessary or advisable in the interests of the United States' to terminate all of the employees of the former [DEIA office.]"[3]  Most likely, discovery will show that the White House or the so-called Department of Government Efficiency simply ordered Defendant Ratcliffe to terminate Plaintiffs for domestic political and ideological reasons, and the Director meekly did so without exercising any independent judgment or mature reflection in his new role as leader of Defendant CIA.

Defendants therefore ask the Court to embrace a breathtaking expansion of the CIA Director's authority under Section 3036(e), to conduct mass firings of Agency officers, without due process, against CIA regulations and subject to no judicial review, for reasons completely unrelated to national security.  This, the Court ought to decline to do.

    a.    <u>Defendant CIA's regulations clearly give Plaintiffs a right to appeal their terminations.</u>

As the Court pointed out in oral argument, Defendant CIA's "regulations state explicitly that [an officer's] right to have reviewed a termination decision exists in every case other than in two instances not applicable here."  (TRO Tr.  at 27:10-12).  The Court is of course correct.

Agency Regulation 4-16, *Termination of Employment*, states that except for contract, reserve and alien employees, and those terminated for revocation of access to classified information, "[i]n *all other cases*, the termination decision may be appealed" to CIA's chief operating officer, and ultimately to the Director.  Def.'s Memo. in opposition to Pl.'s Mot. for TRO, Ex. A, Dkt. #14-1 at ¶ E, *Appeal of Termination Decision* (emphasis supplied).  None of those categories applies to any Plaintiffs, who maintain their security clearances.

---

[3] *See* Def.'s Supplemental Mem. in opposition to Pl.'s Mot. for TRO, Ex. 1, Dkt. #20-1, *Declaration of John L. Ratcliffe, Director, Central Intelligence Agency*, at ¶ 3.

For comparison, in a case in which the Court of Appeals for the District Columbia upheld the constitutionality of the dismissal of an individual National Security Agency ("NSA") officer for counterintelligence reasons, one of the reasons the D.C. Circuit upheld the dismissal from a due process challenged was specifically the facts that the petitioner in that case received the opportunity to personally appeal his dismissal to the NSA Director, albeit ultimately without success. *See Doe v. Cheney*, 885 F.2d 898, 911 (D.C. Cir. 1989) (Wald, Chief Judge).

Plaintiffs are being given no such opportunity here, for individual consideration of their particular cases, despite the strong prodding of Defendant Ratcliffe by the Court to grant them just such a hearing. A congressional grant of discretion to an agency official never means that this power can be wielded with no regard for due process guarantees in the Constitution, and other laws and regulations. *See e.g., Wilburn v. Dep.'t of Transportation*, 757 F.2d 260, 262 (Fed. Cir. 1985) (finding that RIF regulations must be interpreted to reflect "the congressional concern for fairness" and that an agency's "assertion of absolute discretion" in conducting a RIF does not satisfy its decision). Here, AR 4-16(E), *Appeal of Termination Decision*, grants a post-termination right. The right to reassignment, as the Court recognized, is a post-termination right. Therefore, even if Defendants CIA and ODNI's unreasonably broad interpretation of their Directors' termination powers is correct, that discretion does not address post-termination rights.

b.    <u>Most Plaintiffs had minimal involvement with DEIA throughout their careers.</u>

As this Court well knows, the IC is made of up more than just operations officers and analysts. Plaintiffs here include specialists in data analytics, government contracting, graphic design, health care, human resources, information technology, law, rare earth elements, security, software development, strategic communications and technical intelligence. None are specialists in DEIA, as there is no such career service in the IC.

8

Several Plaintiffs already had formally secured onward reassignments in their original career fields when they received termination notices. Almost all quickly received such job offers from other offices when word spread that they faced termination; a data scientist received *eight* such offers.

Within the IC, as in many organizations focused on human capital—such as the U.S. Marine Corps for example—recruiting young Americans to perform public service is career-enhancing duty. Personnel likely to be attractive as role models to potential recruits are selected for it; e.g., picture a Marine recruiting sergeant. Also as in the U.S. military, a joint duty tour with a different organization than one's own career service is—understandably—required for promotion to senior ranks and selection to billets with interservice/interagency responsibilities. In the IC, this includes administrative or human resources assignments; one Plaintiff also had a similar "broadening" tour with the Federal Bureau of Investigation ("FBI"), for example. Plaintiffs are not "woke." Rather, they are dedicated, humble and patriotic American intelligence officers.

As one Plaintiff stated, "I was not a diversity bureaucrat. I was an empowerment strategist—equipping officers with the skills and knowledge to do their jobs better." Approximately *ninety percent* of DEIA programs in the federal government are related to accessibility for the disabled. One Plaintiff noted that his chief contribution to DEIA was to direct a video podcast about another officer's battle with cancer, only to highlight available CIA resources for those similarly situated, something presumably Defendant Ratcliffe might support. Academic ivory tower identity politics, this was not.

Some Plaintiffs hold graduate and professional degrees, including doctoral degrees, some in STEM (science, technology, engineering and math) subjects; one was his program's valedictorian. They include veterans, including a retired U.S. Navy Chief Petty Officer. Many

focused, given the nature of threats to our nation since 2001, on counterterrorism and cyber operations.

As one Plaintiff stated about his reason for joining CIA, "Part of the reason I had chosen to accept the Agency's offer of employment was because I had been searching for a professional sense of Mission, to do something that had more meaning and substance than the pursuit of money." As one Plaintiff put it, "None of us were hired specifically for DEI positions. We all have mission critical skills and belong to skills-based career services. I wish for nothing more than to continue my employment at the CIA and to continue to protect the American people from all enemies, foreign and domestic."

One Plaintiff explained how recruiting positions, now associated by Defendant Ratcliffe with DEIA, focused on Defendant CIA's operational needs:

> I was in the Regional Recruiter Program, which had existed as an independent unit for many years prior. This program ensured CIA visited all 50 states to engage a wide berth of Americans, engaged with high caliber sources of academic talent, and connected with programs and organizations that aligned to Agency-established high-priority hiring requirements.

> Everything was based on data, received approval through Talent Acquisition Office leadership and supported outreach priorities and hiring requirements across more than 150 occupations. I planned and executed on-campus and virtual engagements to identify and inform top-tier talent on Agency opportunities, often pivoting to focus on immediate high priority hiring needs or hard-to-fill positions.

Many Plaintiffs are justifiably proud of their long family traditions of uniformed and other public service, especially in wartime. One stated, "every member of my immediate family serves, whether it be in healthcare, law enforcement, military, or federal service."

Assuming *arguendo* that it is somehow constitutionally permissible to terminate Plaintiffs for involvement in these legally required and congressionally-mandated DEIA-related activities—without due process or judicial review—in some cases, individual Plaintiffs' involvement in such

10

activities was *de minimis*.  Some Plaintiffs' work in DEIA-related roles represents a small fraction of their IC service; one served in diversity roles for three months of a nine-year career, another for five months of ten years.

These Plaintiffs' brief assignment to DEIA programs is miniscule compared to their many years of yeoman's intelligence work in the IC.  The flimsy factual basis for terminating these career civil servants shows why CIA officers maintain a regulatory right to appeal unjust terminations to the Agency's director.  The absence of any evidentiary support for these Plaintiffs' terminations also shows why a detail-intensive inquiry by the CIA director is needed to in order make the kind of individualized determination of an officer's suitability for continued Agency service required by *Webster v. Doe*, 486 U.S. 592 (1988), as discussed *infra*.  The thin ice upon which these Plaintiffs' terminations rest shows why no CIA director ever before attempted to rely upon Section 3036(e) authority for a mass firing of officers, much less for domestic ideological reasons, as opposed to national security reasons.

   c.   Defendants seek powers under Section 3036 far beyond those upheld by *Webster v. Doe.*

Thirty-three Senate-confirmed Directors of Central and Directors of National Intelligence over the last seventy-eight years, appointed by presidents of both parties, never once to our knowledge exercised Section 3036(e) authorities to terminate a group of officers, nor any officer for a reason other than national security.  These directors all properly understood that they lacked such authority under the statute.  It is unlikely that Defendants Ratcliffe and Gabbard are the first directors to have discovered a heretofore latent but lawful power.  It is far more likely that this supposedly dormant power does not lawfully exist.

Defendants' gross overreach risks destroying the Intelligence Community as a nonpartisan entity.  The application of Section 3036(e) untethered to individualized suitability determinations

related to national security, with neither due process nor judicial review to temper any abuses, could turn CIA into what its main adversary the KGB was during the Cold War: the servant of a party and its leaders, and not a nation's best interests.[4]

*Webster* upheld the constitutionality of terminating a single CIA officer, pursuant to Section 3036(e) and without due process, specifically based upon (1) the Agency Director's individualized determination that this one officer presented an unacceptable counterintelligence risk, only because as a closeted gay man in the 1980s, he was uniquely susceptible to sexual blackmail regarding his sensitivity to the confidentiality of the identity of his similarly closeted paramours; (2) the Director's "responsibility for protecting intelligence sources and methods from unauthorized disclosure;" and (3) "because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Id.* at 601 (citing S.Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H.R.Rep. No. 961, 601 80th Cong., 1st Sess., 3–4 (1947)).

There are *no* reported cases of the use of Section 3036 to terminate a group of CIA officers, nor to terminate any officer for anything other than national security reasons. Plaintiffs are not being terminated for counterintelligence concerns; in fact, they maintain their security clearances. Plaintiffs are instead being terminated for domestic ideological reasons inapplicable and inappropriate to career civil servants in a foreign intelligence agency. Specifically, Plaintiffs are being fired only for their suspected roles in the implementation of congressionally-funded and -mandated DEIA programs (subject to stringent reporting requirements back to Congress), and the

---

[4] Indeed, the KGB's motto was, "Sword and Shield of the Communist Party" – not of the Soviet Union, or Russia. Richard Lacayo, *The Shakeout: Blunt Sword, Dented Shield*, TIME (Sept. 2, 1991), *available at* https://time.com/archive/6718484/the-shakeout-blunt-sword-dented-shield/.

enforcement of valid civil rights statutes, all at the direction of both Congress *and* the previous President of the United States.

While reassignment within the IC for the closeted CIA officer in *Webster* might have been impractical given the manners and mores of his time and the specific justification for his termination, that reasoning does not apply to officers CIA is terminating for dubious reasons.  At best, assuming that CIA is terminating Plaintiffs because they are determined to be excess, CIA's regulations reasonably provide for placement services within the Agency for such officers.  *See* AR 4-16(C)(4)(b)-(c).  These regulations also provide that when terminating an officer in the interests of the United States, Defendant Ratcliffe "need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required," and that the exercise of this authority is not limited by any other law, and abrogates any interest an officer might have under the regulation.  *See id*. at ¶ (D)(1)-(2).

*Webster* upheld the Director's Section 3036(e) authority to terminate an individual officer for specified national security reasons, without constitutional due process or judicial review.  AR 4-16(D) goes beyond the remit of *Webster* in asserting that a Director need not provide a court his reasons for exercising this authority on a basis other than national security.  And, if an officer is being terminated for other than counterintelligence reasons, it is not clear why that officer would not be entitled to placement services within the Agency, as provided for by regulation, like those services afforded to officers simply determined to be excess.  AR 4-16, and Defendants' misapplication of it to Plaintiffs in this case, stretches the authority granted by Section 3036(e) and narrowly upheld by *Webster* beyond its constitutional breaking point.

Defendants seek to press their reasonable counterintelligence authorities under Section 3036(e) too far.  Under the Government's vastly expansive reading of the powers granted by this

statute, a future CIA director appointed by a Democratic president could, for example, fire any Agency officer shown to be registered to vote as a Republican.  Or to have donated to his defeated opponent's campaign.  Or to an interest group irrelevant to national security concerns, such as a pro-life or traditional marriage organization, or one opposed to gender theory.  Such nakedly partisan, albeit hypothetical, misuse of Section 3036(e) would not differ in kind from Defendants' attempted abuse, for their own domestic ideological reasons, of their statutory authority in this case against those suspected of commitment to our civil rights laws.

In fact, the Government argued last week that it could do something strikingly similar:  *see* J. Ornedo, *DOJ Argues Trump Could Fire All Agency Heads Who Are Women or Over 40*, DAILY BEAST (Mar. 18, 2025).  The judiciary should decline any invitation to ratify any such blatant and ill-intentioned abuses of executive power.

Furthermore Section 3036(e) and *Webster*'s grant of authority to CIA directors presupposes a Senate-confirmed Cabinet-level official, subject to congressional oversight, exercising his independent good judgment, carefully balancing the fate of an individual Agency officer against the national security interests of the United States, on the basis of a factual record.  Here Director Ratcliffe shrugs, and points helplessly to his perceived need to blindly implement an executive order and a memo from an (acting) OMB chief, to fire over fifty officers.  He does so without any substantive explanation to his terminated officers or the Court as to *why* any individual Plaintiff deserves to be fired.  Neither is there any invocation of the state secrets privilege, as there are no security accusations against Plaintiffs.

This weak beer of an explanation by Defendant Ratcliffe is not enough to overcome the constitutional presumptions for the need of due process subject to judicial review before terminating CIA officers, absent any allegation of misconduct or security risk on their part.

## II.    Plaintiffs will suffer irreparable economic and reputational harm absent an injunction.

Plaintiffs acknowledge that the Court found on February 27 that discussion of the reputational harm they are suffering, for being terminated pursuant to a defamatory statement by the President of the United States that they engaged in dangerous, demeaning, illegal and immoral activity, is a subject for another day.[5]

However, Plaintiffs are already suffering irreparable economic harm.  Faced with imminent termination from the IC, absent requested judicial intervention, Plaintiffs are applying for other employment.  When Plaintiffs do so, prospective employers reasonably ask a standard question: have you ever been terminated from a job, and if so, why?

Even in advance of impending termination, Plaintiffs are losing out on job opportunities when they truthfully state that they are indeed in the process of being terminated.  They must honestly explain—at a minimum—that they are being fired pursuant to an executive order issued by President eager to punish businesses employing those he sees as ideological opponents.[6]

Over thirty potential employers asked Plaintiffs what post-employment restrictions apply them as former IC personnel, such as termination codes and cooling off periods.  Plaintiffs received no answers to some of these questions from Defendants, making it a practical impossibility for them to find work in their career fields.  Undersigned counsel is further aware of defense

---

[5] *See* the White House statement, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* of January 21, 2025.  The President continued to state that Plaintiffs undermined national unity and traditional American values "in favor of an unlawful, corrosive, and pernicious identity-based spoils system" that stigmatizes and demeans hardworking Americans, resulting in tragic and "disastrous consequences" on the basis of "pernicious discrimination."

[6] *See, e.g. Addressing Risks from Paul Weiss* (Mar. 14, 2025); *Addressing Risks from Perkins Coie* (Mar. 6, 2025); and *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025) (regarding Covington & Burling); *available at* https://www.whitehouse.gov/presidential-actions/.

contractors in the Washington, DC area seeking legal advice on what unique new post-employment restrictions may apply to former federal employees terminated as a result of executive orders. As this question is *sui generis* and presents a matter of first impression, the answers are not readily clear, further diminishing Plaintiffs' private sector employment prospects.

As the Court of Appeals found in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), a preliminary injunction was appropriate when the Air Force sought to discharge servicemembers based on Human Immunodeficiency Virus. That court found that the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id*. at 229. These airmen faced "a particularly heinous brand of discharge … that bears no relationship to their ability to perform their jobs," and servicemembers could not address these harms through post-discharge procedures. *Id*.; *see also Does 1-26 v. Musk*, No. 25-cv-00462, 2025 WL 840574 at *27-8 (D. MD. Mar. 18, 2025) (finding that when defendants' "public statements regarding the reasons" for termination of agency employees "go far beyond the ordinary," the resultant "likely harm to the reputation of personnel who worked" for the agency satisfies likelihood of irreparable harm).

Plaintiffs are similarly situated to the airmen wrongfully discharged in *Roe*, under circumstances impacting their employment prospects. Few employers in 2025 would hesitate to hire an HIV-positive employee. Today, law firms as powerful as WilmerHale remove biography pages from their websites regarding partners as eminent as former Special Counsel, FBI Director, Assistant Attorney General, U.S. Attorney and combat valor-decorated Marine Vietnam veteran Robert Mueller, only for fear of drawing the negative attention of this White House.[7] If

---

[7] *See* J. Henry, *Big Law Firms Scrub Mueller Ties as Trump Targets Enemies*, BLOOMBERG LAW (Mar. 21, 2025).

WilmerHale is now afraid to admit employing a great American such as Director Mueller, what chance does a previously-anonymous junior CIA officer—fired by the Agency's Director, further to his understanding of an order by the sitting president, regarding that officer's allegedly illegal and immoral activities—stand in a job interview process with a government contractor?

Institutions as powerful, prestigious and previously independent as the Paul Weiss law firm and Columbia University are forced to pay $40 million and $400 million in Dane-geld, respectively, to the President, and give him substantial control over their firm's hiring and school's admissions, in an attempt to escape his wrath.[8]  Defense contractors where Plaintiffs might seek to use their skills are even more vulnerable to such pressure than white shoe law firms and Ivy League universities.

If Plaintiffs' terminations are actually finalized, beyond a painful and frightening period for them and their families of potential long-term unemployment, several officers will also lose valuable pension benefits if they are unable to secure follow-on employment, despite years of hard and often physically dangerous service on behalf of our country since 9/11.

The knock-on effects extend to CIA itself.  As one Plaintiff explained,

The Agency claims the Director has unilateral authority to remove officers under "national interest," bypassing legal frameworks passed by Congress, due process and oversight.

This unchecked power sets a dangerous precedent—if intelligence officers can be sidelined for executing lawful orders, what prevents future purges based on shifting political priorities?

The chilling effect is already evident: employees fear advocating for themselves, and some have been explicitly told not to discuss morale with Congress.

---

[8] *See* M. Schmidt, *How a Major Democratic Law Firm Ended Up Bowing to Trump*, NEW YORK TIMES (Mar. 21, 2025)); T. Closson, *Academia Confronts a Watershed Moment at Columbia*, NEW YORK TIMES (Mar. 22, 2025); *see also* R. Kipling, *Dane-geld, A.D. 980-1016* (1911), *available at* https://www.kiplingsociety.co.uk/poem/poems_danegeld.htm.

**III.    The balance of hardships weighs in Plaintiffs' favor.**

In contrast to the irreparable economic and reputational harms Plaintiffs will suffer in the absence of an injunction, as set forth *supra*, Defendants will face no hardship from simply allowing Plaintiffs to appeal their terminations in accordance with CIA regulations, allowing them to seek employment elsewhere in the IC, and staying their terminations in the meantime.

As one Plaintiff stated,

> If terminated from my employment at the Agency, I will lose access to my physical, dental, and mental health care, resulting in a significant decline in my mental and physical health.

> One year shy of vesting, **I would lost part of my retirement savings and pension savings, and my student loan payments will be unaffordable, causing severe financial hardship**.  I expect the job market, currently flooded with applicants, to be biased against me for being terminated from my most recent position in addition to recently working in a DEI office.

(Emphasis in original.)

A second Plaintiff confidentially shared, "I have since been forced pursue FERS [Federal Employees Disability System] disability retirement due to the trauma and deterioration of my well-being resulting from these actions."  A third Plaintiff related that "Being exiled and terminated from the Agency has been, and continues to be, a traumatic and excruciating experience, as well as crippling from an employment perspective."  The careers of intelligence officers, as a fourth Plaintiff put it, "have been arbitrarily destroyed."

A fifth Plaintiff stated,

> Thousands of Americans volunteer themselves to the scrutiny of the national security clearance process, forfeit more lucrative opportunities in the private sector and make themselves a target to our adversaries in exchange for stability, a strong sense of duty and purpose, and, most of all, an opportunity to serve a country that has provided us with the freedom and community to pursue lives we couldn't elsewhere.

When that contract is severed in a manner that is void of respect, dignity, justification or humanity, it risks dismantling the foundation on which the entire trusted workforce is built.

A sixth Plaintiff noted, Director Ratcliffe once said that the best job he ever had was to be a federal prosecutor, as "it was an apolitical position.  I stood up always to represent the United States of America.'  Much like the Director, I loved standing up for and defending this country.  Everyone in this case shares that calling—but we have been unceremoniously dismissed by D/CIA."

Finally a seventh Plaintiff observed,

When Director Ratcliffe, in his nomination hearing to become D/CIA, invoked Bill Donovan and said, "…the ideal recruit for the Agency would be a Ph.D. who could win in a bar fight," I took that to heart.  I have a Ph.D., and while I have the strength to win in a bar fight, I have the wisdom not to be in one.  My mission was never about division—it was about removing barriers, breaking down exclusion, and strengthening the workforce. And for that, I was punished.

## IV.     An injunction serves the American public's interest.

Plaintiffs' continued service as expensively recruited and well-trained, highly-experienced, career intelligence officers obviously serves the American public's economic and national security interests.  Our nation faces myriad threats from foreign adversaries, and indeed our armed forces are in combat in the Middle East.

It is a curious time indeed for Defendants to choose to throw away *over eight-hundred years* of accumulated agency service among the fifty-eight CIA and ODNI intelligence officers being terminated for some association with DEIA.  The average length of service of those identified for termination is seventeen years of service; one served for *thirty-five years*.  Perhaps not coincidentally, at least fifty-six of these officers are members of at least one protected class under equal opportunity laws, including *inter alia* veterans with service-related disabilities.

In contrast, Plaintiffs' contemplated terminations present a growing risk of a politicized CIA, beginning with Defendants Ratcliffe and Gabbard purposefully stripping the IC of officers, almost all of them members of minority groups, trained in and dedicated to the implementation of our civil rights laws.

As one Plaintiff stated,

I have dedicated almost 15 years to the Agency's mission and service to the Nation, and I have loved my ability to serve apolitically, without fame or glory, but with the knowledge that my work has pre-empted threats and protected American lives.

Having served as a talent acquisition officer, I know that the Agency has struggled to find individuals with skillsets and talents that are critical to national security. Hence, I cannot understand why the CIA is weakening our national security posture by sidelining career intelligence professionals simply because of political optics surrounding "DEIA." Our officers were serving federally mandated roles involved in protected civil rights activities, and targeting us sets a precedent that any intelligence officer serving in any position or issue that falls out of political favor could be subject to similar harm and lack of due process.

Defendant Ratcliffe begins his tenure as CIA Director by ignoring the Court's strong suggestion on February 27, 2025, and his own Agency's regulations, in refusing to even listen to Plaintiffs' request for the opportunity to appeal their terminations. Defendants' insistence on terminating Plaintiffs, instead of simply reassigning them to other duties for which they are well-qualified, even though the Executive Order 14151 does *not* call for their firing, suggests (as the Court implied, *see* TRO Tr. at 15:3-5) at least unfairness and poor judgment by Defendants. It may be more than that: given current events, it may signify malintent.

Plaintiffs' request for injunctive relief is not made in a vacuum. Their terminations could be a first step towards Defendants CIA and ODNI engaging in activities prohibited by the National Security Act of 1947. Defendants Gabbard and Ratcliffe are openly contemptuous of the oversight authority of Congress; *see*, *e.g.*, A. Hauslohner, *Gabbard, Ratcliffe face fresh questions from House on Yemen war chats*, WASHINGTON POST (Mar. 26, 2025), leading to a U.S. Representative

  
accusing them of perjury for their testimony to the intelligence committees.[9]  Defendants Gabbard and Ratcliffe's representations about Plaintiffs' terminations therefore ought not be taken at face value.  We unfortunately live in a time in which senior Executive Branch officials, such as the Vice President, openly contemplate violating final court orders.[10]  The President has further called for imprisoning his perceived domestic enemies, "scum" who should be investigated for suspected crimes,[11] even those for which they received pardons.[12]  And these are only the wave-tops of the most recent outrageous comments from the senior officials of the Executive Branch.  These are dangerous times.

President Harry Truman's fear of politicized intelligence agencies is what led him to disband the Office of Strategic Services in 1945, despite the exemplary wartime record of Major General William Donovan's OSS.  Congress, in establishing CIA through the National Security Act of 1947—the same law that provides what is now Section 3036(e)—shared President Truman's concerns and sought to sharply limit the Agency's domestic role.  Changes to an original draft of the National Security Act of 1947, such as those forbidding CIA to issue subpoenas or exercise police powers, "have been effected in order to … protect against the possible development of the Central Intelligence Agency into a Gestapo-type Organization."  80th Congress, 1st Session, Report No. 961 at 10-11 (Jul. 16, 1947).  It does not stand to reason that a president and a Congress

---

[9] *See Nadler calls for Gabbard and Ratcliffe to be prosecuted for perjury following latest Signal-gate release*, *available at* https://nadler.house.gov/news/documentsingle.aspx?DocumentID=396301.

[10] *See* C. Savage, *Vance Says 'Judges Aren't Allowed to Control' Trump's 'Legitimate Power*, NEW YORK TIMES (Feb. 9, 2025).

[11] N. Riccardi, *'Scum,' 'crooked' elections and 'corrupt' media. What Trump said inside the Justice Department*, ASSOCIATED PRESS (Mar. 15, 2025).

[12] P. Smith, *Trump claims Biden's pardons for Jan. 6 committee are 'void' because he used an autopen*, NBC NEWS, (Mar. 17, 2025).

so concerned about a foreign intelligence service adopting an improper internal security role, would simultaneously empower the CIA director with the unreviewable authority to summarily fire an unlimited number of Agency officers only because of their supposed views on domestic issues, much less support for civil rights.

In balancing the equities, now is exactly the *wrong* time for the judiciary to approve giving IC leaders the unprecedented power to purge their agencies of good intelligence officers perceived to be political opponents only because they believe in civil rights laws—presumably to replace them with officers who do not similarly share those deeply American beliefs.

**Conclusion**

As one Plaintiff stated, the decision to terminate him "was sudden. It was unjust. And it was wrong. In the wake of my expulsion, a colleague reached out to say my termination was a 'terrible loss for the Agency' and praised my 'moral courage and ability to speak truth to power.' Now, I ask you to speak truth to power for me—because I no longer can."

As another Plaintiff put it,

Both I and my colleagues were resigned to the fact that that the diversity and inclusion related work that we had been legally and appropriately doing as of 22 January 2025 was no longer available nor even politically sanctioned.

What we were NOT expecting was to be scapegoated and discarded, and not even in the administratively proscribed manner set forth in our own Agency / Government regulations, with no opportunity for re-assignment, redress or even rights of common decency.
Our treatment is wrong, it is un-American, and it needs to be addressed and corrected.

The Executive Order in question is already enjoined for good if separate reasons by two judges in this Circuit, while a third judge within the Circuit halted the mass firings of tens of thousands of officers pursuant to another recent E.O. Plaintiffs are likely to succeed on the merits of their Fifth Amendment Due Process claim; Plaintiffs will suffer irreparable economic and

reputational harm absent an injunction, whereas Defendants will face no hardships from following CIA regulations allowing Plaintiffs to appeal their terminations, and also to seek employment elsewhere in the IC; and finally, an injunction serves America's truest long-term public interests at this fraught time in our nation's history.

Plaintiffs therefore respectfully request the following preliminary injunctive relief:

(1)    Stay their and other similarly situated individuals' terminations from the IC;

(2)    Order Defendant Ratcliffe, in accordance with CIA regulations, to personally review and reconsider his termination decisions of Plaintiffs and other similarly situated Agency officers on an individualized basis;

(3)    Order Defendants Ratcliffe and Gabbard, pursuant to *Webster v. Doe*, to state why each individual termination somehow serves the national interest; and

(4)    Allow Plaintiffs and other similarly situated individuals to be considered for reassignment within the IC to positions commensurate with their civil service grades and their skills.

Dated: March 27, 2025                    Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB No. 95292
Kia Rahnama, VSB No. 93718
**Fluet**
1751 Pinnacle Dr., Ste. 1000, Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
krahnama@fluet.law
e-file@fluet.law

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 27, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.
