**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JOHN DOE 1, *et al.*, )<br> )<br>          Plaintiffs, )<br> )<br>     v. )<br> )<br>UNITED STATES OFFICE OF THE )<br>DIRECTOR OF NATIONAL )<br>INTELLIGENCE, *et al.*, )<br> )<br>          Defendants. ) | Case No. 1:25cv300 (AJT/LRV) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED**
**MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Weeks after this Court denied their original request for extraordinary emergency injunctive relief, Plaintiffs have filed a renewed motion seeking essentially the same relief. The circumstances of their case, however, have not materially changed. Importantly, as with their last motion, none of the Plaintiffs face immediate separation from the agency such that emergency relief is warranted, indeed, the earliest any plaintiff will be separated from either agency is June 2025. Plaintiff have thus again failed to establish irreparable harm that would justify their extraordinary request for relief.

Perhaps more importantly, however, as with their last motion, Plaintiffs have also again failed to establish a clear likelihood of success on the merits of their Fifth Amendment claim – the sole substantive basis of their renewed motion. In short, Plaintiffs ask this Court to stall their employment separations based on agency regulations that do not apply to their circumstances and do not in any event create due process rights, and that the ODNI plaintiffs are essentially receiving as an exercise of the DNI's discretion.

In short, as with Plaintiffs' last request for emergency relief, the instant motion should be denied.

**BACKGROUND**

I.   **STATUTORY AND REGULATORY BACKGROUND**

Plaintiffs have brought their claims, and their renewed motion for a preliminary injunction, against two national security and intelligence-related federal agencies – the Central Intelligence Agency ("CIA") and the Office of the Director of National Intelligence ("ODNI"). The CIA was established by the National Security Act of 1947, *see* Act of July 26, 1947, 61 Stat. 496, ch. 343, § 102, and is led by the Director of the CIA ("D/CIA"), who has the responsibility to, *inter alia*,

1

"collect intelligence through human sources and by other appropriate means," and "correlate and evaluate intelligence related to the national security," 50 U.S.C. §§ 3035(a); 3036(c)(1)-(2). The position of the Director of National Intelligence ("DNI") was created in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004). The DNI "serve[s] as head of the intelligence community," "act[s] as the principal adviser to the President, to the National Security Council, and the Homeland Security Council for intelligence matters related to the national security," and "oversee[s] and direct[s] the implementation of the National Intelligence Program." 50 U.S.C. §§ 3023(a)-(b). ODNI was further established by Congress to assist the DNI in carrying out her duties and responsibilities as directed by law or the President. *Id.* § 3025(b). And notably, despite Plaintiffs' continued insistence to the contrary, *Mem.* (Dkt. No. 33), at 13-14, the statute authorizes termination not when the D/CIA concludes that such is in the "*national security* interests of the United States," but rather, simply that such is in the "interests of the United States."

This civil action particularly relates to ongoing employment-related decisions at CIA and ODNI. And on this subject, as this Court has previously recognized, *Trans.* (Feb. 27, 2025) (Dkt. No. 27), at 21-22, Congress has been pellucidly clear: the aforementioned National Security Act – including its subsequent amendments – provides both the D/CIA and the DNI with exceptional discretion to terminate the employment of personnel employed within the CIA and ODNI. With respect to CIA, the statute provides as follows:

> Notwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, in the discretion of the Director, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director *deems* the termination of employment of such officer or employee *necessary or advisable in the interests of the United States*.

*Id.* § 3036(e)(1) (emphasis added).[1]  Congress vested the exact same discretion in the DNI.  *Id.* §
3024(m)(1) ("The [DNI] may exercise with respect to the personnel of the [ODNI] any authority
of the [D/CIA] with respect to the personnel of the CIA under the Central Intelligence Agency Act
of 1949 [50 U.S.C. §§ 3501, *et seq.*], and other applicable provisions of law, as of December 17,
2004, to the same extent, and subject to the same conditions and limitations, that the [D/CIA] may
exercise such authority with respect to personnel of the [CIA] . . . .").

    The CIA has implemented the discretion that Congress provided to the D/CIA in the
National Security Act of 1947, in part, by issuing an internal regulation concerning "Termination
of Employment," which provides that "[a]ll employment terminations other than mandatory or
involuntary retirement under the Central Intelligence Retirement Act of 1964 for Certain
Employees, as amended (50 U.S.C. § 2001 et seq.), shall be pursuant to the Director of the Central
Intelligence Agency's (D/CIA's) statutory authority," and "sets forth circumstances under which
[CIA] employment may be terminated and provides for the manner in which such employment
terminations may be effected."  AR 14-6 (Dkt. No. 14-1) at 1.[2]  The regulation first explains that
for termination of a CIA employee to be effected, the D/CIA "need only deem employment
termination necessary or advisable in the interests of the United States': *i.e.*, "[i]t is not required
that an employment termination under this statute be in the interests of the national security, but
only that the [D/CIA], in his discretion, [has] deem[ed] such termination to be in the interests of

---

[1] The statute similarly provides that when the D/CIA exercises this extraordinary discretion,
a terminated employee is not precluded from "seek[ing] or accept[ing] employment in any other
department, agency, or element of the United States Government."  50 U.S.C. § 3036(e)(2).

[2] ODNI applies the same regulation with respect to terminations by the ODNI.  *See*
Declaration, Dkt. No. 14-3.  For clarity, this regulatory background describes the regulation as
written, which refers to CIA and D/CIA, but these provisions apply with equal force to ODNI and
the DNI's termination decisions as well.

the United States." *Id.* § I.  The regulation then articulates a series of "circumstances" under which a CIA employee might have his or her employment terminated (*e.g.*, "failure to complete trial period," "failure to meet security standards," "failure to meet the work and efficiency requirements of the agency"), *id.* § II.B, but this list concludes with a catch-all provision that encompasses the statutory discretion that the D/CIA may invoke: "In addition to the circumstances specified in paragraphs (1) through (10) above, an employee may have his or her employment be terminated whenever the D/CIA, in his discretion, deems such termination necessary or advisable in the interests of the United States." *Id.* § II.B(11)

CIA's regulation also identifies obligations that are to be followed when the D/CIA effects the termination of CIA employment under *certain circumstances*.  As such, the regulation identifies particularized bases for termination (*e.g.*, "for abandonment of position"), and describes the procedural steps that the agency is to take in effecting that type of termination.  *Id.* § II(C).  The regulation also provides impacted employees with a limited ability to appeal their termination internally with an identified agency official.  *Id.* § II(E).  But these provisions do not apply to terminations effected pursuant to "paragraph D" of Section II of the regulation, which mirrors D/CIA's broad grant of statutory authority under 50 U.S.C. § 3036(e)(1), and provides as follows:

> Pursuant to statutory authority, any employee may be terminated from the [CIA] at any time *without regard to any procedural steps set forth in this regulation or elsewhere* when *the D/CIA, in his discretion*, deems it necessary or advisable in the interests of the United States. . . . The existence or the exercise of this discretionary authority by the D/CIA is:
>
> (1) Not constricted, limited, affected or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law.
>
> (2) In abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law.

4

*Id.* ¶ II(D) (emphasis added).  Accordingly, when the D/CIA exercises his or her discretion to terminate an employee pursuant to 50 U.S.C. § 3036(e)(1) and § II(D) of Agency Regulation 4-16, the impacted employee is not *entitled* to any of the procedures set forth in the regulation, or any other interests or privileges to which the employee might otherwise be entitled under the regulation.  And once again, despite Plaintiffs' continued insistence to the contrary, *Mem.*, at 2; 11-14, the regulation does not in any way require the D/CIA to provide, to the employee, the actual reason for his decision that the employee's termination was in the "interests of the United States."

The regulation also discusses the potential dissemination of information regarding an employee's termination.  *See id.* § II.H.  To this end, the regulation articulates a general mandate that "the reasons for the termination or resignation of [CIA] employment shall not be disseminated outside the [CIA] to any private organization or Federal or other governmental body without the consent of the employee."  *Id.*  Instead, absent such consent and subject to certain exceptions, in "response to a request for information as to why an individual's employment was terminated," CIA personnel may *only* indicate – generically – "that the employment was terminated pursuant to statutory authority."  *Id.*

## II.   FACTUAL BACKGROUND

### A.   PRESIDENTIAL EXECUTIVE ORDER & OPM MEMORANDUM

On January 20, 2025, President Trump issued an Executive Order, which mandated "the termination" of all "DEI and 'diversity equity, inclusion, and accessibility,' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  *Exec. Ord. No.* 14151, § 2(a), *available at* 2025 WL 244164 (Jan. 20, 2025).  The Executive Order also mandated that "[e]ach agency head . . . in consultation with the Attorney General, the Director of [the Office of Management and Budget ("OMB")], and the Director of

[the Office of Personnel Management ("OPM")]" take certain actions within the ensuing sixty days. *Id.* § 2(b). Amongst these actions was the "terminat[ion], to the maximum extent allowed by law," of "all DEI [and] DEIA . . . offices and positions." *Id.*[3]

### B.    CIA IMPLEMENTATION

The current D/CIA is John Ratcliffe, who was confirmed by the United States Senate on January 23, 2025. Am. Compl. ¶ 22. On February 18, 2025, D/CIA Ratcliffe signed a memorandum in conformance with President Trump's aforementioned Executive Order and consistent with OPM's memorandum regarding the same. Dkt. No. 14-2. That memorandum articulated that D/CIA Ratcliffe had concluded – in an exercise of his discretionary authority under the National Security Act of 1947 and Agency Regulation 4-16 – that the termination of employees who were then-employed in the agency's now shuttered "Diversity and Inclusion Office" ("DIO") was "necessary or advisable in the interests of the United States." *Id.* ¶¶ 2; 4; *see also* Declaration of John Ratcliffe, Dkt. No. 20-1. Consistent with the provisions of both the National Security Act of 1947 and Agency Regulation 4-16, these employees will retain their security clearances and are free to apply to federal agency employment vacancies, including those at the CIA. D/CIA's determination that this action was "necessary or advisable in the interests of the United States" in

---

[3]Plaintiffs make much in their latest memorandum about how other district court decisions have enjoined Executive Order 14,151. *Mem.*, at 3; 22. Although Plaintiffs blithely note that these injunctions were "for other reasons," *id.*, they fail to note that these decisions actually enjoined other *provisions* of the Executive Order – those terminating current government grants to non-federal entities, requiring the same entities to make certain certifications about their activities, and threatening enforcement actions against the same entities in certain circumstances. *See, e.g.*, *Nat'l Ass'n of Diviersity Officers in Higher Ed. v. Trump*, 2025 WL 573764, at *2-5 (D. Md. Feb. 21, 2025); *Am. Ass'n of Colleges for Teacher Ed. v. McMahon*, 2025 WL 833917, at *4-6 (D. Md. Mar. 17, 2025). And similarly, Plaintiffs' reference to *Maryland v. U.S. Dep't of Ag.*, 2025 WL 800216 (D. Md. Mar. 13, 2025), is similarly inapposite here, as that injunction concerned the termination of non-Intelligence Community probationary employees.

this context follows directly from the President's and OPM's published guidance to all executive agencies regarding the elimination of DIO offices.

Since the last time that the parties were before this Court, CIA personnel have informed impacted employees of the various options from which they could choose in ending their employment relationship with the CIA. To this end, impacted employees had the following options:

- *Retirement* – If an impacted employee were eligible to retire (under generally applicable federal regulations), he or she would be entitled to elect a retirement date prior to September 30, 2025, and would remain on administrative leave (with pay) up until their retirement date. If the impacted employee would not become eligible to retire until a date between October 1 and December 31, 2025, the agency may allow them to extend their administrative leave to their retirement date within this temporal window.[4]

- *Deferred Resignation Program ("DRP")* – Akin to the much-publicized DRP that was offered to the general federal workforce over the past month, CIA is offering a virtually identical program to impacted employees here. Should an impacted employee elect this option, their voluntary resignation from the CIA's employ will be effective on September 30, 2025, and until then, they will remain on administrative leave (with pay).

- *Termination* – An impacted employee may elect to be formally terminated by the CIA. But an election of this option does not result in *immediate* termination; rather, an impacted employee electing termination will remain on administrative leave (with pay) for *ninety (90) days*, and only after the expiration of this ninety (90) day period will the employee's termination become effective.

- *Voluntary Resignation* – An impacted employee may elect to voluntarily resign from the CIA. If they elect this option, the employee's resignation is effective immediately.

---

[4] Similarly, if an impacted employee would not be eligible for traditional retirement during calendar year 2025, but *would* be eligible for participation in the Voluntary Early Retirement Authority ("VERA") during calendar year 2025, *see* 5 U.S.C. §§ 8336(j); 8414, the CIA will allow the impacted employee to avail him or herself of VERA – in the same manner as traditional retirement described above.

As such, the CIA has offered multiple choices to impacted employees. Pl. Mem., Ex. 3 (Dkt. No. 33-3). And in a message transmitted to their counsel on March 17, 2025, Plaintiffs were informed that the D/CIA had elected to rest on the Agency's long-standing plain reading of its own regulations; as such, that "[t]here [was] no process to appeal this decision within the Agency or otherwise seek reassignment within the Agency." *Defendants' Exhibit* ("DEX") A.

And importantly for Plaintiffs' renewed preliminary injunction application, under none of these circumstances is the CIA *immediately* terminating the employment of any impacted employee; instead, at the *earliest*, an impacted employee will only be involuntarily separated from employment with the agency ninety (90) days after making such an election, which is currently due today, March 31, 2025.

### B.    ODNI IMPLEMENTATION

ODNI has largely followed the same process as CIA. On March 9, 2025, ODNI informed affected employees that they too would have a choice between taking a deferred resignation, resigning immediately, termination effective June 9, 2025, or, for eligible individuals, retirement or early retirement. *See* Pl. Mem.., Ex. 1. For any employee who selects termination, however, the DNI has authorized – as an exercise of her discretion outside of the pertinent regulation – that employee to seek "reconsideration" of the decision from the DNI. *Id.* The two ODNI Plaintiffs in this action have exercised this limited "reconsideration" option. *Id.*

### III.    PROCEDURAL HISTORY

On February 17, 2025, Plaintiffs, certain (but not all) employees of ODNI and CIA who were impacted by the above employment decisions, filed suit in this Court (Dkt. No. 1). Plaintiffs' Complaint (Dkt. No. 1), and their subsequently filed Amended Complaint (Dkt. No. 17), brought

claims under the Administrative Procedure Act ("APA"), the Administrative Leave Act ("ALA"), and the First and Fifth Amendments to the U.S. Constitution.

1.      Plaintiffs also filed a motion for a temporary restraining order (Dkt. No. 6), seeking to prevent CIA and ODNI from terminating their employment.  After briefing by both sides and three hearings, this Court converted Plaintiffs' motion into one for a preliminary injunction and denied – in full – Plaintiffs' request for relief enjoining Defendants. *Ord.* (Feb. 27, 2025) (Dkt. No. 26). This Court elucidated its reasoning for refusing to enjoin Defendants from taking any particular action (or, conversely, requiring them to *take* any particular action) in a lengthy oral ruling from the bench. Hr'g Tr. (Feb. 27, 2025) (Dkt. No. 27), at 15-28.

This Court first concluded that it was "clear" that it lacked "subject-matter jurisdiction as to either Plaintiffs' [ALA] claim, or the APA claim." *Id.* at 17.  With respect to the ALA, this Court explained that the statute lacked a waiver of sovereign immunity so as to allow the United States to be sued under its provisions. *Id.* at 17-18.[5]  As to the APA claim, this Court explained that it was "foreclosed by the Civil Service Reform Act ["CSRA"], which provides the exclusive means of judicial review for certain claims brought by civil servants relating to the termination of their employment," including "claims that in taking a particular adverse personnel action, an agency violated its own regulations." *Id.*

This Court then moved to the constitutional claims, holding that although it could exercise jurisdiction over those claims, Plaintiffs had not demonstrated a clear likelihood of success on them.  With respect to Plaintiffs' First Amendment claim, this Court held that "the evidence . . . at this point" was that Plaintiffs "were slated for termination not because of their speech but simply

---

[5]This Court "also observe[d] that the [ALA] claim would likely fail on the merits given the definition of 'administrative leave' applicable in this case." *Hr'g Tr. (Feb. 27, 2025)* (Feb. 27, 2025), at 18.

because they had the misfortune of having been last assigned to a DEI program." *Id.* at 20. And in any event, any putative speech occurred "in the employees' official duties and was not protected speech." *Id.*

Finally, this Court addressed Plaintiffs' Fifth Amendment due process claim. This Court held that "[t]he regulations at issue and the statute pursuant to which they were promulgated make[] clear that the employees have no" constitutionally protected "due process interest in their continued employment." *Id.* at 21. Although this Court noted that it was "less clear" whether Plaintiffs could make out a cognizable due process claim "based on reputational injury or [] to post-termination consideration for reassignment," *id.* at 21-22 it ultimately concluded that the then-current evidentiary record fell short of that which was necessary to justify extraordinary emergency relief, *id.* at 22-28. On reputational injury, this Court explained that "[m]uch would certainly depend on the uncertain unfolding of future events, including whether information would be disseminated, to whom, what that information is, and [what] actions or decisions were taken in response to that information." *Id.* at 25. This Court next stated its belief that "the applicable statutes and regulations make clear" that "reassignment was not required before the Director made the decision to slate these Plaintiffs for termination," but that Plaintiffs might have a cognizable protected right to that and to "have reviewed a termination decision" in an appeal that would represent "a request for *reconsideration* that is directed to the Director himself" after the termination decision was made. *Id.* at 27 (emphasis added). But in both of these scenarios, this Court held that it could not enter any injunction against the Defendants because it was unclear "what particular course any particular Plaintiff may take in response to the options offered to them," or whether any Plaintiff would seek to appeal the D/CIA's decision. This Court noted that

10

it would be "available for future consideration of this as the facts unfold over the next several months." *Id.* at 27.

Having concluded that Plaintiffs did not demonstrate a clear likelihood of success on the merits, the Court did not consider the remaining preliminary injunction factors.

**2.**    On March 27, 2025, ten days after their counsel was informed that there was "no process to appeal this decision within the Agency," DEX 1, Plaintiffs filed their instant renewed motion for a preliminary injunction (Dkt. No. 32). Plaintiffs' supporting memorandum (Dkt. No. 33) is extremely light on legal analysis or supporting authority; rather, it largely consists of a discussion of what Plaintiffs maintain is the inequitable nature of Defendants' decision-making. On the law, however, Plaintiffs' motion is exclusively premised on their putative Fifth Amendment due process claim. *Mem.* (Dkt. No. 33), at 6-14. In this respect, Plaintiffs argue only that (a) they have a constitutional right – derived *exclusively* from Agency Regulation 4-16 – to "appeal their terminations," and (b) they have a constitutional right not to be subject to termination pursuant to 50 U.S.C. § 3036(e). *Id.*[6]

For these reasons, Plaintiffs seek entry of a preliminary injunction that includes the following relief:

> (1) stay[s] their looming terminations; (2) order[s] Defendant John Ratcliffe, the CIA Director, in accordance with Agency regulations, to review and reconsider his termination decisions on an individualized basis; (3) order[s] Defendants Ratcliffe and Gabbard, pursuant to *Webster v. Doe*, to state why each individual termination somehow serves the national interest; and (4) allow[s] each Plaintiff to be considered for reassignment within the IC in accordance with their civil service grades and their skills.

*Id.* at 2.

---

[6]Plaintiffs also maintain, without citation to any authority, that the Fifth Amendment precludes their termination "because their efforts with respect to DEI issues were "de minimis" when considered within the entirety of their careers with the Agency. *Mem.*, at 8-11.

## STANDARD OF REVIEW

Plaintiffs seek a preliminary injunction—"an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (Trenga, J.). To be eligible for a preliminary injunction, Plaintiff must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22. The requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (alterations and quotation marks omitted) (emphasis in original).

## ARGUMENT

This Court should deny Plaintiffs' motion for a preliminary injunction because they have not met their burden of making a "clear showing" on *any* of the four required elements for obtaining a preliminary injunction.

I.    **PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FIFTH AMENDMENT CLAIM.**

Plaintiffs appear to be seeking relief on due process theories that are not articulated in their amended complaint, and do not appear to seek relief on the actual theory that *is* enumerated in that complaint. The Fifth Amendment due process claim asserted in Plaintiffs' amended complaint alleges one property interest, and only one property interest – a "property interest in their employment." Am. Compl. (Dkt. No. 17), ¶ 71. As this Court explained in its oral order denying Plaintiffs' first motion for a preliminary injunction, they "have no such property right." Hr'g Tr.

(Feb. 27, 2025) at 21. Perhaps recognizing this issue, Plaintiffs have now articulated two new due process theories: first, that they have a constitutional property interest in CIA's regulations, and second, that they have suffered reputational harm in connection with their terminations sufficient to rise to the level of a due process violation. *Mem.*, at 6-14.

Plaintiffs' newfound due process theories run headlong into two litigative maxims. Initially, "[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed *through the illegality* alleged in the complaint." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) (emphasis added); *see also Sorenson v. Wolfe*, 2016 WL 4761927, at *5 (D. Md. Sept. 12, 2016) (holding that plaintiff "may not circumvent the Federal Rules of Civil Procedure by presenting his new claims in a Motion for Preliminary Injunctive Relief."), *aff'd*, 681 F. App'x 297 (4th Cir. 2017). And it is axiomatic that a complaint may not be amended through briefing. *See Hurst v. District of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017).

Assuming that Plaintiffs can sidestep these issues, however, there are far more substantive problems with their application for extraordinary injunctive relief.

### A. TWO GROUPS OF EMPLOYEES HAVE NO CLAIM TO A RENEWED MOTION FOR INJUNCTIVE RELIEF

As in previous filings, Plaintiffs here seek relief to alleged harms that do not extend to all of them. First, although *several* of the CIA plaintiffs have been informed of their upcoming separation from the agency, some of the CIA plaintiffs remain on administrative leave pending a decision on their employment, which has not yet been made. Because these plaintiffs have not been subject to any action to separate them from the agency, let alone been slated for such an action, any concern *they* may raise about the process in this case is premature at best. And as

Plaintiffs acknowledge, *Mem.* Ex. 1, the DNI, in her extra-regulatory discretion, has decided to allow a reconsideration process for the employees who were subject to termination under this decision, which the two ODNI plaintiffs here have pursued. Put simply, as this Court previously recognized, these Plaintiffs cannot demonstrate a clear likelihood of success on the merits of any due process theory that depends on circumstances that do not apply to them at this time. *See, e.g.*, *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

### B. PLAINTIFFS DO NOT HAVE A CONSTITUTIONAL DUE PROCESS PROPERTY INTEREST TO RECONSIDERATION OR REASSIGNMENT UNDER CIA'S REGULATIONS

Even with respect to those CIA plaintiffs who *do* face termination from CIA pursuant to the D/CIA's decision to terminate them using his extraordinary discretion pursuant to Agency Regulation 4-16, § II(D) without procedures, this termination does not give rise to a Fifth Amendment due process claim. This is so for two reasons – (1) Plaintiff cannot simply, through creative pleading, magically transform mere agency regulations into constitutional mandates; and (2) Agency Regulation 4-16 does not provide them with the procedural protections they now allege. Each of these issues will be addressed in turn.

**1.** *First*, whether an agency's alleged failure to follow its own regulations, without more, does not appear to have been held by the Fourth Circuit to constitute a breach of *constitutional* due process. Plaintiffs' instant motion offers no authority whatsoever for this proposition.[7] To be sure, in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Supreme Court stated

---

[7] Plaintiffs cite *Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989), see *Mem.*, at 8, but the case is wholly inapposite here. *Doe* concerned a National Security Agency employee who was terminated under a statutory provision that, unlike § 3036(e) here, *allowed* for judicial review. *See Doe*, 885 F.2d at 905. Moreover, any discussion of constitutional due process was in the exclusive context of reputational stigma, not standalone regulatory provisions. *See id.* at 910.

that the party seeking relief there was entitled to an order requiring a federal agency to follow its own regulations, which, in turn, would ensure that the party would "be afforded that due process required by the regulations." *Id.* at 268. As numerous courts have noted, however, what the Supreme Court did *not* articulate in *Accardi* was whether it meant its opaque reference to "due process" in the constitutional or colloquial/administrative sense; *i.e.*, "whether *Accardi* derives from the APA or the Constitution's guarantee of due process." *Bourdon v. DHS*, 983 F.3d 473, 483 (11th Cir. 2020); *see also Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) (recognizing that "the caselaw is far from clear on this issue"). And this issue is significant here, because – as this Court has concluded and plaintiffs concede for purposes of their instant motion – plaintiffs *cannot* proceed under the APA and their motion must therefore fail unless they can bootstrap their regulatory claim into the Fifth Amendment.

The Supreme Court itself has acknowledged that *Accardi* "enunciate[d] principles of federal administrative law, other than of constitutional law binding on the States." *Bd. of Curators v. Horowitz*, 435 U.S. 78, 92 n.8 (1978); *see also CGB v. Wolf*, 464 F. Supp. 3d 174, 226 n.41 (D.D.C. 2020) (explaining that, actually, "it is well-settled that *Accardi* is based on administrative law principles, not constitutional due process requirements"). And this makes sense, as courts have routinely rejected the notion that litigants can "circumvent" a legal scheme – such as the CSRA, let alone the *Constitution* – "by artful pleading." *Brown v. GSA*, 425 U.S. 820, 833 (1976). That is exactly what Plaintiffs ask this Court to sanction here – their attempt to circumvent Congress's comprehensive scheme in the CSRA, which provides them no property interest in their employment, by wrapping their claim regarding agency regulatory compliance in constitutional garb. The Fourth Circuit has held an especially firm line against these attempts when the "constitutional garb" is made from the proverbial cloth of the Due Process Clause. *See, e.g.*,

15

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012).  This Court should reject Plaintiffs attempt to do so here.

**2.**      Nor does Agency Regulation 4-16 provide Plaintiffs the procedural protections they now claim.  As Defendants explained in their previous filings, the CIA regulations do not provide for *any* procedure, whether it be consideration for reassignment or appeal of the decision, when the D/CIA invokes his authority to terminate without procedures, as he has done here.  *See TRO Opp. Supp. Mem.*, Ex.1 (Dkt. No. 20-1); AR 4-16 § II.D.  Defendants acknowledge that at the February 27, 2025 hearing, the Court previously stated that it read the regulation differently, and viewed the potential for a due process claim if the D/CIA maintained this position on the regulations, though it did not order Defendants to implement this Court's construction of the regulation at that time (or withhold taking action on Plaintiffs' employment in the absence of an appeal or a prospect for reassignment).  Hr'g Tr. (Feb. 27, 2025), at 26-27; *Ord.* (Feb. 27, 2025) (Dkt. No. 26).  And to this end, had CIA actually offered an appeal or prospect of reassignment to Plaintiffs in the absence of such an order, it would have waived any future appellate review of this Court's construction of the regulation through its own conduct.  Defendants respectfully request that this Court reconsider that position in light of the plain language of the regulation and the legal discussion below.

Put simply, as Section II.D makes clear, the termination of any employee under that section is "without regard to any procedural steps set forth in this regulation or elsewhere," and is "[n]ot constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation." AR 4-16, § II. D.  Thus, because the D/CIA invoked his authority under Section II.D, the procedures found elsewhere in the regulation, including those pertaining to employees terminated as excess personnel and allowing for appeal in other circumstances, do not apply here.  For further avoidance of doubt, AR 4-16 provides that D/CIA's termination authority is "[n]ot

constricted, limited, affected or otherwise controlled by any of the procedures set forth in this regulation or any other regulation document, or law." Requiring D/CIA to reconsider his own termination decision would necessarily "constrict[], limit[], or affect[]" the D/CIA's broad termination authority established under regulation and statute.

This is particularly the case with respect to "*appeal*" under the regulations, as the procedure for appeal only reinforces this interpretation. This Court previously stated that the right to "appeal" was "in effect, a request for *reconsideration* that is directed to the Director himself." *Trans*. (Feb. 27, 2025), at 27 (emphasis added). But there is a significant legal difference between the terms "appeal" and "reconsideration," especially in this context. "Reconsideration," on the one hand, is defined as a request for "review of all or part of a ruling or decision before it becomes final," and is thus directed to the same official or entity who/that issued the ruling in the first instance. BLACK'S LAW DICTIONARY "Reconsideration" (12th ed. 2024) (cross-referencing "Request for Rehearing"). "Appeal," on the other hand, is "[a] proceeding undertaken to have a decision reconsidered *by a higher authority*." BLACK'S LAW DICTIONARY "Appeal" (12th ed. 2024) (emphasis added). Accordingly, "a party's request that a district court reassess one of its own decisions is generally considered a request for reconsideration, not an appeal." *United States v. Braun*, 2024 WL 4528964, at *1 (D.D.C. Oct. 18, 2024).

Plaintiffs' claim in this regard must be premised, if at all, on the *actual regulation*. That regulation, however, does not use the term "reconsideration"; rather, it uses the term "appeal," meaning that any review would be undertaken by a "higher authority." But when it is the *Director himself* who exercises his extraordinary authority under § II(D) of the regulation, there is no "higher authority" (at least at the Agency) to whom an appeal can be directed. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999) (holding that statutes should not be construed such

that "its application leads to unreasonable or impracticable results"). As such, the Agency's appeal procedures simply cannot apply when it is the *Director himself* who makes the decision to terminate.

And the regulation implicitly recognizes this. Indeed, in most cases, the Chief Operating Officer ("COO") is the official who hears the appeal. AR 4-16 § II.D(3). The COO necessarily falls below the D/CIA on the organizational chart, and there is no provision to suggest that he or she could reverse a decision by the Director him or herself. And further, in cases where the right to appeal arises, the D/CIA may consider an appeal "where the COO denies the initial appeal or where the COO serves as the terminating authority," suggesting that the appeal regulation is structured to allow an employee to seek reconsideration by an authority *above* the decisionmaker, something that is impossible when the decision comes from the D/CIA himself.

### C. PLAINTIFFS AGAIN MISREAD *WEBSTER*

Plaintiffs request individualized determinations with respect to their terminations from both the D/CIA and the DNI, purportedly under the authority of *Webster v. Doe*, 486 U.S. 592, 600 (1988). But rather than support that request for relief, which also is not supported by any provision of the agency's regulations or by any other due process theory, the Supreme Court's decision in *Webster expressly* undercuts such a request. In short, Plaintiffs' arguments once again incorrectly read into *Webster* support for a position that is in direct conflict with its actual holding.

Federal law provides that "[n]otwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, *in the discretion of the Director,* terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interests of the United States." 50 U.S.C. § 3036(e)(1) (emphasis added). In *Webster*, the Supreme

Court considered a functionally identical predecessor statute[8] to 50 U.S.C. § 3036(e)(1), and squarely determined that an APA claim seeking court review of the D/CIA's reasons for the plaintiff's termination under this statute was not justiciable. *See Webster*, 486 U.S. at 600. The Supreme Court explained that the statute allows the termination of an Agency employee "whenever the Director shall *deem* such termination necessary or advisable," and not "simply when the dismissal *is* necessary or advisable to those interests." *Id.* (internal quotation marks omitted, alterations in original). This "standard fairly exudes deference to the Director," and "foreclose[s] the application of any meaningful judicial standard of review." *Id.* The Court explained that "short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests," it could not determine a "basis on which a reviewing court could properly assess an Agency termination decision." *Id.* In short, the Court held, the National Security Act "exhibits . . . extraordinary deference to the Director in his decision to terminate individual employees," and "indicate[s] that Congress meant to commit individual employee discharges to the Director's discretion." *Id.* at 601. As this Court previously noted, neither the statute, nor the CIA's regulations, provide any guidelines that would circumscribe or otherwise limit the CIA Director's use of this power. Plaintiffs' instant memorandum certainly provides no basis to conclude otherwise.

Although this provision has been updated and moved to a different section of the federal code, it retains all of the language on which the *Webster* decision turns. And although Plaintiffs argue that, in their view, the national security interests that justify this broad Congressional grant

---

[8] That predecessor statute provided: "[T]he Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States . . . ." 50 U.S.C. § 403 (1947).

of discretionary power are not present in this case, *Mem.*, at 11-14, inquiry into such assertions requires *precisely* the process of questioning the D/CIA directly about the merits of his decision that *Webster* forecloses. *See Webster*, 486 U.S. at 600.[9]  Although Plaintiffs paint the D/CIA's use of his discretion as "beyond" what the Court upheld in *Webster*, it is hard to imagine how the Supreme Court could have read the D/CIA's power any more broadly, and his actions here certainly fall into the scope of the Court's holding.  And *Webster*'s reading is certainly consistent with how the D/CIA's termination power has been repeatedly interpreted.  *See, e.g.*, *Neely v. CIA*, 2 M.S.P.B. 534, 535 (M.S.P.B. 1980) (explaining that CIA's "authority to remove under the National Security Act is not limited to" terminations for national security reasons), *aff'd* 744 F.2d 878 (Table) (D.C. Cir. 1984).  In short, Plaintiffs must look elsewhere from *Webster* to support any request for relief.

It bears noting that Plaintiffs again raise the specter that the Court's view on the Director's power to terminate employees from the CIA under the National Security Act could empower him to fire employees on the basis of protected classes or protected speech with abandon. *See* Pl. Mem. at 14.  This is simply untrue.  As Defendants have repeatedly explained, Plaintiffs in this case and their colleagues in the intelligence agencies could raise claims to protect against terminations based on protected class or protected speech, even in light of the D/CIA's expansive termination authority.

### D. PLAINTIFFS HAVE PRESENTED NO NEW EVIDENCE TO CHANGE THIS COURT'S CONCLUSION THAT THEY FAILED TO MAKE A CLEAR SHOWING OF SUCCESS ON THE MERITS OF THEIR CLAIM TO DUE PROCESS RIGHTS TO THEIR REPUTATIONS

At the February 27, 2025 preliminary injunction hearing, this Court denied emergency

---

[9] It bears noting that Director Ratcliffe has provided a rationale for his decision, in a declaration that was filed at docket number 20-1.  Thus, in any event, Plaintiffs' request for such an explanation is likely moot.

injunctive relief to plaintiffs on any due process claim of reputational injury, explaining that on the current record, there was not enough to make a clear showing of likelihood of success on this claim. Hr'g Tr. (Feb. 27, 2025) at 24-25. Although Plaintiffs have renewed their argument in this respect, nothing about the record has changed; indeed, Plaintiffs do not allege that CIA or ODNI are disseminating *any* information about their terminations, which was the focus of the Court's comments about whether such a claim would arise. *Mem.* at 15-17; Hr'g Tr. (Feb. 27, 2025) at 25. Rather, Plaintiffs acknowledge the Court's ruling, but note that *Plaintiffs*, and not CIA or ODNI, might disseminate this information. *Id.* at 15. This allegation cannot alter the Court's conclusion that Plaintiffs have not demonstrated a clear showing of their likelihood to succeed on the merits of this claim.

In short, Plaintiff cannot create their own constitutional claim against Defendants. Indeed, for Plaintiffs to have such a claim, they would need to show that CIA or ODNI planned to disseminate defamatory information about their termination, which they cannot do. *See, e.g.*, *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 177 n.5 (4th Cir. 1988) ("In order to state such a claim, Stone would have to allege facts tending to show that *his superiors* made charges against him that 'might seriously damages his standing and associations in his community.'" (emphasis added) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573-74 (1972))). What's more, even if Plaintiffs could point to the statements of the President or OPM for such a claim, none of these government-wide statements can even theoretically be tied to them as individuals, a necessary element of any such claim. Restatement (Second) of Torts § 564A (1977) ("One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it, if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication

21

reasonably give rise to the conclusion that there is particular reference to the member."); *see also Evans v. Chalmers*, 403 F.3d 636, 660 (4th Cir. 2012) (Wilkinson, J., concurring) (explaining "general statements that reference no individual" cannot be the basis for a stigma-plus claim). This case presents no such situation.

## II.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF *IRREPARABLE* HARM.

### A.    PLAINTIFFS MUST *INDEPENDENTLY* DEMONSTRATE IRREPARABLE HARM TO OBTAIN EXTRAORDINARY RELIEF

As explained in Defendants' previous opposition to Plaintiffs' motion for immediate injunctive relief, this employment dispute, in which Plaintiffs, at worst, will not be terminated from the agency for another 90 days, does not demonstrate a clear showing of irreparable harm. In their renewed motion, Plaintiffs renew their arguments and add lengthy discussions of other issues and cases that do not relate to the issues before the Court. Accordingly, for the reasons explained below, Plaintiffs have failed to make a clear showing of *irreparable* harm to justify their request for relief at this stage.

To prevail, Plaintiffs must also make a "clear showing" that, absent an injunction, they will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (reversing preliminary injunction); *see Winter*, 555 U.S. at 20, 22. "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)).

As the Fourth Circuit has previously held, this inquiry is often dispositive of a litigant's request for emergency injunctive relief, that is, a claim for such relief can *only* proceed to the next

step "if the party establishes irreparable harm." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). In other words, "if a party makes no showing of irreparable harm, the court may deny the motion for injunctive relief without considering the other factors." *In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 122 (D.D.C. 2007); *see also Winter,* 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Put simply, no matter how strong plaintiffs' claim is on the merits – and as provided above, it is *not* strong – the lack of irreparable harm requires the denial of any request for extraordinary preliminary relief.

### B. PLAINTIFFS CANNOT DEMONSTRATE THAT THE INSTANT ACTION IS ANYTHING MORE THAN A TYPICAL EMPLOYMENT DISPUTE

Plaintiffs have two particular problems in bearing their significant burden to demonstrate the existence of irreparable harm here. Either problem independently requires rejection of their application for a temporary restraining order.

**1.** It is well settled that, as a general matter, "termination of employment does not constitute irreparable injury because of the 'possibility that adequate compensatory or other corrective relief will be available at a later date.'" *Roe v. Shanahan,* 359 F. Supp. 3d 382, 419 (E.D. Va. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). As the Supreme Court observed in *Sampson*, absent a "genuinely extraordinary situation," the imminent loss of government employment "will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.* at 92 n.68. This is because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date," as is almost always the case in cases

23

challenging employment actions, "weighs heavily against a claim of irreparable harm." *Id.* at 90.

Following *Sampson*, courts have *repeatedly* held that emergency injunctive relief is not available to government employees seeking to challenge an employment action.  "[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 80 (D.D.C. 2006); *Price v. Howard Cnty. Pub. Sch. Sys.*, 2022 WL 21769772, at *3 (D. Md. June 17, 2022) (collecting cases within the Fourth Circuit); *see also, e.g.*, *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022) ("A permanent loss of employment, standing alone, does not equate to irreparable harm." (internal quotation omitted)); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021) (reversing and vacating grant of preliminary injunctive relief because "[i]t is well settled . . . that adverse employment consequences are not the type of harm that usually warrants injunctive relief").  Put simply, well-settled authority precludes federal employees from immediately coming to this Court seeking emergency injunctive relief whenever they are the subject of an adverse employment action.

Plaintiffs continue to maintain that their putative termination from CIA's employ because of their current placement in the agency's now-shuttered DIO office would create the same kind of stigma that would befall a military member who would have to disclose that he or she was discharged from service for being HIV-positive. Pl. Mem. at 16 (quoting *Roe v. Dep't of Defense*, 947 F.3d at 229-30).  Plaintiffs' forced analogy is flawed for several reasons.

*First*, as noted above, plaintiffs would *not* be required to disclose that they were terminated for being employed in CIA's now-shuttered DIO office; indeed, the agency *itself* would be prohibited from saying anything about the end of their employment *other* than that it was "pursuant

to statutory authority." AR 4-16 §  II(H).  Moreover, *any* termination of CIA employment by the D/CIA "shall not affect the right of the officer or employee to seek or accept employment" in the Government if declared eligible for such employment by OPM.  *See* 50 U.S.C. § 3036(e)(2). *Second*, plaintiffs cannot seriously maintain that their employment in the CIA's DIO office is akin to the type of stigma that attaches to an individual who is obligated to reveal that they are HIV-positive – a unique and long-stigmatized medical diagnosis. And *third*, acceptance of plaintiffs' attempt to shoehorn themselves into the *Roe* exception would ultimately swallow the rule – any federal employee dismissed for any reason (including poor performance, unlike the plaintiffs here) could make the same argument that revelation of their termination for such wrongdoing was stigmatic and thus would cause irreparable harm.  *See Sampson*, 415 U.S. at 64-65, 92 n.68 (rejecting request for immediate injunctive relief in case alleging wrongful termination from federal employment based on "complete unwillingness to follow office procedure and to accept direction from [] supervisors"); *see also id.* at 92 n.68 (expressing concern that courts reserve exceptions to the general rule of no irreparable harm for "genuinely extraordinary situation[s]"); *Rydie v. Biden*, 572 F. Supp. 3d 153, 161 (D. Md. 2021) (refusing to equate, for irreparable harm purposes, termination for failure to obtain the COVID-19 vaccine with "the sort of severe and improper stigma as those who disclose with HIV-positive status" in *Roe*), *vacated on other grounds*, 2022 WL 1153249 (4th Cir. Apr. 19, 2022).

**2.**     In addition, the facts do not support the conclusion that the *specific relief* that plaintiffs request in their instant motion is necessary to avoid irreparable harm as to either CIA or ODNI. As noted above, plaintiffs seek to stay their terminations, *TRO Mtn.* (Dkt. No. 6), at 1 (emphasis added).  But the plaintiffs' *actual involuntary termination* is not imminent.  At the very earliest – for those plaintiffs who choose termination from the myriad of options that the CIA and ODNI

have provided to impacted employees – Plaintiffs who are CIA employees will be terminated in approximately *ninety days*.    And during that lengthy period, plaintiffs will remain on administrative leave with full pay.  That is not imminent irreparable harm requiring extraordinary emergency relief from this Court.  And Plaintiffs' failure to show imminent irreparable harm is even more pronounced as to ODNI, where the two ODNI plaintiffs have been able to seek reconsideration of the DNI's decision.

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST BOTH FAVOR THE GOVERNMENT.

The final requirements for obtaining a temporary restraining order require a plaintiff to demonstrate that the balance of equities tips in his or her favor, and that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20, 22; *Dewhurst v. Century Aluminum Co.*, 649 F. 3d 287, 290 (4th Cir. 2011).  The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Neither the balance of the equities nor the public interest favors Plaintiff's request for preliminary relief.

Plaintiffs' requested relief here would harm the public interest.  Such an injunctive relief would constrain the D/CIA's and DNI's congressionally vested discretion to make personnel determinations when they deem such determinations in the interest of the United States, an authority that, the Supreme Court has acknowledged, is due "extraordinary deference." *Webster* 542 U.S. at 601.  What's more, denying temporary injunctive relief will not leave Plaintiffs without a remedy *if* they are able to plausibly allege and ultimately prove a constitutional violation.  If the Court determines that Plaintiffs have a viable claim with respect to their employment, it can award a host of injunctive relief to make Plaintiffs whole.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: February 20, 2025

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

_____/s/_____
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
REBECCA S. LEVENSON
Assistant United States Attorneys
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3891/3760
Fax:    (703) 299-3983
Email: dennis.barghaan@usdoj.gov
Rebecca.s.levenson@usdoj.gov
*Attorneys for Defendants*